JUDGE WOOD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     **SEALED INDICTMENT**

    - v. -                         :     18 CRIM 217

GORDON FREEDMAN,                   :
JEFFREY GOLDSTEIN,
TODD SCHLIFSTEIN,                  :
DIALECTI VOUDOURIS, and
ALEXANDRU BURDUCEA,                :

          Defendants.            :

- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 5 2017

## COUNT ONE
### (Conspiracy to Violate the Anti-Kickback Statute)

The Grand Jury charges:

#### OVERVIEW

1.   At all times relevant to this Indictment, GORDON
FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS,
and ALEXANDRU BURDUCEA, the defendants, engaged in a scheme in
which they accepted bribes and kickbacks in exchange for
prescribing a potent and highly addictive fentanyl-based spray
(the "Fentanyl Spray") manufactured by a pharmaceutical company
based in Arizona ("Pharma Company-1").

2.   In or about 2012, Pharma Company-1 established a
Speakers Bureau (the "Speakers Bureau") consisting of doctors
selected and compensated by Pharma Company-1 purportedly to



provide educational presentations regarding the Fentanyl Spray ("Speaker Programs").

3.   In truth and in fact, Pharma Company-1 selected and compensated Speakers not based on their qualifications as educators, but rather to induce them to prescribe large volumes of the Fentanyl Spray.

4.   Pharma Company-1 designated GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, as Speakers in Manhattan, New York, at more than 300 Speaker Programs from in or about November 2012 through in or about March 2016.  Speaker Programs were touted as educational events at which the Speaker educated other doctors regarding the Fentanyl Spray using a slide presentation provided by Pharma Company-1.  In reality, many of the Speaker Programs FREEDMAN, GOLDSTEIN, SCHLIFSTEIN, VOUDOURIS, and BURDUCEA conducted were merely social gatherings at high-end restaurants with no educational presentation whatsoever.  Many of the Speaker Programs led by FREEDMAN, GOLDSTEIN, SCHLIFSTEIN, VOUDOURIS, and BURDUCEA also lacked an appropriate audience of peer-level doctors with a professional reason to be educated about the Fentanyl Spray.

5.   As is described in further detail below, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, each annually received

tens of thousands of dollars -- and in some instances more than $100,000 -- in Speaker Program fees from Pharma Company-1. In return, they prescribed large volumes of the Fentanyl Spray.

<u>RELEVANT ENTITIES AND INDIVIDUALS</u>

6. At all times relevant to this Indictment, Pharma Company-1 manufactured, marketed, and sold the Fentanyl Spray.

7. At all times relevant to this Indictment, GORDON FREEDMAN, the defendant, was a doctor certified in pain management and anesthesiology, and was licensed to prescribe controlled substances by the U.S. Drug Enforcement Administration (the "DEA"). FREEDMAN worked as a doctor and owner of a private pain management office ("Medical Office-1") located on the Upper East Side of Manhattan, among other locations, and was an Associate Clinical Professor at a large hospital located in Manhattan ("Hospital-1").

8. At all times relevant to this Indictment, JEFFREY GOLDSTEIN, the defendant, was a doctor of osteopathic medicine, was certified in the area of emergency medicine, and was licensed to prescribe controlled substances by the DEA. GOLDSTEIN worked as a doctor and partner of a private medical office ("Medical Office-2") located on the Upper East Side of Manhattan.

9. At all times relevant to this Indictment, TODD SCHLIFSTEIN, the defendant, was certified in physical medicine and

rehabilitation, and was licensed to prescribe controlled substances by the DEA. SCHLIFSTEIN was an Attending Physiatrist at a large hospital located in Manhattan ("Hospital-2"), and a Consulting Physician at another large hospital located in Manhattan ("Hospital-3"). SCHLIFSTEIN worked as a doctor and partner at Medical Office-2 with JEFFREY GOLDSTEIN, the defendant.

10. At all times relevant to this Indictment, DIALECTI VOUDOURIS, the defendant, was a doctor specializing in oncology and hematology, and was licensed to prescribe controlled substances by the DEA. VOUDOURIS was an Assistant Clinical Professor at Hospital-1 and an Attending Physician at Hospital-3, and she worked as a doctor at a private medical office ("Medical Office-3") located on the Upper East Side of Manhattan.

11. At all times relevant to this Indictment, ALEXANDRU BURDUCEA, the defendant, was a doctor certified in pain management and anesthesiology, and was licensed to prescribe controlled substances by the DEA. BURDUCEA was an Assistant Professor of anesthesiology at Hospital-1, and practiced at an anesthesiology and pain management office in Manhattan that was associated with Hospital-1.

12. From in or about March 2013 through in or about December 2015, Jonathan Roper, a co-conspirator not named as a defendant herein, was employed by Pharma Company-1. From in or about March

4

2013 through in or about August 2013, Roper was a sales representative assigned to, among other doctors, GORDON FREEDMAN, JEFFREY GOLDSTEIN, and TODD SCHLIFSTEIN, the defendants. From in or about September 2013 through in or about June 2015, Roper was a District Sales Manager and supervised numerous sales representatives and a sales territory that included Manhattan. From in or about July 2015 through in or about December 2015, Roper was a Field Sales Director for the Northeast sales territory, which included Manhattan. While working at Pharma Company-1, Roper participated in a scheme to, among other things, pay bribes and kickbacks to doctors in order to induce them to prescribe the Fentanyl Spray.

13. From in or about September 2013 through in or about July 2015, Fernando Serrano, a co-conspirator not named as a defendant herein, was employed by Pharma Company-1 as a sales representative assigned at various points to, among other doctors, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, and DIALECTI VOUDOURIS, the defendants. While working at Pharma Company-1, Serrano participated in a scheme to, among other things, pay bribes and kickbacks to doctors in order to induce them to prescribe the Fentanyl Spray.

THE FENTANYL SPRAY

14.  The U.S. Food and Drug Administration (the "FDA") approved the Fentanyl Spray in or about January 2012 solely for the management of breakthrough pain in cancer patients (i.e., "breakthrough cancer pain") who were already receiving and tolerant to opioid therapy for their underlying persistent cancer pain.  The Fentanyl Spray label expressly warned against prescribing the drug to patients who were not already opioid tolerant, "[d]ue to the risk of fatal respiratory depression." The Fentanyl Spray is administered sublingually (i.e., underneath the tongue).  In or about March 2012, the Fentanyl Spray entered the commercial market.

15.  Fentanyl is a synthetic opioid that is classified as a Schedule II controlled substance under the Controlled Substances Act, meaning that it has a high potential for abuse.  Fentanyl is approximately 50 to 100 times more potent than morphine.

16.  At all times relevant to this Indictment, the Fentanyl Spray was in a category of drugs known as Transmucosal Immediate Release Fentanyl ("TIRF") products, which included other fentanyl-based rapid-onset opioids.  Because of the risk of misuse, abuse, and addiction associated with TIRF products, including the Fentanyl Spray, only practitioners who enrolled in a mandated FDA program known as the Transmucosal Immediate Release Fentanyl Risk

Evaluation and Mitigation Strategy program (the "TIRF REMS Program") and completed required training and testing were permitted to prescribe the Fentanyl Spray and other TIRF products for outpatient use. Only patients who had enrolled in the TIRF REMS Program could be prescribed TIRF products, including the Fentanyl Spray.

17. The Fentanyl Spray was sold in five dosage strengths, ranging from 100 micrograms to 1600 micrograms. The Fentanyl Spray label instructed that "[t]he initial dose of [the Fentanyl Spray] to treat episodes of breakthrough cancer pain is always 100 [micrograms]." A higher dose of the Fentanyl Spray was generally more expensive, and thus was more profitable for Pharma Company-1. Depending upon the dosage and number of units prescribed, a prescription for the Fentanyl Spray typically cost thousands of dollars each month.

18. GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, prescribed the Fentanyl Spray to patients who received reimbursement from both commercial health insurers and publicly funded insurance, including Medicare and Medicaid. Before agreeing to pay for a prescription, most insurers, including Medicare and Medicaid, required patients to obtain prior authorization from the insurer.

7

## SPEAKER PROGRAM POLICIES AND PROCEDURES

19.  Pharma Company-1, like many other pharmaceutical manufacturers, expressly adopted the Pharmaceutical Research and Manufacturers of America's Code on Interactions with Healthcare Professionals (the "PhRMA Code").  At all times relevant to this Indictment, the PhRMA Code provided, among other things, that employees of pharmaceutical manufacturers were prohibited from giving health care professionals items that served no educational purpose.  Under the PhRMA Code, pharmaceutical manufacturer employees had to document any meals or other items of value provided to health care professionals.  Furthermore, employees could not offer anything of value to a person intending to influence that person to recommend or purchase a product or service that might be reimbursed by the federal government.

20.  Under the PhRMA Code, entertainment or recreational benefits should not be offered to health care professionals "regardless of (1) the value of the items, (2) whether the company engages the healthcare professional as a speaker or consultant, or (3) whether the entertainment or recreation is secondary to an educational purpose."

21.  With respect to Speaker Programs, the PhRMA Code required pharmaceutical companies to "ensure that speaking arrangements [were] neither inducements nor rewards for

prescribing a particular medicine or course of treatment" and that "decisions regarding the selection or retention of healthcare professionals as speakers [were] based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills."

22.     Pharma Company-1 policies specified that spouses and other guests not in the health care field were not permitted to attend Speaker Programs.   Beginning in or about February 2014, Pharma Company-1 policies required at least two or more health care professionals in attendance at all Speaker Programs, and provided that Pharma Company-1 would cancel any Speaker Programs that had fewer than two confirmed attendees as of three business days before the event.

23.     Pharma Company-1 policies also required that all Speaker Programs occur at locations conducive to an educational presentation and limited the cost of meals provided at Speaker Programs to $125 per person.

24.     Pharma Company-1 policies required Pharma Company-1 sales representatives to collect and submit to Pharma Company-1 a sign-in sheet reflecting the names, signatures, and employment information for every Speaker Program attendee.

25.     Speakers selected by Pharma Company-1 were required to

participate in training, and these trainings covered, among other topics, Pharma Company-1 Speaker Program policies.

26.  Speakers selected by Pharma Company-1 -- including GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants -- entered into written agreements with Pharma Company-1 (the "Speaker Agreements"), which stated, among other things, that the "Speaker agrees to educate a selected target audience in venues consistent with industry and company policies" and that during Speaker Programs the Speaker would "present pre-approved program slides consistent with labels of [Pharma Company-1] products, therapeutic category, clinical best practices and/or disease state awareness."

27.  The Speaker Agreements required the Speakers to "continue to make all decisions regarding treatment, prescribing, administration, or dispensing (including prescribing, administering or dispensing [Pharma Company-1] products) solely in accordance with the independent judgment (including medical and clinical judgment, if applicable) of the Speaker," and provided that "such decisions shall not be affected by this Agreement, the payments made hereunder or the relationship created hereby."

28.  Practitioners selected to be Speakers by Pharma Company-1 were paid fees, also referred to as "honoraria," for each Speaker Program.  Pharma Company-1 classified Speakers into three

10

categories: local, regional, or national Speakers. National Speakers received the highest fees; local Speakers received the lowest fees.

## THE PHARMA COMPANY-1 BRIBERY AND KICKBACK SCHEME

29. While Pharma Company-1's Speakers Bureau was purportedly aimed at educating practitioners about the Fentanyl Spray, in truth and in fact, Pharma Company-1 used its Speaker Programs to induce a select group of practitioners, including GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, to prescribe large volumes of the Fentanyl Spray.

30. In or about March 2012, Pharma Company-1 began marketing the Fentanyl Spray for commercial sale. Pharma Company-1 quickly took steps to establish its Speakers Bureau and to select Speakers based not on their qualifications as educators, but rather on their potential to prescribe high volumes of the Fentanyl Spray. Pharma Company-1 executives instructed sales representatives to focus their time and resources on a few select doctors, often referred to as "top docs," and provide those doctors with lucrative Speaker Program fees, among other benefits, in exchange for prescribing large volumes of the Fentanyl Spray.

31. The Speakers Bureau launched in or about August 2012. Consistent with their strategy of using the Speakers Bureau to

11

obtain large volumes of Fentanyl Spray prescriptions from doctors selected as Speakers, Pharma Company-1 executives tracked and circulated statistics for each Speaker regarding, among other things, the number of prescriptions written for the Fentanyl Spray, the percentage of prescriptions written for the Fentanyl Spray versus its competitor drugs, the profit Pharma Company-1 earned from the Speaker's prescriptions, and the total Speaker Program fees paid. For a time, Pharma Company-1 calculated the ratio of return on investment ("ROI") for each Speaker by dividing the sales generated from the practitioner's prescriptions by the Speaker Program fees that practitioner was paid.

32. While Jonathan Roper was the District Sales Manager for the sales territory that included Manhattan from in or about September 2013 to in or about June 2015, he allocated Speaker Programs based on practitioners' prescribing practices and not on their qualifications or abilities as Speakers. Roper instructed sales representatives that Speaker Programs would be allocated only to doctors who prescribed large quantities of the Fentanyl Spray in return. For example:

a. On or about November 14, 2013, Roper sent an email to, among others, Manhattan-based sales representatives -- including the sales representatives assigned to GORDON FREEDMAN, JEFFREY GOLDSTEIN, and TODD SCHLIFSTEIN, the defendants --

12

stating, in part:  "Almost all of you have speakers, use that to your advantage and repeatedly inform them of one simple guideline for them to follow as [Pharma Company-1] speakers, NO SCRIPTS, NO PROGRAMS."

  b. On or about May 6, 2014, Roper sent an email to, among others, Manhattan-based sales representatives -- including the sales representative assigned to GOLDSTEIN and SCHLIFSTEIN -- stating, in part:

> Where is the ROI??!!!  All prescribers from this team that are on this list are [Pharma Company-1] speakers.  We invest a lot of time, $, blood, sweat, and tears on "our guys" and help spreading the word on treating [breakthrough cancer pain].  We hire only the best of the best to be apart [sic] of our speaker bureau and dropping script counts is what we get in return? .... Time for your main guys to step it up and give you the ROI you deserve.

> The most common question asked at the conclusion of a speaker program is alway[s], "doc, how many pts [patients] do you currently have on [the Fentanyl Spray]?"  Let['] s not even discuss what some of these prescribers answers may be but I will tell you right now, not enough!

> This is a slap in the face to all of you and is a good indication as to why NONE of you are climbing in the rankings this quarter.  DO NOT be afraid to set your expectations and make them crystal clear as to what they are before, during, and after HIRING these priviliged [sic] set of docs who are fortunate enough to be a part of the best speaker bureau in the market in the world of [breakthrough cancer pain].

13

> Please handle this immediately as funding will
> not be given out to anymore [sic] "let downs" in
> the future.  Thanks.
>
> $$$$

c. On or about January 28, 2015, Roper sent an email to, among others, Manhattan-based sales representatives -- including the sales representatives assigned to FREEDMAN, GOLDSTEIN, SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants -- stating, in part:

> The first month of Q1 is pretty much over and NONE
> of you are on pace to hit your baselines and/or
> growing them .... All of you have speakers so this
> should not be an issue.  If they are not giving
> their full support and business to you, I have NO
> PROBLEM getting rid of them and replacing with
> another speaker who truly supports our drug and
> helping pts suffering from [breakthrough cancer
> pain].

33.  In or about August 2014, Pharma Company-1 instituted a monitoring program purportedly to ensure that its Speaker Programs complied with Pharma Company-1 policies and procedures.  In truth and in fact, when an auditor from the monitoring program ("Monitor") planned to attend particular Speaker Programs, Pharma Company-1 informed sales representatives in advance, allowing the sales representatives to ensure that a proper audience would attend the Speaker Program and that the Speaker would conduct a compliant Speaker Program, including by using the preapproved slide presentation.

<u>THE DEFENDANTS' SHAM SPEAKER PROGRAMS</u>

34.  While  GORDON  FREEDMAN,  JEFFREY  GOLDSTEIN,  TODD
SCHLIFSTEIN,  DIALECTI  VOUDOURIS,  and  ALEXANDRU  BURDUCEA,  the
defendants,  were  compensated  by  Pharma  Company-1  purportedly  for
providing  educational  presentations  about  the  Fentanyl  Spray,  in
truth  and  in  fact,  many  of  the  Speaker  Programs  were  predominantly
social  affairs  with  no  educational  presentation  about  the  Fentanyl
Spray.   Many  of  these  Speaker  Programs  lacked  an  appropriate
audience  of  peer-level  practitioners  seeking  education  regarding
the  Fentanyl  Spray.   Instead,  the  Speaker  Programs  were  frequently
attended  by  Pharma  Company-1  employees,  practitioners  with  no
potential  to  prescribe  the  Fentanyl  Spray  given  their  medical
specialty,  others  with  no  professional  reason  to  attend  an
educational  presentation  regarding  the  Fentanyl  Spray,  and/or  the
friends  and  office  staff  of  the  Speaker.   For  example:

a. GOLDSTEIN  invited  his  accountant  to  a  Speaker  Program,
much  of  which  GOLDSTEIN  and  his  accountant  spent  discussing
GOLDSTEIN's  finances.

b. Attendees  at  VOUDOURIS's  Speaker  Programs  frequently
included  VOUDOURIS's  husband,  who  was  listed  on  sign-in  sheets  as
the  "practice  manager,"  "practice  administrator,"  and  "Chief
Operating  Officer,"  among  other  titles,  of  Medical  Office-3.

c. Attendees at SCHLIFSTEIN's Speaker Programs frequently included staff from Medical Office-2, as was apparent from SCHLIFSTEIN's social media postings. For example, on or about April 15, 2015, SCHLIFSTEIN posted to Instagram a photograph of himself and three individuals at a restaurant where he was purportedly leading an educational Speaker Program that same evening, alongside the caption "#dinner #friends #nyc #threepeesandatodd It isn't easy being me." Two of the individuals depicted in the Instagram photograph worked as staff at Medical Office-2 and were not listed as attendees on sign-in sheets for the Speaker Program.

35. Moreover, although each Speaker Program was supposed to include a presentation of an identical slide deck -- leaving no educational reason to attend Speaker Programs repeatedly -- many people attended numerous Speaker Programs led by GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants. For example:

a. From in or about April 2014 through in or about February 2015, the same doctor was listed as an attendee at approximately 23 of FREEDMAN's Speaker Programs.

b. From in or about June 2013 through in or about September 2014, a podiatrist who was close friends with GOLDSTEIN, and who had no medical basis to prescribe the Fentanyl Spray or

any other TIRF products, was listed as an attendee at approximately 10 of GOLDSTEIN's Speaker Programs.

c. From in or about December 2014 through in or about April 2015, the same doctor was listed as an attendee at approximately six of BURDUCEA's Speaker Programs.

36. Because many Speaker Programs frequently lacked the requisite number of two health care professionals and/or the restaurant bills for Speaker Programs frequently exceeded the $125 maximum per attendee, sign-in sheets for Speaker Programs were often forged and falsified with names and purported signatures of people who had not, in fact, attended. At times, Pharma Company-1 sales representatives added names and signatures of individuals to sign-in sheets without their permission. Many of the Speakers knew that sign-in sheets for their Speaker Programs were being forged and falsified, and certain Speakers participated in the forging and falsification of the sign-in sheets for their Speaker Programs. In particular:

a. GORDON FREEDMAN, the defendant, knew that sign-in sheets for his Speaker Programs were being forged and falsified. At times, FREEDMAN instructed his assigned sales representative, Serrano, to ask particular doctors, including those who worked at Medical Office-1, to sign sign-in sheets for Speaker Programs the doctors had not attended.

17

b. JEFFREY GOLDSTEIN, the defendant, at times helped forge and falsify sign-in sheets for his Speaker Programs, including by providing identifying information of health care professionals who had not been present at his Speaker Programs to be entered on sign-in sheets, without those individuals' authorization.

c. TODD SCHLIFSTEIN, the defendant, knew that sign-in sheets for his Speaker Programs were being forged and falsified. At times, SCHLIFSTEIN instructed his assigned sales representative to have employees from Medical Office-2 sign sign-in sheets for Speaker Programs they had not attended.

d. DIALECTI VOUDOURIS, the defendant, at times helped forge and falsify sign-in sheets, including by providing identifying information of health care professionals who had not been present at her Speaker Programs to be entered on sign-in sheets, without those individuals' authorization.

37. At times, Speakers did not even stay for their own Speaker Programs. For example:

a. JEFFREY GOLDSTEIN, the defendant, at times, did not even stay for a meal during his own Speaker Programs, and instead would order takeout at the restaurant and leave. Before a Speaker Program on or about September 1, 2014, GOLDSTEIN sent a text

message to his sales representative at the time ("CW-1"), stating, "Is dinner take out or we expecting peeps?"

b. On one occasion, after GORDON FREEDMAN, the defendant, arrived at the restaurant where a supposed Speaker Program was to occur and realized that no other attendees would be coming, FREEDMAN sent a text message to his sales representative, Fernando Serrano, stating, "Fernando, going home. Get two dinners to take out so that you have a receipt for your company. I'll catch you next time."

38. Speakers typically did not conduct a presentation using the preapproved slide deck during the Speaker Programs. On occasions when a Monitor was present, however, the Speakers used the slide deck and gave a formal educational presentation. For example, in or about September 2014, CW-1, who was the Pharma Company-1 sales representative assigned to TODD SCHLIFSTEIN, the defendant, learned that a Monitor would attend SCHLIFSTEIN's next Speaker Program. CW-1, having attended many of the more than 20 Speaker Programs SCHLIFSTEIN had conducted in prior months, worried that SCHLIFSTEIN would not know how to conduct a compliant and educational Speaker Program in the Monitor's presence. Accordingly, CW-1 sent SCHLIFSTEIN text messages in advance of the Speaker Program reminding him of certain basic requirements, such as the need to focus his remarks on "on label" uses of the Fentanyl

Spray and the need "to say that you are getting paid by [Pharma Company-1] and this is a non credited educational program."

39.   At   times,   the   Speaker   Programs   involved   excessive alcohol and/or drug use and were purely social affairs.   For example:

      a. During multiple Speaker Programs, JEFFREY GOLDSTEIN, the   defendant,   was   intoxicated   from   alcohol   or   drug   use. GOLDSTEIN   used   marijuana   with   Pharma   Company-1   employees   at Medical Office-2 before some Speaker Programs he led, and he used cocaine in the restaurant bathroom during others.

      b. TODD SCHLIFSTEIN, the defendant, consumed excessive amounts of alcohol at some of his own Speaker Programs, causing him to slur his words.

<u>FREEDMAN'S PARTICIPATION IN THE SCHEME</u>

40.   From in or about August 2012 up to and including in or about   June   2015,   GORDON   FREEDMAN,   the   defendant,   served   as   a Speaker for Pharma Company-1 and received approximately $308,600 in   fees   for   conducting   Speaker   Programs,   many   of   which   were predominantly social affairs involving no educational presentation about the Fentanyl Spray.   FREEDMAN received Speaker Program fees from Pharma Company-1 not in exchange for providing a legitimate educational service, but rather in exchange for prescribing large volumes of the Fentanyl Spray.

FREEDMAN's Initial Interactions with Pharma Company-1 and Early
Fentanyl Spray Prescribing Practices

41.  As noted above, the FDA approved the Fentanyl Spray in
or about January 2012, and the Fentanyl Spray entered the market
in or about March 2012.  In or about February 2012, GORDON
FREEDMAN, the defendant, entered into a consulting agreement with
Pharma Company-1.  The agreement required FREEDMAN to attend and
participate in a Pharma Company-1 consultant meeting in Florida in
or about March 2012, where he was to, among other things, provide
"insight and consultation on the clinical profile, utility, and
commercialization needs of [the Fentanyl Spray] in opioid-tolerant
patients with [breakthrough cancer pain]."   In exchange for
FREEDMAN's participation in the consultant meeting, Pharma
Company-1 paid FREEDMAN $1,500 in addition to his travel and
lodging expenses.  At the March 2012 consultant meeting, Pharma
Company-1 presented detailed information regarding the Fentanyl
Spray.

42.  Following the March 2012 consultant meeting, Pharma
Company-1's Vice President of Marketing ("VP-1") emailed GORDON
FREEDMAN, the defendant.  In the email, VP-1 thanked FREEDMAN for
his participation and told FREEDMAN to let VP-1 know "if you are
interested in joining the speaker bureau."   FREEDMAN responded,
in part, "I would love to get involved with the Speakers Bureau
when it is set up.  We'll be in touch.  Thanks again."

21

43. On or about August 15, 2012, GORDON FREEDMAN, the defendant, entered into a Speaker Agreement with Pharma Company-1. FREEDMAN was initially classified as a Regional Speaker and promised a fee of $1,600 per Speaker Program.

44. In the initial months after the Fentanyl Spray was released in or about March 2012, GORDON FREEDMAN, the defendant, prescribed only a small amount of the Fentanyl Spray, despite having participated in the Pharma Company-1 consulting meeting in or about March 2012, and having been educated regarding the Fentanyl Spray. From in or about March 2012 through on or about November 13, 2012 -- the date of FREEDMAN's first Pharma Company-1 Speaker Program -- FREEDMAN prescribed the Fentanyl Spray to only approximately one patient and wrote a total of only approximately four Fentanyl Spray prescriptions.

45. In or about September 2012, GORDON FREEDMAN, the defendant, emailed Pharma Company-1's Northeast Regional Sales Manager ("RSM-1"), who was responsible for the sales territory that included Manhattan, expressing an interest in setting up Speaker Programs in the coming months, and telling RSM-1 that FREEDMAN had recently written another prescription for the Fentanyl Spray.

46. From on or about November 14, 2012, through in or about February 2013, GORDON FREEDMAN, the defendant, served as the

Speaker at approximately six Speaker Programs, for which he was paid Speaker Program fees of approximately $9,600. During that same period, FREEDMAN prescribed the Fentanyl Spray to approximately two additional patients.

FREEDMAN Is Allocated Additional Speaker Programs and Increased Fees, and Prescribes Substantially Larger Volumes of the Fentanyl Spray

47.   In or about March 2013, Pharma Company-1 began to allocate additional Speaker Programs to GORDON FREEDMAN, the defendant, and increased the fee that FREEDMAN earned for each Speaker Program. As a result, FREEDMAN's prescriptions of the Fentanyl Spray began to rise dramatically.

48.   On or about February 22, 2013, the Pharma Company-1 Regional Sales Manager assigned at that time to the sales territory that included Manhattan ("RSM-2") asked GORDON FREEDMAN, the defendant, to send RSM-2 dates in April 2013 when FREEDMAN would be available to conduct Speaker Programs. FREEDMAN sent RSM-2 a list of available dates, and further informed RSM-2 that FREEDMAN had spoken with a new potential Fentanyl Spray patient who FREEDMAN stated "also could be hundreds of units."

49.   On or about February 25, 2013, RSM-2 informed GORDON FREEDMAN, the defendant, via email that "NO other docs" whatsoever would be attending a Speaker Program FREEDMAN was scheduled to conduct the following evening. Instead, RSM-2 explained, Pharma

Company-1's Vice President of Sales ("VP-2") and "two other 'attractive' area sales reps" would be attending. RSM-2 further wrote that it would be a "[f]un night!" with "[s]ea bass on the menu!" The following evening, on or about February 26, 2013, FREEDMAN was the designated Speaker at a Speaker Program, for which he was paid a fee of approximately $1,600. On or about February 28, 2013, RSM-2 informed GORDON FREEDMAN, the defendant, that RSM-2 "got the official approval going forward for the promotion to national speaker status as we discussed for future programs." Accordingly, effective on or about March 1, 2013, FREEDMAN's fee for each Speaker Program increased from $1,600 to $2,400.

50. After RSM-2 submitted the request to designate GORDON FREEDMAN, the defendant, a national speaker and increase his Speaker Program fee, RSM-1 emailed RSM-2, stating, in part, "cool. you're increasing his [fee]. nice." RSM-2 responded, "Need bigger bait to catch the bigger fish."

51. On or about March 29, 2013, RSM-2 informed GORDON FREEDMAN, the defendant, by email that Pharma Company-1 was increasing the number of Speaker Programs allocated to FREEDMAN for the second quarter of 2013, and that FREEDMAN was scheduled to conduct approximately 11 Speaker Programs in April and May alone. RSM-2 explained that FREEDMAN had been allocated additional Speaker Programs because Pharma Company-1 wanted prescriptions of

the Fentanyl Spray to increase in the second quarter of 2013, stating, in part:

> FYI the reason I was able to grab the extra budget allocation is they wanted us to push for a QUICK start in April with new activations for "Executive Board" reasons in Q2. So please do continue looking in that direction. I don't care if ultimately a few of those are not able to get approved and we wind up using the guarantee. Really!

> Like I said I'd rather you put 20 (or more, of course, LOL) new patients (commercially insured of course, as always) on it in April and even if we wind up only getting 10-14 approved, rather than only have you go with the safe 6-7 that you think will all get approved. It is still a winning proposition. THANKS! See you next week!

52. GORDON FREEDMAN, the defendant, responded to the above-referenced email, in part, "Got it," and he confirmed the dates of the upcoming Speaker Programs.

53. From on or about March 1, 2013, through on or about May 30, 2013, GORDON FREEDMAN, the defendant, was the Speaker at approximately 14 Speaker Programs, for which he received approximately $2,400 per Speaker Program, for a total of approximately $33,600. During that same period, FREEDMAN's prescriptions of the Fentanyl Spray rose markedly. Whereas FREEDMAN had prescribed the Fentanyl Spray to only approximately three patients from in or about March 2012 through in or about February 2013, he prescribed the Fentanyl Spray to approximately 16 new patients from on or about March 1, 2013, through on or about

May 30, 2013. And whereas FREEDMAN had prescribed a total of approximately 1,974,000 micrograms of the Fentanyl Spray from January through March 2013, he prescribed approximately 5,892,000 micrograms of the Fentanyl Spray from April through June 2013.

54. It was widely known among Pharma Company-1 employees that the Speaker Programs of GORDON FREEDMAN, the defendant, were held not to educate other doctors, but rather to ensure that FREEDMAN received his lucrative Speaker Program fees on a regular basis and prescribed high volumes of the Fentanyl Spray. In or about July 2013, a Pharma Company-1 sales representative sent the Pharma Company-1 Founder and Chairman of the Board of Directors an email stating, in part, "Dr. Freedman ... getting $2500 a pop to eat at fancy steakhouses in NYC often (every week if I had to guess) .......so not right!! ... I don't even think anyone goes to his 'programs' ...."

55. In 2013, Pharma Company-1 paid GORDON FREEDMAN, the defendant, a total of approximately $88,800 in Speaker Program fees.

<u>FREEDMAN Is the Highest-Paid Pharma Company-1 Speaker in 2014,<br>and Continues to Increase His Fentanyl Spray Prescriptions</u>

56. On or about March 24, 2014, GORDON FREEDMAN, the defendant, entered into a Speaker Agreement with Pharma Company-1 under which FREEDMAN's fee increased to $3,000 per Speaker Program. In or about 2014, FREEDMAN was the designated Speaker at

26

approximately 50 Speaker Programs, and received total Speaker Program fees of approximately $143,000, making him the highest-paid Pharma Company-1 Speaker in the nation for that year.

57.   During 2014, the prescriptions of the Fentanyl Spray written by GORDON FREEDMAN, the defendant, continued to increase. Whereas FREEDMAN had prescribed approximately 8,988,000 micrograms of the Fentanyl Spray during the last quarter of 2013, he prescribed approximately 14,228,400 micrograms of the Fentanyl Spray during the first quarter of 2014.   During the fourth quarter of 2014, FREEDMAN's prescriptions of the Fentanyl Spray rose even further, to approximately 26,992,800 micrograms.   By the end of the fourth quarter of 2014, FREEDMAN was approximately the fourth-highest prescriber of the Fentanyl Spray nationally, accounting for approximately $1,132,287 in overall net sales of the Fentanyl Spray for that quarter.

<u>Pharma Company-1 Provides Other Benefits to FREEDMAN in Addition to Lucrative Speaker Program Fees</u>

58.   In addition to providing GORDON FREEDMAN, the defendant, with hundreds of thousands of dollars in Speaker Program fees, Pharma Company-1 and its employees provided FREEDMAN with additional benefits, none of which were educational in any respect. These benefits included, among other things, tickets to sporting events and regular free meals for FREEDMAN and his office staff. It was understood that tickets were provided to FREEDMAN as another

incentive for him to prescribe the Fentanyl Spray.

59.   For example, after purchasing hockey tickets for GORDON FREEDMAN, the defendant, on or about January 29, 2014, Jonathan Roper forwarded a copy of the receipt for the tickets to his Regional Sales Director ("RSD-1") and stated, in part, "Freedo [FREEDMAN] deserves this one though.   Turned down 10k to go to Atlanta from [the maker of a competing fentanyl product] and has not written a single script for them!!"

### FREEDMAN Ceases Speaking for Pharma Company-1, and His Fentanyl Spray Prescriptions Decline

60.   In or about the first half of 2015, GORDON FREEDMAN, the defendant, continued to conduct Pharma Company-1 Speaker Programs on a regular basis and remained one of the top prescribers of the Fentanyl Spray nationally.

61.   In or about July 2015, a website published an investigative article (the "July 2015 Article") about Pharma Company-1 and its Speakers Bureau.   The July 2015 Article discussed, among other things, the value of the Speaker Program fees GORDON FREEDMAN, the defendant, had received from Pharma Company-1, and the large volume of Fentanyl Spray prescriptions that FREEDMAN had written.   FREEDMAN ceased conducting Speaker Programs for Pharma Company-1 following the July 2015 Article's publication.

62.   GORDON FREEDMAN, the defendant, conducted his last

Pharma Company-1 Speaker Program on or about June 30, 2015. Following that event, FREEDMAN's prescriptions of the Fentanyl Spray began to decline. Whereas FREEDMAN had prescribed approximately 7,795,200 micrograms of the Fentanyl Spray in June 2015, he prescribed approximately 5,539,200 micrograms of the Fentanyl Spray in July 2015 and approximately 4,380,000 micrograms of the Fentanyl Spray in December 2015.

<u>GOLDSTEIN'S PARTICIPATION IN THE SCHEME</u>

63. From in or about June 2013 up to and including in or about December 2015, JEFFREY GOLDSTEIN, the defendant, served as a Speaker for Pharma Company-1 and received approximately $196,000 in fees for conducting Speaker Programs, many of which were predominantly social affairs involving no educational presentation about the Fentanyl Spray. GOLDSTEIN received Speaker Program fees from Pharma Company-1 not in exchange for providing a legitimate educational service, but rather in exchange for prescribing large volumes of the Fentanyl Spray.

<u>GOLDSTEIN Prescribes the Fentanyl Spray to Become a Speaker</u>

64. On or about March 27, 2013, JEFFREY GOLDSTEIN, the defendant, attended a Speaker Program led by GORDON FREEDMAN, the defendant, and also attended by, among others, RSM-2 and Jonathan Roper, who recently had been hired as a sales representative in Manhattan. Following the Speaker Program, Roper began regularly

visiting GOLDSTEIN's office.   Soon thereafter, Roper raised the possibility of nominating GOLDSTEIN to the Speakers Bureau. GOLDSTEIN quickly showed an interest in becoming a Speaker.

65.   Before on or about March 28, 2013, JEFFREY GOLDSTEIN, the defendant, prescribed the Fentanyl Spray to only approximately one patient.   From on or about March 28, 2013, through on or about April 2, 2013, GOLDSTEIN prescribed the Fentanyl Spray to approximately six new patients.

66.   On or about April 12, 2013, Roper nominated JEFFREY GOLDSTEIN, the defendant, as a Speaker.   RSM-2 noted in an email to Pharma Company-1 executives, including VP-2, that he supported GOLDSTEIN's nomination because GOLDSTEIN had "~10 scripts written in the last two weeks."   VP-2 then put GOLDSTEIN's nomination on hold because, according to VP-2, RSM-2's email had explicitly "correlate[ed] script data with this nomination."   Nevertheless, GOLDSTEIN was quickly re-nominated, and he signed a Speaker Agreement with Pharma Company-1 in or about May 2013.   Under GOLDSTEIN's agreement, GOLDSTEIN was initially classified as a local Speaker and promised a fee of $1,000 per Speaker Program.

67.   After JEFFREY GOLDSTEIN, the defendant, was nominated as a Speaker, his prescriptions of the Fentanyl Spray rose markedly. GOLDSTEIN, who had written a total of approximately eight Fentanyl Spray prescriptions before in or about April 2013, prescribed the

Fentanyl Spray approximately 97 times from in or about April 2013 through in or about September 2013. During that same period, GOLDSTEIN conducted approximately 12 Speaker Programs, for which he was paid total fees of approximately $12,000.

<u>GOLDSTEIN's Speaker Program Fee Increases and His Prescriptions<br>of the Fentanyl Spray Increase</u>

68. From on or about October 17, 2013, until on or about October 20, 2013, JEFFREY GOLDSTEIN, the defendant, attended Pharma Company-1's Speaker Program training in Arizona. During that visit, GOLDSTEIN met with, among others, RSD-1.

69. On or about October 19, 2013, JEFFREY GOLDSTEIN, the defendant, entered into a new Speaker Agreement with Pharma Company-1 that increased GOLDSTEIN's fee per Speaker Program from $1,000 to $1,600.

70. On or about October 23, 2013, shortly after JEFFREY GOLDSTEIN, the defendant, left Arizona, RSD-1 emailed VP-2, stating, in part, "After meeting with Dr. Goldstein this past week, I decided to switch him with [another doctor] on my list of top 5 targets. I am confident that we will gain additional business from him after this week." During the week immediately following GOLDSTEIN's trip to Arizona and increase in his Speaker Program fee, GOLDSTEIN prescribed the Fentanyl Spray to approximately three new patients.

71. The Fentanyl Spray prescriptions written by JEFFREY

31

GOLDSTEIN, the defendant, increased considerably from the third quarter to the fourth quarter of 2013. Whereas GOLDSTEIN had written approximately 54 Fentanyl Spray prescriptions from in or about July 2013 through in or about September 2013, he wrote approximately 85 Fentanyl Spray prescriptions from in or about October 2013 through in or about December 2013. During those latter three months, GOLDSTEIN was the designated Speaker at approximately eight Speaker Programs, for which he received approximately $11,000 in Speaker Program fees.

### Pharma Company-1 Provides Other Items of Value to GOLDSTEIN to Induce Him to Prescribe

72. In addition to paying JEFFREY GOLDSTEIN, the defendant, lucrative Speaker Program fees, Pharma Company-1 paid numerous other expenses for GOLDSTEIN in order to induce him to prescribe higher volumes of the Fentanyl Spray. Those expenses included, among other things, payments for the following events, none of which were educational in any respect:

a. Jonathan Roper used VP-2's Pharma Company-1 credit card to pay a bill of approximately $595.74 for a dinner for Roper, GOLDSTEIN, and their respective wives at a casino in Connecticut on or about May 27, 2013, and a bill of approximately $592.75 for a dinner for Roper and GOLDSTEIN at a casino in Atlantic City, New Jersey, on or about June 15, 2013.

b. Pharma Company-1 paid for multiple nightclub outings

32

for GOLDSTEIN.   For example, on or about July 24, 2013, Roper took GOLDSTEIN to a nightclub and used RSM-2's Pharma Company-1 credit card to pay the bill, which totaled approximately $2,000.

c. On or about November 19, 2013, VP-2 traveled to Manhattan and had dinner with, among others, GOLDSTEIN and Roper. During the dinner, VP-2 offered to pay for an upcoming Christmas party GOLDSTEIN was hosting at a restaurant in Manhattan for the staff of Medical Office-2.   GOLDSTEIN accepted the offer, and the cost of the party, which amounted to approximately $2,095.51, was later charged to VP-2's Pharma Company-1 credit card.

73.   JEFFREY GOLDSTEIN, the defendant, expected one Pharma Company-1 sales representative who was assigned to him, CW-1, to spend the vast majority of CW-1's time at Medical Office-2.   CW-1 frequently assisted the office staff with obtaining prior authorization for Fentanyl Spray prescriptions written by GOLDSTEIN and TODD SCHLIFSTEIN, the defendant.   CW-1 also regularly provided lunch for GOLDSTEIN, SCHLIFSTEIN, and their office staff.

74.   While working at Medical Office-2, CW-1 was provided with a passcode that granted CW-1 access to the Medical Office-2's electronic medical files.   JEFFREY GOLDSTEIN and TODD SCHLIFSTEIN, the defendants, were aware that CW-1 had access to the files.   Many of the patients whose medical files CW-1 accessed

33

had never signed a waiver permitting disclosure of their medical information to Pharma Company-1 and its employees.

### GOLDSTEIN Switches Patients from a Competitor TIRF Product at the Request of Pharma Company-1

75. In or about January and February 2014, VP-2 and another Pharma Company-1 Regional Sales Director ("RSD-2") complained to others at Pharma Company-1 that JEFFREY GOLDSTEIN, the defendant, was prescribing a competitor TIRF product ("TIRF Product-1") to too many patients. In response, Roper told GOLDSTEIN, in substance and in part, that Pharma Company-1 senior management had complained about GOLDSTEIN's TIRF Product-1 prescriptions, and asked GOLDSTEIN to stop prescribing TIRF Product-1 and switch patients to whom he had prescribed TIRF Product-1 to the Fentanyl Spray. Following this conversation, Roper sent a text message to RSD-2 on or about January 29, 2014, which stated, in part:

> Goldy went to collect a check as he just had his
> 3rd kid, first with his gf so he needs $$, assured
> me all [TIRF Product-1] pts will be switched back
> to [the Fentanyl Spray]

76. In addition, on or about February 7, 2014, CW-1 forwarded JEFFREY GOLDSTEIN, the defendant, an internal Pharma Company-1 email listing doctors -- including GOLDSTEIN -- who had prescribed TIRF Product-1 during the week of January 31, 2014. CW-1, who was GOLDSTEIN's sales representative at the time, wrote to GOLDSTEIN, in part, that CW-1 and GOLDSTEIN were "both black sheep" as a

result of GOLDSTEIN's name appearing on the list of TIRF Product-1 prescribers.

77.  As a result of this pressure from Pharma Company-1, JEFFREY GOLDSTEIN, the defendant, switched multiple patients from TIRF Product-1 to the Fentanyl Spray.  From on or about January 30, 2014, through on or about February 12, 2014, GOLDSTEIN prescribed the Fentanyl Spray to approximately four patients to whom he had recently prescribed TIRF Product-1.  Whereas GOLDSTEIN had prescribed TIRF Product-1 approximately 11 times in December 2013, he prescribed TIRF Product-1 only approximately five times in January 2014, approximately five times in February 2014, and approximately twice in March 2014.

78.  On or about March 21, 2014, JEFFREY GOLDSTEIN, the defendant, entered into a Speaker Agreement with Pharma Company-1 under which GOLDSTEIN's fee increased to $2,200 per Speaker Program.

79.  From January through March 2014, the prescriptions of the Fentanyl Spray written by JEFFREY GOLDSTEIN, the defendant, rose relative to the prior quarter, as did GOLDSTEIN's Speaker Program fees.  During the first quarter of 2014, GOLDSTEIN was the designated Speaker at approximately 11 Speaker Programs, for which he received approximately $18,200 in Speaker Program fees.  In addition, whereas GOLDSTEIN had prescribed approximately 5,533,000

micrograms of the Fentanyl Spray from October through December 2013, he prescribed approximately 8,027,000 micrograms of the Fentanyl Spray from January through March 2014.

GOLDSTEIN Threatens to Stop Prescribing the Fentanyl Spray, but Relents After Pharma Company-1 Provides More Speaker Programs

80.  On or about March 28, 2014, JEFFREY GOLDSTEIN, the defendant, emailed Roper a copy of a consulting agreement GOLDSTEIN had entered into with the manufacturer of TIRF Product-1 ("TIRF Manufacturer-1").  Roper forwarded the email to VP-2.

81.  On or about April 3, 2014, VP-2 sent JEFFREY GOLDSTEIN, the defendant, a series of text messages informing him, among other things, that VP-2 had learned about GOLDSTEIN's agreement with TIRF Manufacturer-1, that Pharma Company-1 was in "full litigation/bulldozer mode with these thieves," and that VP-2 would "take down every single physician associated with [TIRF Manufacturer-1]."  GOLDSTEIN responded, in part, "my belief has always been that [the Fentanyl Spray] is the best," but he added, "take the dinners, I can[']t be bought but you lost an asset for your company because your [sic] an ass."  VP-2 replied, in part: "[W]e work on loyalty here pal ... we don't buy business or doctors, it's sad that you even think that way.  If our measly couple hundred grand can buy you...."  GOLDSTEIN responded, in part, that he would "no longer be speaking or writing any ... TIRF drug companies medications," including TIRF Product-1 and the

Fentanyl Spray, and that if "patients want to stay on I will try to direct them to a doctor who's prescribing if they want to stay on the medication."

82.  Despite claiming that he would "no longer be speaking or writing" any TIRF products, JEFFREY GOLDSTEIN, the defendant, quickly reached out to a Pharma Company-1 Marketing Director ("Marketing Director-1") to inform Marketing Director-1 that VP-2 had "fired" GOLDSTEIN.  In response, and in an effort to maintain GOLDSTEIN's high volume of Fentanyl Spray prescriptions, Pharma Company-1 allocated even more Speaker Programs to GOLDSTEIN in the months that followed.  From April through September 2014, Pharma Company-1 allocated approximately 29 Speaker Programs to GOLDSTEIN, for which he received approximately $63,800 in fees as a result.  During that same period, GOLDSTEIN continued to prescribe large volumes of the Fentanyl Spray.

83.  In addition, following his hostile communications with VP-2, including the text messages described above, JEFFREY GOLDSTEIN, the defendant, pressured Pharma Company-1 to reimburse him for a home security system he claimed to have purchased because he feared VP-2.  On or about April 10, 2014, GOLDSTEIN emailed Roper a purported invoice for installation of a security system in the amount of $9,800.  On or about May 15, 2014, Pharma Company-1 sent GOLDSTEIN a check for $9,800.  In fact, however, the invoice

GOLDSTEIN provided to Pharma Company-1 was fraudulent, and the company listed on the invoice did not sell home security systems.

84.   In the last quarter of 2014, the prescriptions of the Fentanyl Spray written by JEFFREY GOLDSTEIN, the defendant, continued to rise. From October through December 2014, GOLDSTEIN prescribed approximately 11,662,000 micrograms of the Fentanyl Spray, an increase from the prior quarter of almost 2.5 million micrograms.

85.   For 2014, JEFFREY GOLDSTEIN, the defendant, was approximately the fifth-highest-paid Speaker by Pharma Company-1 nationally, receiving total Speaker Program fees of approximately $110,600. By the end of the fourth quarter of 2014, GOLDSTEIN was approximately the sixth-highest prescriber of the Fentanyl Spray nationally, accounting for approximately $809,275 in overall net sales of the Fentanyl Spray for that quarter.

GOLDSTEIN's Prescriptions of the Fentanyl Spray Decline

86.   In or about the first half of 2015, amid reports that Pharma Company-1 was being investigated regarding, among other things, its Speakers Bureau, JEFFREY GOLDSTEIN, the defendant, grew concerned that the sham nature of his Speaker Programs might be exposed. As a result, GOLDSTEIN instructed his sales representative at the time ("CW-2") to place an iPad on the table at GOLDSTEIN's Speaker Programs in order to create the false

appearance that GOLDSTEIN was using the iPad to present slides and that the Speaker Program was a legitimate educational event.   In reality, the iPad was nothing more than a prop.

87.   Beginning in or about the third quarter of 2015, Pharma Company-1 significantly decreased the number of Speaker Programs it hosted nationally, including the Speaker Programs of JEFFREY GOLDSTEIN, the defendant.   Whereas Pharma Company-1 had allocated GOLDSTEIN approximately 11 Speaker Programs and paid him fees of approximately $24,200 in the second quarter of 2015, it allocated GOLDSTEIN only one Speaker Program and paid him fees of approximately $3,700 in the third quarter of 2015.   During the same period, GOLDSTEIN's prescriptions of the Fentanyl Spray declined, as well, from approximately 91 Fentanyl Spray prescriptions in the second quarter of 2015 to approximately 64 prescriptions in the third quarter of 2015.

88.   After on or about December 2015, JEFFREY GOLDSTEIN, the defendant, was not allocated any Speaker Programs, and his Fentanyl Spray prescriptions continued to decline.   GOLDSTEIN wrote approximately 37 Fentanyl Spray prescriptions during the first quarter of 2016, and approximately seven Fentanyl Spray prescriptions during the last quarter of 2016.

SCHLIFSTEIN'S PARTICIPATION IN THE SCHEME

89.     From in or about March 2014 up to and including in or
about September 2015, TODD SCHLIFSTEIN, the defendant, served as
a Speaker for Pharma Company-1 and received approximately $127,100
in fees for conducting Speaker Programs, many of which were
predominantly social affairs involving no educational presentation
about the Fentanyl Spray.  SCHLIFSTEIN received Speaker Program
fees from Pharma Company-1 not in exchange for providing a
legitimate educational service, but rather in exchange for
prescribing large volumes of the Fentanyl Spray.

SCHLIFSTEIN Prescribes the Fentanyl Spray in Exchange for
Speaker Programs

90.     From in or about July 2013 through in or about October
2013, TODD SCHLIFSTEIN, the defendant, attended multiple Speaker
Programs at which his partner from Medical Office-2, JEFFREY
GOLDSTEIN, the defendant, was the designated Speaker.

91.     In or about October 2013, TODD SCHLIFSTEIN, the
defendant, expressed an interest in becoming a Speaker to, among
others, Fernando Serrano, who was SCHLIFSTEIN's assigned sales
representative at the time.

92.     In or about September 2013, RSD-1 asked Jonathan Roper
to send RSD-1 a list of "current doctors that you already
established relationships [with] and you believe I could gain
additional business from" in order for RSD-1 to plan RSD-1's

upcoming travel schedule.  Roper responded with three names: GORDON FREEDMAN, JEFFREY GOLDSTEIN, and TODD SCHLIFSTEIN, the defendants.  In or about October 2013, RSD-1 arranged to meet with SCHLIFSTEIN and GOLDSTEIN in Manhattan later that month.

93.  On or about October 29, 2013, TODD SCHLIFSTEIN, the defendant, RSD-1, and others met at a Speaker Program led by JEFFREY GOLDSTEIN, the defendant.  During the Speaker Program, GOLDSTEIN did not present the slide presentation regarding the Fentanyl Spray.  Following the event, GOLDSTEIN, SCHLIFSTEIN, Roper, Serrano, and RSD-1, among others, went to a strip club in Manhattan, where the group spent approximately $4,100 on, among other expenses, a private room, alcoholic drinks, and "lap dances" for SCHLIFSTEIN and GOLDSTEIN.  Pharma Company-1 paid the strip-club bill.

94.  Following that evening, RSD-1 informed Serrano that TODD SCHLIFSTEIN, the defendant, had agreed to give Pharma Company-1 a list of patients to whom SCHLIFSTEIN would prescribe the Fentanyl Spray.  Shortly after, SCHLIFSTEIN and Serrano met in SCHLIFSTEIN's office at Medical Office-2.  SCHLIFSTEIN looked through his calendar of upcoming appointments and identified specific patients to whom he said he would prescribe the Fentanyl Spray.  Serrano wrote down the patients' names and the dates of their scheduled appointments.

41

95.   On  or  about  November  18,  2013,  Pharma  Company-1
nominated TODD SCHLIFSTEIN, the defendant, to become a Speaker.
On or about February 3, 2014, SCHLIFSTEIN entered into a Speaker
Agreement with Pharma Company-1.  The Speaker Agreement promised
SCHLIFSTEIN a fee of $2,400 per Speaker Program.  On or about
March 7, 2014, SCHLIFSTEIN led his first Speaker Program.  Soon
after, on or about April 7, 2014, SCHLIFSTEIN entered into a new
Speaker Agreement with Pharma Company-1 under which SCHLIFSTEIN's
fee increased to $3,000 per Speaker Program.

96.   Whereas TODD SCHLIFSTEIN, the defendant, had prescribed
the Fentanyl Spray to approximately nine of his own patients from
in or about March 2012 (when the Fentanyl Spray was introduced to
the market) through in or about October 2013, he prescribed the
Fentanyl Spray to approximately eight new patients in the month
following his strip-club outing and meeting with RSD-1.  From in
or  about  December  2013  up  to  and  including  the  date  of
SCHLIFSTEIN's first Speaker Program on or about March 7, 2014,
SCHLIFSTEIN placed approximately an additional nine patients on
the Fentanyl Spray.

97.   In  or  about  November  and  December  2013,  TODD
SCHLIFSTEIN, the defendant, took steps to demonstrate to Pharma
Company-1 that he was responsible for a high volume of Fentanyl
Spray prescriptions.  For example, SCHLIFSTEIN informed RSD-1, in

substance and in part, that prescriptions of the Fentanyl Spray written by a physician assistant at Medical Office-2 ("PA-1") should be credited toward SCHLIFSTEIN. Subsequently, on or about November 15, 2013, RSD-1 emailed VP-2, stating, in part, "Schliffstein [sic] told me that he also has his PA [PA-1] writing [the Fentanyl Spray] for his patients. Since these are Schliffstein's patients, is there any way that we can add [PA-1] under Schliffstein for [incentive-compensation] purposes."

Pharma Company-1 Cuts Back on SCHLIFSTEIN's Speaker Programs

98. From on or about March 7, 2014, through on or about September 23, 2014, TODD SCHLIFSTEIN, the defendant, was the designated Speaker at approximately 26 Speaker Programs, for which he was paid a total of approximately $74,400. During that same period, however, the total quantity of the Fentanyl Spray SCHLIFSTEIN prescribed did not increase substantially. As a result, Pharma Company-1 significantly decreased SCHLIFSTEIN's Speaker Programs for the fourth quarter of 2014. By cutting back on SCHLIFSTEIN's Speaker Programs, Pharma Company-1 executives and Jonathan Roper -- who, as the District Sales Manager, was responsible for deciding which doctors would be allocated Speaker Programs -- sought to send a message to SCHLIFSTEIN that in order to be allocated additional Speaker Programs, SCHLIFSTEIN would need to prescribe higher volumes of the Fentanyl Spray.

99.   TODD SCHLIFSTEIN, the defendant, did not conduct any Speaker Programs from on or about September 24, 2014, through on or about December 16, 2014.  During that same period, SCHLIFSTEIN repeatedly lobbied employees and executives from Pharma Company-1 to assign him more Speaker Programs.  In so doing, he often emphasized that he deserved credit for persuading others to prescribe the Fentanyl Spray.

100.   For example, on or about November 16, 2014, SCHLIFSTEIN wrote in an email to RSD-1, in part, that he had "talked to" three other doctors -- including ALEXANDRU BURDUCEA, the defendant -- "who are all writing now."  SCHLIFSTEIN added:  "I hope to have some lectures soon.  I am available to travel to speak."

101.   In addition, on or about November 17, 2014, TODD SCHLIFSTEIN, the defendant, sent an email attaching his résumé to VP-2.  In the email, SCHLIFSTEIN lobbied for additional Speaker Programs, stating, in part, "I have not had a lecture since October and I look forward to getting back out their [sic] speaking.  I am available whenever and wherever you can use me."  SCHLIFSTEIN also reiterated that he was "happy to get Dr[.] Alex Burducea and [another doctor] in as speakers and writers of [the Fentanyl Spray]," and noted that he "look[ed] forward to speaking more."

102.   During this period, TODD SCHLIFSTEIN, the defendant, also asked CW-2, the Pharma Company-1 sales representative who

44

began working with SCHLIFSTEIN in or about late 2014, whether Pharma Company-1 could assign more Speaker Programs to SCHLIFSTEIN. CW-2 informed SCHLIFSTEIN, in substance and in part, that he would be assigned more Speaker Programs only if he prescribed more of the Fentanyl Spray.

### SCHLIFSTEIN Increases His Prescriptions of the Fentanyl Spray and Is Rewarded with Additional Speaker Programs

103. In response to Pharma Company-1 cutting back on his Speaker Programs, and in order to be allocated more Speaker Programs, TODD SCHLIFSTEIN, the defendant, increased his prescriptions of the Fentanyl Spray considerably in the fourth quarter of 2014. Whereas SCHLIFSTEIN had prescribed approximately 1,812,400 micrograms of the Fentanyl Spray in the third quarter of 2014, he prescribed approximately 3,756,000 micrograms of the Fentanyl Spray in the fourth quarter of 2014.

104. As a result of the increase in prescriptions by TODD SCHLIFSTEIN, the defendant, Pharma Company-1 rewarded SCHLIFSTEIN with additional Speaker Programs. From on or about December 17, 2014, through in or about June 2015, SCHLIFSTEIN was the designated Speaker at approximately 14 Speaker Programs, for which Pharma Company-1 paid SCHLIFSTEIN approximately $42,000. During this same period, SCHLIFSTEIN prescribed the Fentanyl Spray to approximately 20 new patients. In addition, the total volume of the Fentanyl Spray SCHLIFSTEIN prescribed continued to rise.

During the second quarter of 2015, SCHLIFSTEIN prescribed approximately 7,368,000 micrograms of the Fentanyl Spray.

105. By the end of the second quarter of 2015, TODD SCHLIFSTEIN, the defendant, was approximately the 19th-highest prescriber of the Fentanyl Spray nationally, accounting for total net sales of the Fentanyl Spray of approximately $593,373 for that quarter.

106. After on or about June 18, 2015, TODD SCHLIFSTEIN, the defendant, was the designated Speaker at only two Speaker Programs. Between on or about June 18, 2015, and at least in or about May 2017, SCHLIFSTEIN prescribed the Fentanyl Spray to no new patients.

<u>VOUDOURIS'S PARTICIPATION IN THE SCHEME</u>

107. From in or about September 2014 up to and including in or about March 2016, DIALECTI VOUDOURIS, the defendant, served as a Speaker for Pharma Company-1 and received approximately $119,400 in fees for conducting Speaker Programs, many of which were predominantly social affairs involving no educational presentation about the Fentanyl Spray. VOUDOURIS received Speaker Program fees from Pharma Company-1 not in exchange for providing a legitimate educational service, but rather in exchange for prescribing large volumes of the Fentanyl Spray.

<u>VOUDOURIS Is Nominated as a Speaker</u>

108. On or about May 28, 2014, DIALECTI VOUDOURIS, the

46

defendant, attended a Speaker Program led by GORDON FREEDMAN, the defendant.  It was the first time that VOUDOURIS attended a Pharma Company-1 Speaker Program.  Fernando Serrano, the Pharma Company-1 sales representative assigned to FREEDMAN at the time, was also present at that event.  Around that same period, VOUDOURIS met with Serrano in VOUDOURIS's office, and they discussed the Speakers Bureau.  In substance and in part, Serrano told VOUDOURIS that Serrano wanted to nominate VOUDOURIS as a Speaker, VOUDOURIS inquired how much she would be paid in fees, and Serrano responded that some Speakers could make more than $100,000 annually.

109. DIALECTI VOUDOURIS, the defendant, had never prescribed the Fentanyl Spray before in or about June 2014.  In fact, VOUDOURIS was ineligible to prescribe the Fentanyl Spray or any other similar TIRF products during that period because she had not enrolled in the TIRF REMS Program, a prerequisite to prescribing TIRF products, including the Fentanyl Spray.

110. In order to enroll in the TIRF REMS Program and become eligible to prescribe TIRF products, doctors were required to take an online exam.  In or about early June 2014, DIALECTI VOUDOURIS, the defendant, authorized Serrano to enroll VOUDOURIS in the TIRF REMS Program and take the TIRF REMS exam for her.  Serrano set up an account using an email address VOUDOURIS provided, then passed the test by relying on an answer key he had obtained from Jonathan

Roper. Once Serrano had taken and passed the TIRF REMS exam for VOUDOURIS, she became eligible to prescribe TIRF products, including the Fentanyl Spray.

111. DIALECTI VOUDOURIS, the defendant, first prescribed the Fentanyl Spray on or about June 5, 2014. From that date through on or about September 1, 2014, VOUDOURIS prescribed the Fentanyl Spray to approximately 11 patients.

112. Pharma Company-1 executives noticed the prescriptions for the Fentanyl Spray written by DIALECTI VOUDOURIS, the defendant. In or around the summer of 2014, Pharma Company-1 had come under criticism in news articles and elsewhere due to the prevalence of Fentanyl Spray prescriptions written for off-label uses. Accordingly, Pharma Company-1 executives were pleased to see that prescriptions were being written by VOUDOURIS, who, as an oncologist, presumably had greater potential to prescribe the Fentanyl Spray for its on-label purpose of treating breakthrough cancer pain.

113. In or about August 2014, Roper nominated DIALECTI VOUDOURIS, the defendant, to be a Speaker. Soon after, Pharma Company-1 approved the nomination. In or about August 2014, VOUDOURIS entered into a Speaker Agreement with Pharma Company-1. The Speaker Agreement promised VOUDOURIS a fee of $3,000 per Speaker Program. On or about September 24, 2014, VOUDOURIS led

her first Speaker Program.

<u>VOUDOURIS Meets with Pharma Company-1 Executives and Is
Explicitly Informed that She Is Expected to Prescribe the
Fentanyl Spray</u>

114. On or about September 2, 2014, DIALECTI VOUDOURIS, the defendant, attended a dinner in Manhattan with, among others, Roper, Serrano, and several Pharma Company-1 executives who had traveled to New York for the occasion, including VP-2. VOUDOURIS was the only doctor present at the dinner, which was not a Speaker Program. During the dinner, VP-2 told VOUDOURIS, in substance and in part, that he wanted her to prescribe the Fentanyl Spray to one new patient every day, and that VOUDOURIS would be allocated Speaker Programs if she continued prescribing the Fentanyl Spray. Pharma Company-1 paid for the dinner.

115. From on or about September 3, 2014, through September 4, 2014, DIALECTI VOUDOURIS, the defendant, prescribed the Fentanyl Spray to approximately two additional patients. But VOUDOURIS did not write any Fentanyl Spray prescriptions from on or about September 5 through 9, 2014.

116. On or about September 9, 2014, VP-2 forwarded an email with recent Fentanyl Spray prescription data to Serrano, Roper, and two of the executives who had attended the September 2 dinner with DIALECTI VOUDOURIS, the defendant. In the email, VP-2 wrote:

> No scripts from Dr. Viduores [sic], unacceptable
> for ALL of us??????

49

UNACCEPTABLE

That same day, Roper replied to everyone who had received VP-2's email, and wrote:

> I completely agree.  Fernando set up a meeting for me asap with Dr. Voudouris after work hours.  We have invested way too much at this point to only have a "few" pts on [the Fentanyl Spray].  Dr. Voudouris has repeatedly told us about her extensive amount of cancer pts suffering from BTCP [i.e., breakthrough cancer pain].
>
> 1 NEW PT A DAY is what was agreed upon.  Get it done and remember,
>
> DON['']T LET THE DR. SELL YOU, YOU SELL THE DOCTER [sic]!!
>
> $$$$

Serrano responded that same day:

> I will handle this issue this evening with her before her speaker training begins at 6pm.  The message WILL be delivered.

117.  Soon after this email exchange, Roper and Serrano met with DIALECTI VOUDOURIS, the defendant.  During the meeting, Roper told VOUDOURIS, in substance and in part, that Pharma Company-1 expected VOUDOURIS to write more Fentanyl Spray prescriptions than she had since the September 2 dinner with Pharma Company-1 executives.

<u>VOUDOURIS's Prescriptions of the Fentanyl Spray Increase</u>

118. Following the discussion with Roper and Serrano, the

50

Fentanyl Spray prescriptions written by DIALECTI VOUDOURIS, the defendant, rose substantially. Whereas VOUDOURIS had prescribed the Fentanyl Spray approximately 24 times from June 2014 through on or about September 9, 2014, she prescribed the Fentanyl Spray approximately 80 times from on or about September 10, 2014, through December 2014. In the fourth quarter of 2014, VOUDOURIS also conducted approximately nine Speaker Programs, for which she received approximately $27,000.

119. DIALECTI VOUDOURIS, the defendant, continued to conduct Speaker Programs through much of 2015. From on or about January 1, 2015, through on or about August 13, 2015, VOUDOURIS conducted approximately 23 Speaker Programs, for which she received total fees of approximately $75,300. During that same period, VOUDOURIS prescribed the Fentanyl Spray to approximately 17 new patients.

120. By the end of the first quarter of 2015, VOUDOURIS was approximately the 10th-highest prescriber of the Fentanyl Spray nationally, accounting for total net sales of the Fentanyl Spray of approximately $581,500 for that quarter.

121. In addition to providing DIALECTI VOUDOURIS, the defendant, with lucrative Speaker Program fees, Pharma Company-1 and its employees provided VOUDOURIS with additional benefits, none of which were educational in any respect. These benefits included, among other things, regular free meals for VOUDOURIS,

which Pharma Company-1 employees would deliver to her at Medical Office-3.

### VOUDOURIS Writes Unnecessary Prescriptions of the Fentanyl Spray in Order to Continue Receiving Speaker Program Fees

122. In order to continue prescribing high volumes of the Fentanyl Spray, and thereby continue collecting Speaker Program fees from Pharma Company-1, DIALECTI VOUDOURIS, the defendant, at times prescribed Fentanyl Spray refills she knew were unnecessary because they were for patients who already had an ample supply of the Fentanyl Spray remaining from previous prescriptions VOUDOURIS had written for them.

123. In order to fill prescriptions unnecessarily, DIALECTI VOUDOURIS, the defendant, often sent Fentanyl Spray prescriptions to a pharmacy in Manhattan ("Pharmacy-1") where she was friendly with the owner and the head pharmacist.  VOUDOURIS then directed Pharma Company-1 employees, including Serrano, to retrieve the Fentanyl Spray from Pharmacy-1 and deliver it to her at Medical Office-3.  Rather than provide the Fentanyl Spray to the patients listed on the prescriptions VOUDOURIS had unnecessarily written, VOUDOURIS instead stockpiled boxes of the Fentanyl Spray in her office at Medical Office-3.

### The "Opt-In" Contest

124. In order for a new patient to receive the Fentanyl Spray, certain paperwork, known as an "opt-in" form, first needed to be

submitted by the practitioner to Pharma Company-1's reimbursement center, where the form was used to obtain prior authorization from the patient's insurer. Opt-in forms sought, among other things, patient identifiers and other confidential information about patients, including their date of birth, medical diagnosis, and previously used medications.

125. In or about April 2015, Pharma Company-1 held a contest offering a $7,500 bonus to the sales representative who obtained the most new patient "opt-ins" from his or her assigned doctors during a period of approximately two weeks. The contest was designed to increase the number of patients who had obtained prior authorization from their insurer to be prescribed the Fentanyl Spray.

126. DIALECTI VOUDOURIS, the defendant, agreed to help her Pharma Company-1 sales representative, Serrano, win the opt-in contest. VOUDOURIS gave Serrano and another Pharma Company-1 employee access to patient names and other patient information that Serrano and the other Pharma Company-1 employee used to complete opt-in forms. Many of the patients listed on the forms had not authorized VOUDOURIS to share their medical information with Pharma Company-1 in order to help Serrano win a contest. As a result, VOUDOURIS's office submitted opt-in forms for approximately 26 patients during a short period in or about early

April 2015. Nevertheless, Serrano did not win the contest; he finished second to a co-conspirator not named herein ("CC-1"), who was the sales representative assigned to ALEXANDRU BURDUCEA, the defendant.

127. In truth and in fact, DIALECTI VOUDOURIS, the defendant, did not intend to prescribe the Fentanyl Spray to the vast majority of the patients whose information she disclosed to Serrano and Pharma Company-1 in or about early April 2015 for the purpose of helping Serrano complete and submit opt-in forms.

128. Indeed, many of the patients listed on opt-in forms that VOUDOURIS's office submitted to Pharma Company-1 were unaware that opt-in forms had been submitted on their behalf and that prior authorization for the Fentanyl Spray was being sought from their insurer. When patients began to receive phone calls from their insurers regarding prior authorization for the Fentanyl Spray, some patients called VOUDOURIS's office to complain. On or about April 14, 2015, VOUDOURIS sent Serrano a text message stating, "Patients are already calling me to complain that they are getting calls at home!!!" VOUDOURIS further stated, "Did you win? (It would be worth it then!)."

129. DIALECTI VOUDOURIS, the defendant, ultimately prescribed the Fentanyl Spray to approximately four of the approximately 26

patients whose information she disclosed to Serrano and others at Pharma Company-1 during the opt-in contest.

### VOUDOURIS's Speaker Programs and Fentanyl Spray Prescriptions Decline

130. When the number of Speaker Programs allocated to DIALECTI VOUDOURIS, the defendant, began to decrease, so too did VOUDOURIS's Fentanyl Spray prescriptions.

131. From on or about August 14, 2015, through on or about March 8, 2016, DIALECTI VOUDOURIS, the defendant, conducted approximately three Speaker Programs, for which she received total fees of approximately $11,100, and she prescribed the Fentanyl Spray to only approximately one new patient. VOUDOURIS conducted her last Speaker Program on or about March 9, 2016. Between March 9, 2016, and at least in or about May 2017, VOUDOURIS prescribed the Fentanyl Spray to no new patients.

### BURDUCEA'S PARTICIPATION IN THE SCHEME

132. From in or about September 2014 up to and including in or about June 2015, ALEXANDRU BURDUCEA, the defendant, served as a Speaker for Pharma Company-1 and received approximately $68,400 in Speaker Program fees. During that same period, Pharma Company-1 hired CC-1, who was BURDUCEA's girlfriend, to work as BURDUCEA's sales representative, and compensated CC-1 based in substantial part on the volume of the Fentanyl Spray prescribed by her assigned doctors, including BURDUCEA. In exchange for the payments he and

CC-1, whom BURDUCEA married in or about April 2016, received from Pharma Company-1, BURDUCEA prescribed large volumes of the Fentanyl Spray.

### Pharma Company-1 Hires CC-1 and Nominates BURDUCEA as a Speaker in Order to Induce BURDUCEA to Prescribe the Fentanyl Spray

133. By at least in or about the summer of 2014, ALEXANDRU BURDUCEA, the defendant, was in a romantic relationship with CC-1.

134. In or about the summer of 2014, CW-1 decided to leave her job as a Pharma Company-1 sales representative. TODD SCHLIFSTEIN, the defendant, suggested to CW-1 that Pharma Company-1 hire CC-1 to replace CW-1, and noted that CC-1's boyfriend, ALEXANDRU BURDUCEA, the defendant, was a pain management doctor with potential to prescribe the Fentanyl Spray. CW-1 encouraged Pharma Company-1 to hire CC-1 in order to obtain Fentanyl Spray prescriptions from BURDUCEA. For example, on or about September 2, 2014, CW-1 sent her supervisor, Jonathan Roper, a text message asking whether Roper had spoken with CC-1 and adding, in part, "Her BF ... will write," i.e., CC-1's boyfriend, BURDUCEA, would write Fentanyl Spray prescriptions. On or about September 8, 2014, CC-1 sent Roper an email attaching her résumé and stating, in part, that CC-1 planned to attend an upcoming Speaker Program and would "bring[] two pain management doctors with me as well."

135. On or about September 10, 2014, ALEXANDRU BURDUCEA, the defendant, and another pain management doctor accompanied CC-1 to a Speaker Program led by TODD SCHLIFSTEIN, the defendant. The next day, CC-1 informed CW-1, who in turn informed Roper, that BURDUCEA would start prescribing the Fentanyl Spray and was interested in becoming a Speaker.

136. ALEXANDRU BURDUCEA, the defendant, had never prescribed the Fentanyl Spray before in or about mid-September 2014. In fact, BURDUCEA was ineligible to prescribe the Fentanyl Spray or any other TIRF products during that period because he had not enrolled in the TIRF REMS Program. In or about mid-September 2014, Roper gave CW-1 an answer key to the TIRF REMS exam to be provided to BURDUCEA. BURDUCEA then passed the TIRF REMS exam, and thus became eligible to prescribe TIRF products, including the Fentanyl Spray.

137. On or about September 17, 2014, CW-1 and another Pharma Company-1 employee met with ALEXANDRU BURDUCEA, the defendant, in BURDUCEA's office at Hospital-1 to provide BURDUCEA with paperwork he would need to begin prescribing the Fentanyl Spray. BURDUCEA began prescribing the Fentanyl Spray that same day. On or about September 17 and 18, 2014, BURDUCEA prescribed the Fentanyl Spray to approximately four patients. He texted information about approximately three of the prescriptions -- including the

patients' names and phone numbers -- to, among others, CW-1 and CC-1, who at that time did not yet work for Pharma Company-1. In response to one of the texts from BURDUCEA about a new Fentanyl Spray prescription, CW-1 texted BURDUCEA and CC-1, "Wowsers! [CC-1] keep this man happy!!!:))" to which BURDUCEA replied, "She is :)."

138. In or about early October 2014, CC-1 began working as a Pharma Company-1 sales representative assigned to, among others, ALEXANDRU BURDUCEA, the defendant. Pharma Company-1 compensated its sales representatives primarily with quarterly bonuses based on a percentage of the Fentanyl Spray prescriptions written by the doctors assigned to them. On a form Pharma Company-1 placed in CC-1's personnel file, CC-1 listed BURDUCEA as her emergency contact and described BURDUCEA's relationship to her as "Boyfriend."

BURDUCEA, CC-1, and Pharma Company-1 Profit as BURDUCEA
Prescribes the Fentanyl Spray and Conducts Speaker Programs

139. From on or about September 17, 2014, through on or about December 1, 2014, ALEXANDRU BURDUCEA, the defendant, prescribed the Fentanyl Spray to approximately 22 patients. Meanwhile, on or about September 25, 2014, Pharma Company-1 nominated BURDUCEA to become a Speaker. In or about late 2014, BURDUCEA entered into a Speaker Agreement with Pharma Company-1. The Speaker Agreement

promised BURDUCEA a fee of $1,900 per Speaker Program.   On or about December 2, 2014, BURDUCEA led his first Speaker Program.

140. From on or about December 2, 2014, through on or about June 30, 2015, ALEXANDRU BURDUCEA, the defendant, conducted approximately 36 Speaker Programs, for which Pharma Company-1 paid him total fees of approximately $68,400.

141. After Pharma Company-1 hired CC-1 and began to provide Speaker Program fees to ALEXANDRU BURDUCEA, the defendant, BURDUCEA's prescriptions of the Fentanyl Spray increased significantly.   BURDUCEA, who had never prescribed the Fentanyl Spray before September 2014, prescribed the Fentanyl Spray approximately 37 times from October through December 2014. BURDUCEA then prescribed the Fentanyl Spray approximately 82 times during the first quarter of 2015, and approximately 103 times during the second quarter of 2015.

142. By the end of the second quarter of 2015, ALEXANDRU BURDUCEA, the defendant, was approximately the 14th-highest prescriber of the Fentanyl Spray nationally, accounting for approximately $621,345 in total net sales of the Fentanyl Spray for that quarter.

143. Throughout the period when ALEXANDRU BURDUCEA, the defendant, conducted Speaker Programs, he and CC-1 continued their romantic relationship and CC-1 was the Pharma Company-1 sales

representative assigned to BURDUCEA.  Fentanyl Spray prescriptions written by BURDUCEA from in or about January 2015 through in or about June 2015 accounted for more than $1 million in net profits for Pharma Company-1, and more than 40% of the net sales attributable to all doctors whose Fentanyl Spray prescriptions Pharma Company-1 credited to CC-1 for purposes of calculating quarterly bonuses.  Pharma Company-1 paid CC-1 bonuses of approximately $30,278.86 for the fourth quarter of 2014, approximately $60,681.99 for the first quarter of 2015, and approximately $89,787.22 for the second quarter of 2015.

<u>BURDUCEA Leaves the Pharma Company-1 Speakers Bureau</u>

144. In or about early July 2015, multiple people associated with Pharma Company-1 and/or its Speakers Bureau learned that the July 2015 Article would be published imminently.  The July 2015 Article was ultimately published on or about July 14, 2015.

145. On or about July 10, 2015, ALEXANDRU BURDUCEA, the defendant, resigned from the Speakers Bureau.  In an email to Jonathan Roper, BURDUCEA wrote:

> Hi Jonathan, I decided as [of] today not to be a speaker any[ ]more since I am busy with my office [a]nd my department director would not be ok with it.  Please contact [Pharma Company-1] and remove me immediately as [of] today July 10th.  I will continue using the medication for Patients as always that are in pain and most are happy with it. Please advise [Pharma Company-1] to protect my privacy and not disclose any information to anyone about me. Thanks Dr[.] Alex Burducea

146. After on or about July 1, 2015, ALEXANDRU BURDUCEA, the defendant, did not conduct any Speaker Programs.

147. Although ALEXANDRU BURDUCEA, the defendant, claimed upon withdrawing from the Speakers Bureau that he would "continue using the medication for Patients as always that are in pain," his total Fentanyl Spray prescriptions plummeted after he stopped conducting Speaker Programs and collecting Speaker Program fees.   For the second quarter of 2015 -- the last quarter in which BURDUCEA conducted Speaker Programs -- BURDUCEA ranked approximately 14th nationally in net sales of the Fentanyl Spray.   For the third quarter of 2015, BURDUCEA ranked approximately 129th in net sales, and for the fourth quarter of 2015 he ranked approximately 1,185th.

## BURDUCEA's False Statements to Hospital-1

148. In connection with his employment at Hospital-1, ALEXANDRU BURDUCEA, the defendant, was required to complete and certify a disclosure form, titled "Report of Relationships with Outside Entities" (the "Hospital-1 Disclosure Form"), annually. The Hospital-1 Disclosure Form required BURDUCEA to disclose, among other things, any relationship he had during the prior calendar year with any outside entity's "Speakers' Bureau."

149. On or about February 24, 2015, and March 10, 2016, ALEXANDRU BURDUCEA, the defendant, certified and submitted Hospital-1 Disclosure Forms that omitted any reference to Pharma

Company-1 or the compensation he received from the Pharma Company-1 Speakers Bureau in 2014 and 2015, even though the Hospital-1 Disclosure Forms plainly required BURDUCEA to disclose that information.

### BURDUCEA's False Statements to the FBI

150. On or about June 19, 2017, ALEXANDRU BURDUCEA, spoke voluntarily with two Special Agents from the Federal Bureau of Investigation ("FBI") and made multiple false statements, including the following:

    a.   BURDUCEA stated, in substance and in part, that he gave a slide presentation at every Pharma Company-1 Speaker Program for which he was the designated Speaker.  But, as BURDUCEA well knew, he had failed to give a slide presentation at the majority of his Speaker Programs, and at least some of his Speaker Programs were predominantly social affairs involving no educational presentation, let alone a formal slide presentation, about the Fentanyl Spray.

    b.   BURDUCEA stated, in substance and in part, that he and CC-1 were not dating (i) when BURDUCEA was nominated to become a Speaker for Pharma Company-1, (ii) during the period when BURDUCEA was prescribing the Fentanyl Spray, or (iii) at any point until after his tenure at Hospital-1 ended in or about February 2016.  BURDUCEA acknowledged that he and CC-1 married in or about

April 2016, and stated, in substance and in part, that they had not dated for a long time before their wedding. But as BURDUCEA well knew, he and CC-1 had dated from at least in or about the summer of 2014 through the remainder of BURDUCEA's tenure at Hospital-1, and during that period CC-1 served as BURDUCEA's Pharma Company-1 sales representative and earned bonuses based on BURDUCEA's prescriptions of the Fentanyl Spray.

## STATUTORY ALLEGATIONS

151. From at least in or about August 2012 up to and including at least in or about March 2016, in the Southern District of New York and elsewhere, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B).

152. It was a part and object of the conspiracy that GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, and others known and unknown, willfully and knowingly would and did solicit and receive remuneration (including kickbacks, bribes, and rebates), directly and indirectly, overtly and covertly, in cash and in kind, in

63

return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering a good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

## Overt Acts

153. In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about September 29, 2014, GORDON FREEDMAN, the defendant, received check number 26761, issued by Pharma Company-1's third-party payer, in the amount of $3,000, as payment for a Speaker Program held in New York, New York, on or about September 25, 2014.

b. On or about October 30, 2014, JEFFREY GOLDSTEIN, the defendant, received check number 27641, issued by Pharma Company-1's third-party payer, in the amount of $2,200, as payment for a Speaker Program held in New York, New York, on or about October 29, 2014.

c. On or about January 26, 2015, TODD SCHLIFSTEIN, the defendant, received check number 28930, issued by Pharma Company-1's third-party payer, in the amount of $3,000, as payment for a

Speaker Program held in New York, New York, on or about January 21, 2015.

      d. On or about October 29, 2014, DIALECTI VOUDOURIS, the defendant, received check number 27558, issued by Pharma Company-1's third-party payer, in the amount of $3,000, as payment for a Speaker Program held in New York, New York, on or about October 24, 2014.

      e. On or about May 11, 2015, ALEXANDRU BURDUCEA, the defendant, received check number 31117, issued by Pharma Company-1's third-party payer, in the amount of $1,900, as payment for a Speaker Program held in New York, New York, on or about May 4, 2015.

      (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Violation of the Anti-Kickback Statute)

The Grand Jury further charges:

154.    The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

155.    From at least in or about August 2012 up to and including at least in or about March 2016, in the Southern District of New York and elsewhere, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, willfully and knowingly solicited and received

remuneration (including kickbacks, bribes, and rebates), directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering a good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, to wit, FREEDMAN, GOLDSTEIN, SCHLIFSTEIN, VOUDOURIS, and BURDUCEA solicited and received Speaker Program fees and other benefits in return for prescribing the Fentanyl Spray.

(Title 42, United States Code, Section 1320a-7b(b)(1)(B), and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Honest Services Wire Fraud)

The Grand Jury further charges:

156. The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

157. From at least in or about August 2012 up to and including at least in or about March 2016, in the Southern District of New York and elsewhere, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with

each other to violate Title 18, United States Code, Sections 1343 and 1346.

158.   It was a part and object of the conspiracy that GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive patients of their intangible rights to their doctors' honest services, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, FREEDMAN, GOLDSTEIN, SCHLIFSTEIN, VOUDOURIS, and BURDUCEA participated in a scheme to prescribe the Fentanyl Spray to patients in return for bribes and kickbacks, including Speaker Program fees and other benefits, provided by Pharma Company-1, thereby depriving patients of their intangible rights to their doctors' honest services.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Aggravated Identity Theft)

The Grand Jury further charges:

159.   The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

160.   From at least in or about June 2013 up to and including at least in or about March 2016, in the Southern District of New York and elsewhere, JEFFREY GOLDSTEIN and DIALECTI VOUDOURIS, the defendants, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, without authorization, GOLDSTEIN and VOUDOURIS transferred, possessed, and used, and aided and abetted the transfer, possession, and use of, the names, signatures, National Provider Identifier numbers, and state license numbers of health care professionals on sign-in sheets for Speaker Programs during and in relation to the offense charged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1),
1028A(c)(5), and 2.)

## COUNT FIVE
### (False Statements)

The Grand Jury further charges:

161.   The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

162.   On or about June 19, 2017, in the Southern District of New York and elsewhere, ALEXANDRU BURDUCEA, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, BURDUCEA told Special Agents from the FBI, in sum and substance, that BURDUCEA and CC-1 were not dating (a) when BURDUCEA was nominated to become a Speaker for Pharma Company-1, (b) during the period when BURDUCEA was prescribing the Fentanyl Spray, or (c) at any point until after BURDUCEA's tenure at Hospital-1 ended in or about February 2016, when in truth and in fact, and as BURDUCEA well knew, BURDUCEA and CC-1 dated from at least in or about the summer of 2014 through the remainder of BURDUCEA's tenure at Hospital-1.

(Title 18, United States Code, Section 1001(a).)

69

## COUNT SIX
### (Wrongful Disclosure of Individually Identifiable Health Information)

The Grand Jury further charges:

163.    The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

164.    In or about September 2014, in the Southern District of New York and elsewhere, ALEXANDRU BURDUCEA, the defendant, willfully and knowingly, without authorization, disclosed individually identifiable health information relating to another person, which information was maintained by a covered entity as defined in the HIPAA privacy regulation described in Title 42, United States Code, Section 1320d-9(b)(3), to wit, BURDUCEA disclosed without authorization, and aided and abetted the unauthorized disclosure of, patient information to CC-1, among others.

(Title 42, United States Code, Sections 1320d-6(a)(3) and 1320d-
   6(b)(1), and Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (Wrongful Disclosure of Individually Identifiable Health Information)

The Grand Jury further charges:

165.    The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

166.   In or about April 2015, in the Southern District of New York and elsewhere, DIALECTI VOUDOURIS, the defendant, willfully and knowingly, without authorization, disclosed individually identifiable health information relating to another person, which information was maintained by a covered entity as defined in the HIPAA privacy regulation described in Title 42, United States Code, Section 1320d-9(b)(3), to wit, VOUDOURIS disclosed without authorization, and aided and abetted the unauthorized disclosure of, patient information to Pharma Company-1 employees.

(Title 42, United States Code, Sections 1320d-6(a)(3) and 1320d-6(b)(1), and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wrongful Disclosure of Individually Identifiable Health Information)

The Grand Jury further charges:

167.   The allegations set forth in paragraphs 1 through 150 and 153 of this Indictment are repeated and realleged as if fully set forth herein.

168.   In or about 2013 and 2014, in the Southern District of New York and elsewhere, JEFFREY GOLDSTEIN and TODD SCHLIFSTEIN, the defendants, willfully and knowingly, without authorization, disclosed individually identifiable health information relating to another person, which information was maintained by a covered entity as defined in the HIPAA privacy regulation described in

Title 42, United States Code, Section 1320d-9(b)(3), to wit, GOLDSTEIN and SCHLIFSTEIN disclosed without authorization, and aided and abetted the unauthorized disclosure of, patient records to Pharma Company-1 employees.

(Title 42, United States Code, Sections 1320d-6(a)(3) and 1320d-6(b)(1), and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

169. As a result of committing the offenses charged in Counts One and Two of this Indictment, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

## FORFEITURE ALLEGATION AS TO COUNT THREE

170. As a result of committing the offense charged in Count Three of this Indictment, GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

72

States Code, Section 2461(c), any and all property, real and personal, which constitutes, or is derived from, proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense that the defendant personally obtained.

### Substitute Assets Provision

171. If any of the above described forfeitable property, as a result of any act or omission of GORDON FREEDMAN, JEFFREY GOLDSTEIN, TODD SCHLIFSTEIN, DIALECTI VOUDOURIS, and ALEXANDRU BURDUCEA, the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


_____
FOREPERSON


_____
GEOFFREY S. BERMAN
United States Attorney

74

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

GORDON FREEDMAN,
JEFFREY GOLDSTEIN,
TODD SCHLIFSTEIN,
DIALECTI VOUDOURIS, and
ALEXANDRU BURDUCEA,

Defendants.

## SEALED INDICTMENT

18 Cr.

(18 U.S.C. §§ 371, 1001,
1028A(a)(1), 1028A(c)(5), 1349 and
2; 42 U.S.C. §§ 1320a-7b(b)(1)(B),
1320d-6(a)(3) and 1320d-6(b)(1).)

GEOFFREY S. BERMAN
United States Attorney.

**A TRUE BILL**

Foreperson.

3/15/18   Filed Sealed Indictment
Filed Arrest Warrants
Judge Wettan