UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                  :
UNITED STATES OF AMERICA                          :
                                                  :
     -v.-                                          :          18 Cr. 217 (KMW)
                                                  :
GORDON FREEDMAN,                                  :
JEFFREY GOLDSTEIN,                                :
TODD SCHLIFSTEIN, and                             :
DIALECTI VOUDOURIS,                               :
                                                  :
                        Defendants.               :
                                                  :
------------------------------------------------------------x


### GOVERNMENT OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


                         GEOFFREY S. BERMAN
                         United States Attorney
                         Southern District of New York
                         One St. Andrew's Plaza
                         New York, New York 10007


Noah Solowiejczyk
David Abramowicz
Assistant United States Attorneys

- Of Counsel -

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT**...................................................................................................1

**BACKGROUND**............................................................................................................................4

I. THE INDICTMENT...........................................................................................................4

II. RULE 16 DISCOVERY AND OTHER DISCLOSURES..................................................12

**ARGUMENT**.................................................................................................................................13

I. THE MOTIONS TO DISMISS THE INDICTMENT SHOULD BE DENIED.................13

    A.   Applicable Law…………………………....................................................................13

    B.   Discussion…………………………...........................................................................15

        1.   The Motions to Dismiss Counts One and Three Based on a Purported Failure to Allege an Agreement Should Be Denied ……………………………..................15

        2.   The Motions to Dismiss Count Two Should Be Denied……………………....19

        3.   The Motions to Dismiss Count Three Should Be Denied……………………..22

        4.   The Motions to Dismiss Count Four Should Be Denied……………………......33

        5.   The Motion to Dismiss Count Eight Should Be Denied.....................................37

II. THE MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED.................38

    A.   Background…………………………........................................................................38

    B.   Applicable Law…………………………..................................................................40

    C.   Discussion......................................................................................................................44

        1.   Defense Request 1 Should Be Denied …………………………....................45

        2.   Defense Request 2 Should Be Denied…………………….............................48

        3.   Defense Request 3 Should Be Denied…………………….............................50

        4.   Defense Requests 6 and 7 Should Be Denied…………………........................52

III. THE TRIALS SHOULD NOT BE SEVERED……………….........................................54

    A.   Misjoinder…………………………........................................................................55

    1. Applicable Law ……………………….....................................................55

    2. Discussion…………………………….................................................................57

  B. Discretionary Severance………………………….....................................................59

    1. Applicable Law ………………………….....................................................60

    2. Discussion…………………………….................................................................61

IV. THE DEFENDANTS' REQUESTS FOR DISCOVERY ORDERS
  SHOULD BE DENIED…………….....................................................................62

  A. *Brady* and Related Disclosures………………………….............................62

    1. Applicable Law ………………………….....................................................63

    2. Discussion…………………………….................................................................64

  B. Production Deadlines………………………………….................................................67

    1. Expert and Rule 404(b) Notice ………………………….............................67

    2. 3500 Material………………………….................................................................69

    3. Trial Exhibits and Witness List…………………….............................69

  **CONCLUSION**....................................................................................................71

**Table of Authorities**

## Cases

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ...................................................... 14

*Cart v. United States*, No. H-88-16, 1989 WL 165585 (D. Conn. Nov. 15, 1989).................................... 20

*Costello* v. *United States*, 350 U.S. 359  (1956) ............................................................ 1, 13, 35

*Flores-Figueroa v. United States*, 556 U.S. 646  (2009) .................................................... 35, 52

*Hamling v. United States*, 418 U.S. 87 (1974)........................................................................ 13

*In re United States*, 834 F.2d 283  (2d Cir. 1987)............................................................... 69

*McNally v. United States*, 483 U.S. 350 (1987) .................................................. 22, 23, 27, 29

*Richardson v. Marsh*, 481 U.S. 200 (1987) ......................................................................... 54

*Russell v. United States*, 369 U.S. 749 (1962) .................................................................. 14

*United States v. Santeramo*, 45 F.3d 624 (2d Cir. 1995) ........................................................ 38

*Schnautz v. United States*, 263 F.2d 525, (5th Cir.1959) ..................................................... 16

*Skilling v. United States*, 561 U.S. 358 (2010) ...........................................................passim

*U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................ 21

*United States ex rel. Lucas* v. *Regan*, 503 F.2d 1 (2d Cir. 1974)..................................... 69

*United States v. Al Marri*, 230 F. Supp. 2d 535 (S.D.N.Y. 2002) ..................................... 68

*United States v. Alessi*, 638 F.2d 466 (2d Cir. 1980) ................................................. 56, 69

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ................................................ 35

*United States v. Allums*, No. 97 Cr. 267 (HS), 1997 WL 599562 (S.D.N.Y. Sept. 25, 1997) .................. 68

*United States v. Babich et al.*, No. 16 Cr. 10343 (ADB) ........................................ 12, 13, 65, 66

*United States v. Berganza*, No. 03 Cr. 987 (DAB), 2005 WL 372045 (S.D.N.Y. Feb. 16, 2005).. 40, 46, 51

*United States v. Blaszczak*, 17 Cr. 357 (LAK)....................................................................... 70

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002)............................................................ 61

*United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)........... 49

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) (per curiam)................................. 38, 40

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011)............................................................ 22

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011)........................................................... 27

*United States v. Carson*, 702 F.2d 351 (2d Cir. 1983)........................................................... 60

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989)................................................. 60, 61

*United States v. Cephas*, 937 F.2d 816 (2d Cir. 1991)........................................................... 42

*United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990)......................................................... 56

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ......................................... 70

*United States v. Chestman*, 947 F.2d 551 (2d Cir.1991)........................................................ 29

*United States v. Cimino*, 31 F.R.D. 277 (S.D.N.Y. 1962) .................................................... 43

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)....................................................... 63, 69

*United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. March 11, 2009) ................ 65

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) .............................................. 1, 13

*United States v. DeMizio*, 2012 WL 1020045 (E.D.N.Y. Mar. 26, 2012) ................................ 27

*United States v. DeMizio*, 741 F.3d 373 (2d Cir. 2014)........................................................ 27

*United States v. DeSantis*, 134 F.3d 760 (6th Cir. 1998) ................................................... 26

*United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.NY. Feb. 7, 2012)....................... 14

*United States v. Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997) ................................................. 14

ii

*United States v. Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990) ...................................................... 41
*United States v. Faison*, 393 Fed. Appx. 754 (2d Cir. 2010) ....................................................... 15
*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ....................................................... 42
*United States v. Gambino*, 809 F. Supp. 1061 (S.D.N.Y. 1992) ................................................. 14
*United States v. Gatto*, 17 Cr. 686 (LAK) ................................................................................. 70
*United States v. Gatto*, 316 F. Supp. 3d 654 (S.D.N.Y. 2018) ................................................... 66
*United States v. Gaudin*, 515 U.S. 506 (1995) ............................................................................ 26
*United States v. Greenspan*, No. 16 Cr. 114 (WHW), 2016 WL 4402822 (D.N.J. Aug. 16, 2016) .......... 29
*United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) ................................................. 28, 30
*United States v. Heinemann*, 801 F.2d 86 (2d Cir. 1986) .......................................................... 56
*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ............................................... 43, 46
*United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008 (S.D.N.Y. July 3, 2003) ...... 53, 68
*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992) .......................................................... 14
*United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) .......... 65
*United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) ..................... 64
*United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996) ................................................. 25, 26, 27
*United States v. Jimenez*, 824 F.Supp. 351 (S.D.N.Y.1993) ..................................................... 45
*United States v. Jones*, 652 F. Supp. 1561 (S.D.N.Y. 1986) ................................................ 56, 58
*United States v. Kazarian*, No. 10 Cr. 895, 2012 WL 1810214 (S.D.N.Y. May 18, 2012) .............. 41, 42
*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) ........................................................ 32, 33
*United States v.* Leonelli, 428 F. Supp. 880 (S.D.N.Y. 1977) ............................................... 43, 46
*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) ........................................................... 63, 66
*United States v. Levy*, 11 Cr. 62(PAC), 2013 WL 664712 (S.D.N.Y. 2013) ................................ 50
*United States v. Light*, No. 00 CR 417, 2000 WL 875846 (N.D. Ill. June 29, 2000) ..................... 20
*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ................... 67
*United States v. Lloyd*, 947 F. Supp. 2d 259 (E.D.N.Y. 2013) .................................................. 58
*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) .................................................................. 61
*United States v. Mahabub*, No. 13 Cr. 908, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ..... 41, 42, 44, 48
*United States v. Manarite*, 448 F.2d 583 (2d Cir. 1971) ...................................................... 57, 59
*United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982) ........................................................... 29
*United States v. Martin*, 411 F. Supp. 2d 370 (S.D.N.Y. 2006) ................................................ 20
*United States v. Matos-Peralta*, 691 F. Supp. 780 (S.D.N.Y. 1988) ........................................ 68
*United States v. Medina*, 944 F.2d 60 (2d Cir. 1991) ................................................................ 18
*United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) ................................................... 28
*United States v.* Mitlof, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ................................................. 43
*United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) .......... 42
*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) ..................................................... 42
*United States v. Napout*, 332 F. Supp. 3d 533 (E.D.N.Y. 2018) .............................................. 24
*United States v. Nayak*, 769 F.3d 978 (7th Cir. 2014) ....................................................... passim
*United States v. Neufeld*, 908 F. Supp. 491 (S.D. Ohio 1995) .............................................. 30, 31
*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................................. 64
*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) ................................................................. 22
*United States v. Numisgroup Int'l Corp.*, 128 F. Supp. 2d 136 (E.D.N.Y. 2000) ...................... 50
*United States v. O'Connor*, 650 F.3d 839 (2d Cir. 2011) ......................................................... 61

iii

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) .................................................................... 43

*United States v. Payden*, 613 F. Supp. 800 (S.D.N.Y. 1985) ............................................. 41, 42, 46

*United States v. Percoco*, No. 16-cr-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) .............. 20

*United States v. Reddy*, 190 F. Supp. 2d 558 (S.D.N.Y. 2002) ..................................... 63, 66, 70

*United States v. Reyes*, 417 F. Supp. 2d 257 (S.D.N.Y. 2005) ......................................................... 64

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ......................................... 41, 44, 47

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ...................................................................... 40

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008) ......................................................... 56, 61

*United States v. Rooney*, 866 F.2d 28 (2d Cir. 1989) ....................................................................... 56

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ......................................................................... 60

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ...................................................................... 27

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) ............................................. passim

*United States v. Samaria*, 239 F.3d 228 (2d Cir.2001) ................................................................... 16

*United States v. Samsonov*, 07 Cr. 1198, 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ............ 41, 42, 44, 47

*United States v. Scanlon*, 753 F. Supp. 2d 23 (D.D.C. 2010) .......................................................... 29

*United States v. Silberstein*, No. 02 Cr. 800 (SWK), 2003 WL 21488024 (S.D.N.Y. June 27, 2003) ....... 41

*United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604 (S.D.N.Y. Jan. 14, 2002) ................. 46

*United States v. Skelos*, 15 Cr. 317 (KMW) ........................................................................... 16, 32

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) .............................................................. 60, 61

*United States v. Spy Factory*, 960 F. Supp. 684 (S.D.N.Y. 1997) ................................................... 40

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ............................................................ 14

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ...................................................... 13, 14, 15

*United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) ..................................................... 56, 57, 58

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) .................................................................. 16

*United States v. Taggert*, No. 09 Cr. 984 (BSJ), 2010 WL 532530 (S.D.N.Y. Feb. 11, 2010) ............ 57, 59

*United States v. Tanner*, No. 17 Cr. 61 (LAP), 2018 WL 1737235 (S.D.N.Y. Feb. 23, 2018) ................. 23

*United States v. Taylor*, 707 F. Supp. 696 (S.D.N.Y. 1989) ............................................................ 41

*United States v. TEVA Pharm. USA, Inc.*, No. 13 Civ. 3702 (CM), 2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ........................................................................................................................... 21

*United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ............ 43

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ............................................................... passim

*United States v. Triana-Mateus*, No. 98 CR. 958(SWK), 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) .... 41

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ...................................................... 42

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) .............................................. 57, 59

*United States v. Vanwort*, 887 F.2d 375 (2d Cir. 1989) ................................................................. 57

*United States v. Velasquez*, No. 96 Cr. 126 (JFK), 1997 WL 414132 (S.D.N.Y. July 23, 1997) .............. 64

*United States v. Washington*, 947 F. Supp. 87 (S.D.N.Y. 1996) ..................................................... 69

*United States v. Wedd*, 15 Cr. 616 (KBF), 2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) ....................... 66

*United States v. Williams*, 540 U.S. 36 (1992) ............................................................................... 14

*United States v. Willis*, 737 F.Supp. 269 (S.D.N.Y.1990) ............................................................. 30

*United States v. Wydermyer*, 51 F.3d 319 (2d Cir. 1995) ............................................................... 33

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ..................................................... 13, 15, 19

*United States v. Yaron*, No. S2-10-CR-363 GBD, 2011 WL 3279054 (S.D.N.Y. July 28, 2011) ........ 24, 32

*United States v. Yu–Leung*, 51 F.3d 1116 (2d Cir.1995) ................................................................. 16

*United States v. Zackson*, 6 F.3d 911 (2d Cir. 1993) ........................................................ 60, 63

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ............................... 41, 43, 53

*United States v. Zullo*, No. 1:09-CR-64-JGM-2, 2013 WL 2322966 (D. Vt. May 28, 2013) .................... 16

*Weatherford v. Busey*, 429 U.S. 545 (1977) ..................................................................... 69

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486 (S.D.N.Y. 2007) ........................ 30

*Zafiro v. United States*, 506 U.S. 534 (1993) ............................................................ 54, 55, 60, 61

## Statutes

18 U.S.C. § 3500 .......................................................................................... 87, 88

45 C.F.R. § 164.506(c)(1) ..................................................................................... 48

Fed. R. Crim. P. 14 .......................................................................................... 75

Fed. R. Crim. P. 16 (a)(1)(G) ................................................................................. 85

Fed. R. Crim. P. 16 (b)(1)(C)(i) .............................................................................. 85

Fed. R. Crim. P. 29 ...................................................................................... 16, 45

Fed. R. Crim. P. 7(c) ........................................................................................ 15

Fed. R. Crim. P. 7(f) ........................................................................................ 51

Fed. R. Crim. P. 8(b) ........................................................................................ 69

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendants Gordon Freedman, Jeffrey Goldstein, Todd Schlifstein and Dialecti Voudouris (collectively, "the defendants").[1]  The defendants' motions should be denied in their entirety.

In moving to dismiss the Indictment, the defendants advance a series of premature arguments that turn on their views of the sufficiency of evidence at a trial that has not yet occurred.  Many of their arguments consist of factual assertions and characterizations of the Indictment's allegations that are more appropriate for a jury address than a motion claiming that the Indictment is legally insufficient.  As this Court is aware, dismissal of an Indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted); *see also Costello v. United States*, 350 U.S. 359, 363 (1956) ("[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits.").  The defendants cannot meet that heavy burden here, where the detailed, 74-page, 171-paragraph speaking Indictment sets forth the criminal conduct underlying the eight counts of the Indictment in far more detail than necessary.

With respect to Counts One and Three of the Indictment—which charge conspiracy to violate the Anti-Kickback Statute and conspiracy to commit honest services wire fraud, respectively—the defendants argue that the Indictment fails to allege an agreement, or "meeting

---

[1] As this Court is aware, defendant Alexandru Burducea pleaded guilty to Count One of the Indictment on February 14, 2019.  Accordingly, Burducea's motions are moot and the Government only addresses Burducea's arguments to the extent that they have been adopted by the other defendants; however, the Government does not address any arguments raised in Burducea's brief that are fact specific to Burducea.

of the minds," between Insys Therapeutics, Inc. ("Insys")[2] and the defendant doctors.  (*See, e.g.,* Voudouris MTD Br., at 8).[3]  This argument fails on multiple grounds.

*First*, the defendants' arguments boil down to a sufficiency-of-the-evidence challenge that is not appropriate for a motion to dismiss.  Whether a conspiratorial agreement was reached is a fact issue for the jury.  *Second*, the defendants' motion relies on the mistaken premise that the Government is required to allege an *explicit* agreement between Insys and the doctors.  Proving—let alone alleging—a conspiracy requires no evidence of an explicit agreement.  *Third*, and finally, the defendants' arguments ignore and, at times, mischaracterize the Indictment's detailed speaking allegations, which describe numerous conversations and acts that demonstrate the existence of a criminal agreement.  In the end, a jury will decide whether the evidence the Government presents proves beyond a reasonable doubt that the defendants participated in a conspiracy.

The defendants' motion to dismiss Count Two, which charges a substantive violation of the Anti-Kickback Statute, fails for similar reasons.  Count Two alleges that the defendants received Speaker Program fees in exchange for prescribing Subsys.  The question of the defendants' intent at the time they prescribed Subsys is a jury question that cannot be resolved at the motion-to-dismiss stage.

---

[2] The Indictment refers to Insys as "Pharma Company-1," and to the Insys-manufactured sublingual fentanyl spray called Subsys as the "Fentanyl Spray."  The defendants refer to Insys and Subsys throughout their moving papers.

[3] "Voudouris MTD Br." refers to the memorandum of law in support of Voudouris's motion to dismiss the Indictment. (Dkt. No. 68).  "Voudouris BOP Br." refers to the memorandum of law in support of Voudouris's motion for a bill of particulars and *Brady* material. (Dkt. No. 71).  "Freedman Br." refers to the memorandum of law in support of Freedman's pre-trial motions.  (Dkt. No. 80-1).  "Goldstein Br." refers to the memorandum of law in support of Goldstein's pre-trial motions. (Dkt. No. 79).  "Schlifstein Br." refers to the memorandum of law in support of Schlifstein's pre-trial motions. (Dkt. No. 77).  "Burducea Br." refers to the memorandum of law in support of Burducea's pre-trial motions. (Dkt. No. 75).

As to Count Three, which charges conspiracy to commit honest services wire fraud, the defendants further argue that, *inter alia*, the Indictment fails to allege that any of their Subsys prescriptions were not medically appropriate.  Contrary to the defendants' assertion, however, in an honest services fraud prosecution the Government need not allege, nor prove at trial, that the defendants prescribed Subsys to patients who did not need it.  Under binding Second Circuit precedent, no such showing is required.

Goldstein and Voudouris also contend that the aggravated identity theft counts against them must be dismissed because the Indictment fails to allege their knowledge of the forging and falsification of Speaker Program sign-in sheets, and because the forging of the sign-in sheets did not occur "during and in relation to" the honest services wire fraud conspiracy charged in Count Three.  These arguments should be rejected.  The Indictment alleges that the defendants possessed the requisite knowledge, and that the forged sign-in sheets created the false appearance that the Speaker Programs were legitimate educational events, thereby enabling the defendants to collect bribes and kickbacks in return for prescribing Subsys, all in breach of their duties to their patients.  Finally, Schlifstein's motion to dismiss the HIPAA count should be denied because the Indictment alleges all of the requisite elements of the offense.

The defendants' other pending motions similarly lack merit.  The defendants are not entitled to a bill of particulars, especially in light of the detailed, 74-page speaking Indictment and the extensive discovery they have received.  The defendants' motion for a bill of particulars seeks the sort of evidentiary minutiae they are not entitled to under well-settled law.

Nor are the defendants entitled to severance under Federal Rules of Criminal Procedure 8(b) or 14.  The defendants' claim that the Government has not alleged the proper "rim" in the hub-and-spoke conspiracy is both premature incorrect.

3

The defendants' motions for *Brady* and related materials are similarly meritless.  The defendants have already received *Brady* disclosures from the Government and, to the extent the Government identifies any additional *Brady* material, that material will be provided promptly. Nothing more is required, and the defendants are not entitled to any of the additional disclosures that they seek at this time.  Finally, the deadlines the defendants seek for witness lists and exhibits are extraordinary even for a complex case.

## BACKGROUND

### I.   THE INDICTMENT

Indictment 18 Cr. 217 (KMW) charges defendants Gordon Freedman, Jeffrey Goldstein, Todd Schlifstein, and Dialecti Voudouris with conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371 (Count One); a substantive violation of the Anti-Kickback Statute, in violation of 42 U.S.C. § 1320a-7b(b)(1)(B) (Count Two); and conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Three).  In addition, it charges Goldstein and Voudouris with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(c)(5), and 2 (Count Four); Voudouris with wrongful disclosure of individually identifiable health information, in violation of 42 U.S.C. §§ 1320d-6(a)(3) and 1320d-6(b)(1) (Count Seven); and Goldstein and Schlifstein with wrongful disclosure of individually identifiable health information, in violation of 42 U.S.C. §§ 1320d-6(a)(3) and 1320d-6(b)(1) (Count Eight).

The Indictment, spanning 74 pages and 171 paragraphs, provides a detailed description of the defendants' participation in a scheme in which they accepted bribes and kickbacks in the form of Speaker Program fees in exchange for prescribing the Insys-manufactured fentanyl spray Subsys.  (Indictment ¶¶ 1-3).  The doctors acting as Speakers were purportedly compensated for

4

conducting educational events about the medical properties of Subsys. In reality, however, many of the Speaker Programs conducted by the defendants were "merely social gatherings at high-end restaurants with no educational presentation whatsoever" and "lacked an appropriate audience of peer-level doctors with a professional reason to be educated about [Subsys]." (*Id.* ¶ 4). The defendants each received tens of thousands of dollars – and in some instances more than $100,000 – in Speaker Program fees annually. "In return, they prescribed large volumes of [Subsys]." (*Id.* ¶ 5).

The Indictment provides background information regarding Subsys. (Indictment ¶¶ 14-18). Subsys was approved by the FDA in or about January 2012 solely for the management of breakthrough cancer pain in opioid-tolerant patients. (*Id.* ¶ 14). Subsys, a synthetic opioid, is a Schedule II controlled substance and is approximately 50 to 100 times more potent than morphine. (*Id.*). The Indictment further details Insys's policies and procedures with respect to its Speaker Programs, (*id.* ¶¶ 19-28), including that, beginning in February 2014, all Speaker Programs required at least two or more health care professionals in attendance (*id.* ¶ 22).

In addition, the Indictment describes how Insys "used its Speaker Programs to induce a select group of practitioners, including [the defendants] . . . to prescribe large volumes of [Subsys]." (*Id.* ¶ 29). Examples are provided of email correspondence from Insys's District Sales Manager for the sales territory that included Manhattan, including emails in which this District Sales Manager instructed the Insys sales representatives, in sum and substance, "that Speaker Programs would be allocated only to doctors who prescribed large quantities of [Subsys] in return." (*Id.* ¶ 32).

The Indictment also details the various ways in which the defendants' own Speaker Programs were not educational and were instead predominantly social affairs. (Indictment ¶ 34).

5

The defendants' Speaker Programs, among other things, frequently "lacked an appropriate audience of peer-level practitioners seeking education regarding [Subsys]," and were instead "frequently attended by [Insys] employees, practitioners with no potential to prescribe [Subsys] given their medical specialty, others with no professional reason to attend an educational presentation regarding [Subsys], and/or the friends and office staff of the Speaker." (*Id.*).  The defendants' Speaker Programs were frequently attended by individuals on a repeated basis, which served no educational purpose because "each Speaker Program was supposed to include a presentation of an identical slide deck." (*Id.* ¶ 35).  Specific examples of such repeat attendees are provided. (*Id.*).

Furthermore, "[b]ecause many of the Speaker Programs frequently lacked the requisite number of two health care professionals and/or the restaurant bills for Speaker Programs frequently exceeded the $125 maximum per attendee, sign-in sheets for Speakers Programs were often forged and falsified with names and purported signatures of people who had not, in fact, attended." (*Id.* ¶ 36).  The defendants knew that sign-in sheets for their Speaker Programs were being forged and falsified, and they participated in the falsification of sign-in sheets for their own Speaker Programs. (*Id.* ¶ 36).  Specific examples are provided as to each of the four defendants (*id.* ¶ 36(a)-(d)), including descriptions of Goldstein and Voudouris adding names and other identifying information of health care professionals who had not been present at the Speaker Programs, without those individuals' authorization. (*Id.* ¶ 36(b), (d)).

Furthermore, the Indictment alleges that Speaker Programs at times "involved excessive alcohol and/or drug use."  It specifically alleges that Schlifstein consumed excessive alcohol at his own Speaker Programs and that Goldstein used marijuana with Insys employees at his

medical office prior to some Speaker Programs, and cocaine in the restaurant bathroom during other Speaker Programs. (*Id.* ¶ 39(a)-(b)).

The Indictment describes each defendant's participation in the Speaker Program bribery scheme. Freedman did not initially prescribe much Subsys despite having been educated about the drug at an Insys consulting meeting in early 2012. (Indictment ¶¶ 41-46). As Freedman was allocated Speaker Programs and increased fees per Speaker Program, his prescriptions of Subsys rose substantially. (*Id.* ¶¶ 47-55). Emails between Freedman and Insys employees are described and quoted in the Indictment, including an email in which Freedman sent an Insys Regional Sales Manager dates he was available for Speaker Programs and noted that he had spoken with a new potential Subsys patient who "also could be hundreds of units." (*Id.* ¶ 48). In another email exchange, Freedman was informed by the Insys Regional Sales Manager that at his next Speaker Program "NO other docs [i.e. doctors]" whatsoever would be present and that instead the Speaker Program would only be attended by Insys's Vice President of Sales and "two other 'attractive' area sales reps." (*Id.* ¶ 49). On or about March 29, 2013, the Insys Regional Sales Manager informed Freedman, in sum and substance, that Insys was increasing the number of Speaker Programs allocated to Freedman for the second quarter of 2013, and that Freedman had been allocated additional Speaker Programs because Insys wanted Subsys prescriptions to increase in the second quarter of 2013. The Regional Sales Manager then requested, in sum and substance, that Freedman put more new patients on Subsys. Freedman replied to the email, "Got it." (*Id.* ¶ 51). Thereafter, Freedman's prescriptions of Subsys rose precipitously. (*Id.* ¶ 53).

During 2014, Freedman's Subsys prescriptions continued to increase and he was the highest-paid Insys Speaker nationally, receiving approximately $143,000 in Speaker Program fees that year. (Indictment ¶ 56). During the fourth quarter of 2014, Freedman was the fourth-

highest prescriber of Subsys nationally, accounting for approximately $1,132,287 in overall net sales of Subsys. (*Id.* ¶ 57). In July 2015, following the release of an investigative article detailing Freedman's involvement in the Insys Speakers Bureau, and in particular the large volume of Subsys prescriptions Freedman had written and the lucrative Speaker Program fees he had received, Freedman ceased conducting Speaker Programs for Insys. (*Id.* ¶ 61). Thereafter, Freedman's prescriptions of Subsys declined significantly. (*Id.* ¶ 62).

With respect to Goldstein, the Indictment describes how, after an Insys employee first suggested to him the possibility of becoming a Speaker, Goldstein prescribed Subsys on multiple occasions in a short time period. (Indictment ¶ 65). After Goldstein was nominated as a Speaker, his Subsys prescriptions rose markedly. (*Id.* ¶ 67). Goldstein attended an Insys Speaker Program training in October 2013 in Arizona, where he entered into a new Speaker Agreement with Insys that increased his fee per Speaker Program. (*Id.* ¶¶ 68-69). Thereafter, Goldstein's prescriptions of Subsys increased considerably. (*Id.* ¶ 71). Goldstein also received other items of value from Insys, including meals at high-end restaurants at casinos (*id.* ¶ 72(a)), multiple night club outings (*id.* ¶ 72(b)), and the costs of his medical office's holiday party, which amounted to more than $2,000 (*id.* ¶ 72(c)).

After Goldstein began prescribing a competitor product to multiple patients, an Insys District Sales Manager told him, in sum and substance, that Insys senior management had complained and had asked that Goldstein switch the patients back to Subsys. (*Id.* ¶ 75). Goldstein switched multiple patients from the competitor product back to Subsys, and his prescriptions of the competitor product in the ensuing months decreased considerably. (*Id.* ¶ 77).

In 2014, Goldstein was the fifth-highest-paid Speaker by Insys nationally, and in the fourth quarter of 2014, he was approximately the sixth-highest prescriber of Subsys nationally.

(*Id.* ¶ 85).   After reports surfaced that Insys was being investigated regarding its Speaker Program, Insys significantly decreased the number of Speaker Programs it hosted nationally, and the number of Speaker Programs allocated to Goldstein declined.   Thereafter, Goldstein's prescriptions of Subsys decreased markedly.  (*Id.* ¶ 87-88).

Schlifstein, who co-owned his medical office with Goldstein, attended multiple Speaker Programs led by Goldstein from in or about July 2013 through October 2013.  In approximately October 2013, Schlifstein expressed an interest in becoming a Speaker himself.  (*Id.* ¶ 91).  In October 2013, Schlifstein attended a Speaker Program led by Goldstein.  Thereafter, Goldstein, Schlifstein, and Insys employees, managers, and executives went to a strip club together in Manhattan, where the group spent approximately $4,100 on, among other expenses, a private room, alcoholic drinks, and "lap dances" for Goldstein and Schlifstein.  Insys paid the bill.  (*Id.* ¶ 93).

Soon after, an Insys Regional Sales Director who had participated in the strip club outing told Schlifstein's assigned Insys sales representative that Schlifstein had agreed to give Insys a list of patients to whom Schlifstein would prescribe Subsys.  (*Id.* ¶ 93).  Thereafter, Schlifstein met with the Insys sales representative in his office, looked through his calendar of upcoming appointments, and identified specific patients to whom he said he would prescribe Subsys.  (*Id.* ¶ 94).  Schlifstein was nominated as an Insys Speaker on or about November 18, 2013.  (*Id.* ¶ 95).  Schlifstein's prescriptions of Subsys to new patients then increased.  (*Id.* ¶ 96). Schlifstein also took steps to demonstrate to Insys that he was responsible for a high volume of Subsys prescriptions, even informing an Insys executive that he deserved credit for Subsys prescriptions written by his physician assistant.  (*Id.* ¶ 97).

After Schlifstein began being allocated more Speaker Programs in 2014, his prescriptions of Subsys did not increase substantially.  (Indictment ¶ 98).  As a result, Insys cut back on the number of Speaker Programs that would be allocated to Schlifstein for the last quarter of 2014. (*Id.*).  In response, Schlifstein repeatedly lobbied employees and executives of Insys to assign him more Speaker Programs.  In doing so, he often emphasized that he deserved credit for persuading others to prescribe Subsys.  (*Id.* ¶¶ 99-101).  During this same period, Schlifstein asked his assigned Insys sales representative whether Insys could assign him more Speaker Programs, and was told, in substance and in part, that he would be allocated more Speaker Programs only if he prescribed more Subsys.  (*Id.* ¶ 102).  In response to Insys cutting back on his Speaker Programs, and in order to be allocated more Speaker Programs, Schlifstein increased his prescriptions of Subsys substantially in the fourth quarter of 2014 and, as a result, was rewarded by Insys with additional Speaker Programs in 2015.  (*Id.* ¶¶ 103-104).  In the first half of 2015, Schlifstein's prescriptions of Subsys continued to rise, and by the end of the second quarter of 2015 Schlifstein was the 19th-highest prescriber of Subsys nationally.  After Insys reduced Schlifstein's Speaker Programs in the latter half of 2015, Schlifstein's Subsys prescriptions declined and he did not prescribe Subsys to any new patients.  (*Id.* ¶ 106).

Voudouris was nominated as a Speaker in August 2014.  (Indictment ¶ 113).  On or about September 2, 2014, several Insys executives traveled to Manhattan to meet with Voudouris. Over dinner, an Insys Vice President told Voudouris, in substance and in part, "that he wanted her to prescribe [Subsys] to one new patient every day, and that VOUDOURIS would be allocated Speaker Programs if she continued prescribing [Subsys]."  (*Id.* ¶ 114).  From September 3 through September 9, 2014, Voudouris prescribed Subsys to only two additional patients.  On or about September 9, 2014, the Insys Vice President forwarded an email with

recent Subsys prescription data to Voudouris's assigned sales representative and his manager, among others, and stated, "No scripts from [Voudouris], unacceptable for ALL of us?????" (*Id.* ¶ 116). In response, the Insys District Sales Manager instructed Voudouris's sales representative to "set up a meeting for me asap with Dr. Voudouris after work hours," adding: "[w]e have invested way too much at this point to only have a 'few' pts [patients] on Subsys. Dr. Voudouris has repeatedly told us about her extensive amount of cancer pts [patients] suffering from BTCP [i.e. breakthrough cancer pain]. . . . 1 NEW PT A DAY is what was agreed upon." (*Id.* ¶ 116). The District Sales Manager and Voudouris's assigned Insys sales representative met with Voudouris and informed her, in substance and in part, that Insys "expected [her] to write more [Subsys] prescriptions than she had since the September 2 dinner" with the Insys executives. (*Id.* ¶ 117).

Following that discussion, Voudouris's prescriptions of Subsys rose substantially. By the end of the first quarter of 2015, Voudouris was approximately the 10th-highest prescriber of Subsys nationally. (Indictment ¶ 120). From January 1, 2015, until August 13, 2015, Voudouris conducted approximately 23 Speaker Programs and received total fees of approximately $75,300. (*Id.* ¶ 119).

In order to continue prescribing high volumes of Subsys and thereby continue to collect Speaker Program fees, Voudouris at times prescribed Subsys refills to patients who already had an ample supply remaining from previous prescriptions. (Indictment ¶ 122). Voudouris's assigned Insys sales representative retrieved the Subsys prescriptions from a nearby pharmacy and delivered the Subsys to Voudouris at her office. Rather than provide this Subsys to the patients listed on the prescriptions, Voudouris stockpiled boxes of Subsys in her medical office. (*Id.* ¶ 123). Voudouris also sought to assist her Insys sales representative win a contest whereby

11

the sales representative who obtained the most new patient "opt-ins" from his or her assigned doctors during a two-week period would receive a bonus.  Voudouris gave her Insys sales representative and another Insys employee access to patient names and other patient information that they then used to complete opt-in forms for patients who had not authorized their medical information to be shared with Insys.  As a result, Voudouris's office submitted opt-in forms for approximately 26 patients during a short period in or about early April 2015.  (*Id.* ¶ 126).

When the number of Speaker Programs allocated to Voudouris decreased starting in or about August 2015, Voudouris's prescriptions of Subsys also declined considerably.  (*Id.* ¶¶ 130-131).

## II.   RULE 16 DISCOVERY AND OTHER DISCLOSURES

The Government has produced voluminous and organized discovery in this case pursuant to Rule 16.  The productions have included, among other things, sign-in sheets from the defendants' Speaker Programs, medical records, insurance records, records from the New York Bureau of Narcotics Enforcement relating to the prescribing of controlled substances, and bank records.  The Government has also produced a voluminous quantity of emails obtained from Insys, as well as emails obtained from a search warrant of the email accounts of Freedman, Goldstein, and Schlifstein.  All of the emails were produced in a format such that they could be loaded to a document review database where they are text-searchable.  Text messages obtained from various witnesses' electronic devices have also been produced.  The Government has also obtained from the United States Attorney's Office for the District of Massachusetts the discovery provided to the defendants in *United States v. Michael Babich et al.*, No. 16 Cr. 10343 (ADB) (D. Mass.), through September 17, 2018.  The defendants in *United States v. Babich et al.* are former Insys executives.  The charges against them relate, in part, to Insys's Speaker Program

bribery scheme.  To the extent the U.S. Attorney's Office for the District of Massachussetts has produced additional discovery to the defendants in *Babich et al.* since September 17, 2018, the Government intends to provide those additional materials to the defendants in this case promptly.[4]

Finally, consistent with its obligations, the Government has provided multiple disclosure letters to the defendants pursuant to *Brady v. Maryland* and in an abundance of caution.

## ARGUMENT

## I.     THE MOTIONS TO DISMISS THE INDICTMENT SHOULD BE DENIED

### A.     Applicable Law

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).  Indeed, it is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).

To be valid on its face, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* Fed. R. Crim. P. 7(c).  In general, to satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime."  *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation

---

[4] Trial in *U.S. v. Babich et al.* is ongoing.

marks omitted).[5]   When determining whether a count sufficiently alleges a violation, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

A facially valid indictment is not subject to challenge based on the quality or quantity of evidence.  *See United States v. Williams*, 540 U.S. 36, 54 (1992); *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.NY. Feb. 7, 2012).   A defendant seeking to challenge the sufficiency of the evidence must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict.  *See* Fed. R. Crim. P. 29; *see also United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997) ("[I]t is well established that an Indictment that is valid on its face may not be dismissed on the ground that it is based on inadequate or insufficient evidence. . . . [T]he Government is not required to demonstrate the sufficiency of its proof until the close of its case-in-chief at trial."); *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.  Instead, a defendant must await a Rule 29 proceeding . . . ."); *Elie*, 2012 WL 383403, at *1 ("[T]here is no summary judgment in criminal cases").   Indeed, because a post-trial motion is the proper avenue for challenging the accuracy or sufficiency of the Government's factual allegations, on a pretrial motion to dismiss, the allegations as set forth in the Indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).

---

[5] Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, *see Stringer*, 730 F.3d at 125-26 (discussing, for example, the special case of *Russell v. United States*, 369 U.S. 749 (1962)), defendants do not and could not contend such circumstances are present here.

B.      **Discussion**

There can be no serious dispute that the 74-page Indictment returned by the grand jury in this case alleges every element of each charged offense and fairly informs the defendants of the charges against which they must defend.  The Indictment is sufficient on this ground alone.  *See Stringer*, 730 F.3d at 124.

Moreover, and far beyond meeting the requirement of "track[ing] the language of the statute charged and stat[ing] the time and place" of the alleged crime, *Yannotti*, 541 F.3d at 127, the Indictment sets forth in considerable detail how the defendants agreed to prescribe Subsys in return for Speaker Program fees.  It describes specific conversations, acts, and emails, as well as the physicians' prescribing patterns before, during, and after they each received Speaker Program fees.  The Indictment further describes the sham nature of the defendants' purportedly educational Speaker Programs.  The Indictment provides similar detail—far more than required to defeat a motion to dismiss—for the aggravated identity theft and HIPAA charges.

That alone warrants a denial of a motion ostensibly challenging the validity of the Indictment.  *See, e.g.*, *United States v. Faison*, 393 F. App'x 754, 757 (2d Cir. 2010) (summary order) (internal quotation marks omitted) (affirming the district court's denial of a motion to dismiss the indictment because "the indictment ... track[ed] the language of [the statute] ... [and] stated adequately the object of the conspiracy-possessing cocaine with intent to distribute it.").  Nonetheless, the Government responds to the defendants' specific contentions below.

1.      *The Motions to Dismiss Counts One and Three Based on a Purported Failure to Allege an Agreement Should Be Denied*

At bottom, the defendants' motions to dismiss Counts One and Three, which charge conspiracy to violate the Anti-Kickback Statute and conspiracy to commit honest services wire fraud, respectively, assert that the allegations in the Indictment are not sufficient to show a

"meeting of the minds."  (*See, e.g.,* Voudouris MTD Br. at 8).  These fact-dependent arguments cannot be resolved on a motion to dismiss.  Whether a conspiracy existed and whether the defendants joined that conspiracy are plainly fact questions for the jury that cannot be resolved before trial.  *See, e.g., United States v. Zullo*, No. 09Cr. 64 (JGM), 2013 WL 2322966, at *3 (D. Vt. May 28, 2013) (denying motion to dismiss and noting that "[w]hether evidence at a trial would prove a conspiracy, including if a defendant knowingly entered the conspiracy, is a question for a jury."), *aff'd*, 581 F. App'x 70, 71 (2d Cir. 2014) (Summary Order).[6]

The defendants' argument that the Indictment fails to allege an agreement relies on the mistaken premise that the Indictment charging a conspiracy offense must allege an *explicit* agreement.  That is not the law.  "'A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.'"  *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quoting *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001).  Indeed, courts in this District—including this Court—regularly instruct juries that "[t]o establish a conspiracy, the government is not required to show that two or more persons sat around a table and entered into a solemn compact, orally or in writing" and that "[w]hen people agree to enter into a criminal conspiracy, much is left to unexpressed understanding."  Charge of the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317 (KMW); *see also id.* ("Since conspiracy, by its very nature, is characterized by secrecy, it is rare that a conspiracy can be proven by direct evidence of that

---

[6] The defendants' argument that Counts One and Three must be dismissed for failure to allege the existence of an agreement is particularly baseless in light of the fact that, as the Second Circuit has recognized, "[a]lleging the existence of an agreement [is] superfluous because, '[b]y definition, conspiracies require agreements.'"  *See Zullo*, 581 F. App'x at 71 (quoting *United States v. Yu–Leung,* 51 F.3d 1116, 1122 n. 3 (2d Cir.1995)).  The defendants' contention that the Indictment fails to allege that the defendants joined the conspiracy likewise fails because an "indictment [need not] allege that [the defendant] willingly joined the conspiracy because the 'charge of conspiracy to violate a criminal law has implicit in it the elements of knowledge and intent.'"  *Zullo*, 581 F. App'x at 71 (quoting *Schnautz v. United States,* 263 F.2d 525, 529 (5th Cir. 1959)).

explicit agreement. Thus, you may infer its existence from the circumstances of this case and the conduct of the parties involved. . . . The saying 'actions speak louder than words' is applicable here."). Accordingly, the defendants' arguments that the allegations in the Indictment do not support a conspiratorial agreement should be rejected.[7]

The defendants' other contentions in support of dismissal of Counts One and Three amount to one-sided characterizations of the allegations that are more appropriately directed to a jury during summation than to a court on a motion to dismiss. For example, Voudouris asserts that "the pattern of Dr. Voudouris' prescriptions alleged. . . *does not support an agreement* by Dr. Voudouris to prescribe to one patient every day, or to do anything else, as a quid pro quo exchange for payments for Speaker Programs." (Voudouris MTD Br. at 11) (emphasis added). Whether Voudouris's actions and words support a conspiratorial agreement must be resolved at a trial.[8]

---

[7] That said, the Indictment alleges a number of strikingly explicit conversations between Insys employees and the defendants that constitute strong evidence of the charged conspiracies. For example, the Indictment alleges that Freedman received an email from his Insys sales representative informing him, in sum and substance, that more Speaker Programs had been allocated to him for the coming quarter and that Insys wanted to see more "new activations," *i.e.* prescriptions, as a result, and that, in turn, Freedman's prescriptions of Subsys rose substantially during the months that followed. (Indictment ¶¶ 51-53). During a period when he was receiving significant fees from Insys for running sham Speaker Programs, Goldstein complied with an Insys manager's request, on behalf of others at the company, that he switch patients to whom he had prescribed a competitor drug back to Subsys. (*Id.* ¶¶ 75-77). During conversations with Insys executives and managers, Voudouris was informed that Insys would allocate her more Speaker Programs if she continued to prescribe Subsys, and that Insys "wanted her to prescribe [Subsys] to one new patient every day." (*Id.* ¶ 114). In a subsequent conversation with an Insys manager, she was told that Insys "expected [her] to write more [Subsys] prescriptions than she had been." After these conversations, Voudouris's prescriptions of Subsys increased dramatically while she received lucrative Speaker Program fees. (*Id.* ¶¶ 117-118). And Schlifstein asked his Insys sales representative what it would take to start being allocated more Speaker Programs, and was told that he needed to prescribe more Subsys. (*Id.* ¶ 102). Thereafter, Schlifstein's prescriptions of Subsys rose dramatically and he began receiving more Speaker Program fees. (*Id.* ¶¶ 102-103). Such allegations amply allege the defendants' participation in a conspiracy.

[8] Voudouris also argues that because the Indictment alleges that an Insys executive demanded "one new patient every day" and Voudouris's prescriptions of Subsys did not mean that target (although her prescriptions did rise considerably), no conspiracy could have existed. (Voudouris MTD Br. at 8-9).

Freedman, Goldstein, and Schlifstein make similarly fact-dependent assertions that have no place in a motion to dismiss and should be rejected.  (*See* Freedman Br. at 9-10; Goldstein Br. at 5-13; Schlifstein Br. at 6-7).  For example, Freedman claims that an email in which an Insys employee informed Freedman, in sum and substance, that he had been allocated more Speaker Programs because Insys "wanted us to push for a QUICK start in April with new activations," *i.e.* prescriptions, and to which Freedman responded "got it," cannot "be construed as an agreement to violate the laws of the United States."  (Freedman Br. at 6-7).  But whether this email exchange tends to prove or disprove a conspiracy is plainly a fact question for the jury.

Similarly, Goldstein asserts that allegations that he switched patients from a competitor product to Subsys at Insys's request do not prove a conspiracy because "Dr. Goldstein's shift away from the competitor drug does not demonstrate that Goldstein was conspiring with Insys as he was still working with and for Insys' competitor."  (Goldstein Br. at 11-12).  It will be for the jury to decide whether those facts, if proven at trial, constitute evidence of a conspiratorial agreement.

Schlifstein argues that "the Indictment identifies no agreement between Dr. Schlifstein and Insys that tied Subsys prescriptions to Speaker Program assignments" and notes that there is no allegation that many of the internal Insys emails quoted in the Indictment were ever passed on to Schlifstein."  (Schlifstein Br. at 6-7).  Once again, these arguments fail because whether Schlifstein reached an agreement with Insys to receive Speaker Program fees in exchange for prescribing, and the adequacy of the Government's evidence in that regard, are issues to be decided by a jury.

---

This argument borders on the frivolous.  It is well-settled that "[c]o-conspirators need not . . . agree 'on the details of the conspiracy, so long as they agree[ ] on the essential nature of the [unlawful] plan.'" *United States v. Medina*, 944 F.2d 60, 64 (2d Cir. 1991) (quotations and citations omitted).

In sum, the detailed allegations in the Indictment more than adequately support the conspiracy offenses charged in Counts One and Three. Given that an indictment need only "track the language of the statute charged and state the time and place" of the alleged crime, *Yannotti*, 541 F.3d at 127, the defendants' motions to dismiss Counts One and Three must be denied.

2.     *The Motions to Dismiss Count Two Should Be Denied*

The defendants further contend that Count Two, which charges a substantive violation of the Anti-Kickback Statute, should be dismissed because the Indictment "fails to allege that [they] received remuneration in the form of Speaker Program fees in exchange for prescribing Subsys." (Schlifstein Br. at 7; *see also* Freedman Br. at 10). This is false. The Indictment plainly alleges that the defendants prescribed Subsys in exchange for Speaker Program fees. (*See, e.g.,* Indictment ¶ 1 (defendants "engaged in a scheme in which they accepted bribes and kickbacks in exchange for prescribing [Subsys]"), ¶ 5 (defendants "each annually received tens of thousands of dollars – and in some instances more than $100,000 – in Speaker Program fees from [Insys] [and] [i]n return, they prescribed large volumes of [Subsys].")). Moreover, the allegations in Count Two track the statutory language and contain a detailed "to wit" clause that alleges that the defendants "solicited and received Speaker Program fees and other benefits in return for prescribing [Subsys]." (Indictment ¶ 155). As explained above, nothing more is required for to defeat the motions to dismiss.

The defendants' remaining arguments are similarly premature attacks on the sufficiency of the evidence. Schlifstein, for example, argues that "[t]he Speaker Programs and prescriptions the Indictment identifies . . . even if proved true  . . . would not show such a relationship between the Speaker Program fees and Dr. Schlifstein's prescriptions of Subsys and would fall far short

of demonstrating the necessary direct link." (Schlifstein Br. at 8).  But whether such a link exists and whether Schlifstein acted with the requisite criminal intent are questions for the jury.  *See, e.g., United States v. Percoco*, No. 16-cr-776 (VEC), 2017 WL 6314146 at *7 (S.D.N.Y. Dec. 11, 2017)  ("[T]he sufficiency of the Government's evidence of intent cannot be considered on a motion to dismiss the indictment, and the indictment need only track the language of the statute." (citing *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006))); *Cart v. United States*, No. H-88-16, 1989 WL 165585, at *4 (D. Conn. Nov. 15, 1989) (stating that whether defendants' actions qualify "as quid-pro-quo for the lump sum payment is a question of fact for the jury"); *United States v. Light*, No. 00 CR 417, 2000 WL 875846, at *2 (N.D. Ill. June 29, 2000) ("The issue of [the defendant's] intent involves evidentiary issues that will be addressed at trial.  Thus, this argument is not properly made on a motion to dismiss.").

Moreover, Schlifstein's arguments simply ignore many of the Indictment's specific allegations against him, including allegations that he took steps to demonstrate to Insys that he accounted for a high volume of Subsys prescriptions (Indictment ¶ 97), that he asked his Insys sales representative how he could be allocated more Speaker Programs and was told that he would need to prescribe more Subsys (*id.* ¶ 102), and that his prescriptions thereafter rose considerably and he began to receive more Speaker Programs as a result (*id.* ¶ 103).  These allegations, among many others, clearly allege the "direct link" Schlifstein claims is lacking in the Indictment.  His motion should be denied.

Freedman and Schlifstein both argue that Speaker programs are "approved activities" under 42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(d), and that the Indictment fails to allege that the doctors received these payments "under circumstances that fall outside the approved activities" of the Anti-Kickback Statute. (Freedman Br., at 11; *see also* Schlifstien Br.

at 9-10).  They are wrong.  The Anti-Kickback Statute may allow physicians to receive Speaker Programs fees for legitimate educational events, but no safe harbor covers Speaker Programs that are largely shams involving no education, as is alleged in the Indictment here (*see, e.g.,* Indictment ¶¶ 4, 34-39, 40, 63, 89, 107).  *See United States v. TEVA Pharm. USA, Inc.*, No. 13 Civ. 3702 (CM), 2016 WL 750720, at *18 (S.D.N.Y. Feb. 22, 2016) ("allegedly sham honoraria . . . are not shielded by the AKS' personal services safe harbor" under 42 U.S.C. § 1320-7b(b) and 42 C.F.R. § 1001.952(d) because the civil complaint "clearly allege[d] facts inconsistent with the personal services safe harbor"; the allegations "support[ed] the inference that the compensation paid to the physician was not 'consistent with fair market value,' in that the speaker programs often had no 'market value' at all, and were indeed 'determined in a manner that t[ook] into account the volume or value of any referrals or business otherwise generated between the parties' insofar as physicians could only *become* speakers and *remain* speakers if they generated sufficient prescriptions."); *cf. U.S. ex rel. Bilotta v. Novartis Pharm. Corp.,* 50 F. Supp. 3d 497, 521 (S.D.N.Y. 2014) ("Given the examples of doctors and sham speaker events set forth in the pleadings, and the detailed description of how the scheme functioned, the Government Entities have pled the underlying anti-kickback violations with sufficient particularity to satisfy the requirements of Rule 9(b).").[9]

---

[9] Freedman's arguments that Count Two should be dismissed mirror his arguments with respect to Count One, and fail for similar reasons.  (*See* Freedman Br. at 10-11).

### 3.     The Motions to Dismiss Count Three Should Be Denied

The defendants further contend that Count Three, which charges a conspiracy to commit honest services wire fraud, should be dismissed because the Indictment purportedly fails to allege (i) a scheme or artifice to defraud; (ii) a breach of a fiduciary duty; and (iii) material misrepresentations or omissions. (*See* Voudouris MTD Br. at 11; Freedman Br. at 12-14; Schlifstein Br. at 11-13).  These arguments all fail for the reasons described below.

### a.     The Indictment Alleges a Scheme or Artifice to Defraud

The mail and wire fraud statutes criminalize "schemes" to defraud, and 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the *intangible right of honest services*."[10]  In *Skilling v. United States,* a private-sector honest services fraud case, the Supreme Court held that, in order to prevent 18 U.S.C. § 1346 from being unconstitutionally vague, the statute must be read to proscribe "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived."  *Skilling*, 561 U.S. 358, 404 (2010).  In applying *Skilling*, the Second Circuit has stated that, to commit honest services wire fraud "the charged conduct must involve a *quid pro quo*, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)).

The defendants contend that the Indictment fails to allege a scheme or artifice to defraud because there is no allegation that, in prescribing Subsys, the defendants intended to cause harm

---

[10] Congress enacted this provision in 1988 to overturn the Supreme Court's then-recent decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), which had held that only tangible property rights were protected from schemes to defraud under the mail and wire fraud statutes.

to their patients or that the defendants' prescribing of Subsys constituted improper medical care.[11]  (*See* Voudouris MTD Br. at 13; Schlifstein Br. at 11; Freedman Br. at 12).

The defendants' argument is wrong and must be rejected under binding Second Circuit precedent.  Under the honest services fraud statute, the Government is not required to show that the defendants intended to cause tangible harm to their patients or that they provided improper medical care.  To the contrary, as the Second Circuit has held, "actual or intended economic or pecuniary harm to the victim need not be established" in an honest services fraud prosecution.  *See United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc).  Rather, "the only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services."  *Id.* at 145 (quotations omitted).[12]

Nothing about *Skilling* changes the Second Circuit's conclusion in *Rybicki*; indeed, as the Seventh Circuit in *United States v. Nayak* recognized, *Skilling* merely confirms that a showing of tangible harm is not necessary in the private-sector honest services fraud context.  *See United States v. Nayak*, 769 F.3d 978, 982 (7th Cir. 2014).  Multiple courts in this Circuit have reached the same conclusion post-*Skilling*.  *See United States v. Tanner*, No. 17 Cr. 61 (LAP), 2018 WL 1737235, at *6 (S.D.N.Y. Feb. 23, 2018) ("The Court agrees with the Government that after *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback, but

---

[11] The defendants' arguments that they did not prescribe Subsys in a manner intended to harm any patients also appear to be directed at the substantive offense of honest services wire fraud.  The defendants are charged with conspiring to commit honest services wire fraud, not the substantive offense, and thus the Government need allege that the defendants *agreed* with others to defraud their patients of the right to their doctors' honest services, not that the defendants actually did so.

[12] Notably, *Rybicki* held that "there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment" to the employer—but only in self-dealing cases that are no longer criminalized in light of *Skilling*.  *Id.* at 142.  The Court expressly held that "detriment" would *not* be required in bribery or kickback cases (unlike in self-dealing cases) based on its review of pre-*McNally* case law.  *Id.* ("[I]n self-dealing cases, unlike bribery or kickback cases, there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment—but that is of no moment with respect to the case at bar, which involves secret payments, not conflicts of interest.").

23

whether such actions benefited or harmed the employer who enjoyed a right to the honest services of its employee, is irrelevant." (citing *Nayak*, 769 F.3d at 981-82)); *United States v. Napout*, 332 F. Supp. 3d 533, 550 (E.D.N.Y. 2018) ("The flaw in Napout's argument, however, is that the crime of honest services fraud does not require a showing of pecuniary harm to the victim.   Indeed, as the Second Circuit stated in *Rybicki*, 'actual or intended economic or pecuniary harm to the victim need not be established' to prove a crime of honest services fraud." (quoting *Rybicki*, 354 F.3d at 145)); *United States v. Yaron*, No. S2-10-CR-363 GBD, 2011 WL 3279054, at *4 (S.D.N.Y. July 28, 2011) ("As Defendants concede, the Second Circuit has expressly held under Section 1346, 'actual or intended economic or pecuniary harm to the victim need not be established.'" (quoting *Rybicki,* 354 F.3d at 145)).

In claiming that the Government must allege intended patient harm, the defendants fail to discuss *United States v. Nayak*, a recent Seventh Circuit decision that is on all fours with the instant prosecution and which is entirely consistent with the Second Circuit's holding in *Rybicki*. In *Nayak*, an honest services fraud case involving the breach of a physician's duty to his patients, the Seventh Circuit held that a showing of intended patient harm is *not* required in order to allege honest services fraud.   *See United States v. Nayak*, 769 F.3d 978, 981-82, 984 (7th Cir. 2014) (rejecting defendant's request "to create yet another judicial limitation on the scope of [Section 1346]: a requirement that the victims of *private* honest-services fraud suffer actual or intended tangible harm. . . . [Section] 1346 applies exclusively to the *intangible* right of honest services, so tangible harm need not be shown.") (emphasis in original).   The defendant in *Nayak* was the owner of outpatient surgery centers who made under-the-table payments to physicians who referred patients to his centers.   He was charged with, among other offenses, honest services mail fraud.   The defendant argued that the Government needed to allege "some form of actual or

intended harm to the referring physicians' patients as an element of the crime." *Id.* at 979. In light of the Supreme Court's decision in *Skilling*, the Seventh Circuit disagreed, reasoning in pertinent part:

> [B]ecause *Skilling* tells us that [section] 1346 applies to this case, the rest is clear: [section] 1346 applies exclusively to the *intangible* right of honest services, so tangible harm need not be shown. Why would Congress specify (via [section] 1346) that [section] 1341 reaches schemes causing intangible harm if Congress also meant to limit [section] 1341 only to schemes that result in tangible harm? . . . . [I]t is contradictory to require the government to show actual or intended *tangible* harm when the crime being prosecuted is defined as causing or intending to cause *intangible* harm. Nayak's proposed construction would not only be contrary to the plain language of the statute but would also mean that [section] 1346 is superfluous, as fraudulent schemes causing tangible harm are covered under [section] 1341.

*Id.* at 982.

The *Nayak* court added that "the intangible harm from a fraud can often be quite substantial, especially in the context of the doctor-patient relationship, where patients depend on their doctor—more or less completely—to provide them with honest medical services in their best interest." *Id.* at 984. The court thus concluded that "no showing of tangible harm to a victim is necessary" under the honest services fraud statute. *Id.* at 984.

In support of their argument that patient harm must be alleged, the defendants rely on a lone Eighth Circuit opinion, *United States v. Jain*, which predates *Skilling*. (*See* Voudouris MTD Br. at 12; Schlifstein Br. at 12). *Jain* is inconsistent with *Skilling* and the law in this Circuit. In *Jain*, a doctor received undisclosed payments from a hospital to refer his patients, and the government alleged that the patients were the victims of a "fraudulent referral fees scheme." *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996). The Eighth Circuit noted that "no evidence that any patient suffered tangible harm" was presented at trial, and that "Dr. Jain provided quality psychological services." *Id.* at 441. According to the Eighth Circuit, the

government was required to prove the defendant intended to cause tangible harm to the patients. *Id.* at 442 ("when the client was not harmed because the breach did not affect the services rendered, how has the client's right to honest services been violated?").[13]

The Eighth Circuit's conclusion in *Jain* that proof of intent to cause tangible harm to the patients was required is inconsistent with the law in this Circuit as is discussed in detail above. *E.g., Rybicki*, 354 F.3d at 145. Moreover, as the Seventh Circuit pointed out in *Nayak*, *Jain* is based on the false premise that public sector and private sector honest services fraud cases are different in kind, which the Supreme Court made clear in *Skilling* was simply not the case. *See Nayak*, 769 F.3d at 982 ("Nayak's entire argument—as well as the *Jain* decision—is based on the premise that § 1346 does not apply to private corruption, and thus that the government must show tangible harm in a private corruption case. But because *Skilling* tells us that § 1346 applies to this case, the rest is clear: § 1346 applies exclusively to the *intangible* right of honest services, so tangible harm need not be shown.") (emphasis original).[14] For this reason and others, this

---

[13] The Eighth Circuit acknowledged that there had been evidence presented regarding "undisclosed, unethical referral fees," but concluded that this was not sufficient to support the conviction. It reasoned that "there is no independent evidence proving that [the defendant] thereby intended to defraud his patients" because there was no "evidence that any patient would have considered Dr. Jain's relationship with [the hospital] material if it did not affect the quality or cost of his services to that patient." *Jain*, 93 F.3d at 442. *Jain* by its own terms thus turns on the materiality of the defendant's failure to disclose the referral payments to his patients. Materiality is a fact question for the jury, so even under *Jain*'s own reasoning, the motion to dismiss the Indictment should be denied. *See United States v. Gaudin,* 515 U.S. 506, 523 (1995); *see also United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) ("[U]nless no reasonable mind could find a statement or omission to be material, a criminal trial court *must* submit the issue to the jury." (citing *Gaudin*, 515 U.S. at 511) (emphasis in original)).

[14] While the court in *Jain* acknowledged that a showing of tangible harm was not required in public sector honest services fraud cases, in the Eighth Circuit's view "the transition from public to private sector in this context raises troublesome issues" because "[w]hen official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated," but "in the private sector . . . [w]hen there is no tangible harm to the victim of a private scheme, it is hard to discern what intangible 'rights' have been violated." *Jain*, 93 F.3d at 441-42. The *Jain* decision was thus rooted in a distinction between public sector and private sector honest services fraud cases that was rejected in *Skilling*. While there may be differences in the *application* of certain elements of the crime in the private and public sectors (an employer, for example, might consider certain bribes or kickbacks immaterial even though the same

Court should do as the Seventh Circuit did in *Nayak* and decline to follow *Jain*, especially in light of the Second Circuit's clear precedent on this very question.[15]

>    b.    *The Indictment Alleges a Cognizable Breach of Fiduciary Duty*

In moving to dismiss Count Three, the defendants further argue that (1) "the Indictment fails to allege any [fiduciary] duty owed by [the doctors] to [their] patients" and (2) that, even if the Indictment did allege such a duty, the Indictment fails to allege a breach of fiduciary duty "[b]ecause the Indictment never alleges that [the doctors] prescribed Subsys to patients who did not need it." (*See* Schlifstein Br. at 13; *see also* Freedman Br. at 13-14; Voudouris MTD Br. at 16). These arguments are contrary to well-settled law and should be rejected.

First and foremost, the defendants' contention that no breach of a fiduciary duty is alleged fails based on the face of the Indictment itself, which alleges the very breach of duty that

---

might not be true for a public official, *see United States v. DeMizio*, 2012 WL 1020045, at *9 n.3 (E.D.N.Y. Mar. 26, 2012), *aff'd*, 741 F.3d 373 (2d Cir. 2014)), there is no basis in Section 1346's language or in the cases that have interpreted it to conclude that the nature of the harm criminalized by the statute is different, *i.e.* that the Government must show tangible harm in private sector cases but not make said showing in public sector cases. In the public sector context, it is well-settled that it is no defense to say that the defendant's acts may have been desirable or beneficial to the public, or that the defendant might have lawfully and properly performed the same official acts even if there had been no bribes. *See, e.g., United States v. Rosen*, 716 F.3d 691, 701-02 (2d Cir. 2013) (finding it irrelevant that the legislator's actions were "routine" and "consistent with the interests of the official's constituents" because "[p]ayments to State legislators may constitute bribes even if the legislator's resulting actions are otherwise 'routine' . . . . [T]he corrupt intent that is central to an illegal quid pro quo exchange persists even though the State legislator's acts also benefit constituents other than the defendant."); *United States v. Bryant*, 655 F.3d 232, 242 (3d Cir. 2011) (affirming honest-services fraud conviction and holding "[t]hat [the defendant's] actions may also have benefited his constituents is irrelevant"); *United States v. Black*, 530 F.3d 596 (7th Cir. 2008) ("Judges who accept bribes invariably argue that they didn't allow the bribes to influence their decisions. But a judge who accepts bribes deprives the judiciary of his honest services even if, as contended by Francis Bacon, the most famous of corrupt judges, he does nothing for the person who bribed him.").

[15] Furthermore, section 1346 was meant to reinstate pre-*McNally* law, which, as Congress well knew, applied equivalently to both the private and public sector. *See Skilling*, 561 U.S. at 401. Thus, the Second Circuit recently expressly *rejected* a defendant's "suggestion that . . . [the court] should ignore cases involving public officials" in a private sector honest services fraud prosecution. *See United States v. DeMizio*, 741 F.3d 373, 381 (2d Cir. 2014) (explaining that the Supreme Court's decision in *Skilling* "analyzed cases involving public officials as well as cases involving employees in the private sector in deciding the appeal brought by Skilling himself, a private-sector employee," and that, thus, the Second Circuit would do the same).

they claim is lacking.  The Indictment expressly alleges that the defendants conspired to "deprive patients of their intangible rights to their doctors' honest services" by "participat[ing] in a scheme to prescribe [Subsys] to patients in return for bribes and kickbacks . . . thereby depriving patients of their intangible rights to their doctors' honest services."  (Indictment ¶ 158).

With respect to the defendants' argument that the Indictment fails to allege a cognizable fiduciary duty, the defendants specifically contend that "the Indictment fails to allege any such duty owed by [the doctors] to [their] patients." (Schlifstein Br. at 13; *see also* Freedman Br. at 13; Voudouris MTD Br. at 16).  This argument should be rejected.  The Government does not dispute that after *Skilling* a breach of a fiduciary duty is a required element of an honest services fraud prosecution.  *See Skilling*, 561 U.S. at 407 (noting that the "solid core" of the honest services doctrine "involved offenders who, *in violation of a fiduciary duty*, participated in bribery or kickback schemes.") (emphasis added).

The defendants err in their assertion that the duty they owed to their patients does not fall within the purview of the fiduciary duties recognized under the honest services fraud statute.  To the contrary, it is clear that a doctor who breaches his duties to his patient by accepting bribes may be prosecuted for honest services fraud.  The honest services fraud statute does not just criminalize violations of the right to honest services by employees of businesses and, rather, extends to a wide range of other fiduciary relationships.  *See, e.g., United States v. Milovanovic*, 678 F.3d 713, 724 (9th Cir. 2012) (collecting cases and noting that the statute "is not limited to a formal 'fiduciary' relationship well-known in the law, but also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise").

The Second Circuit has indicated that a fiduciary relationship exists "when confidence is reposed on one side and there is resulting superiority and influence on the other."  *See United States v. Chestman*, 947 F.2d 551, 568 (2d Cir.1991) (citation omitted).  "'At the heart of the fiduciary relationship' lies 'reliance, and de facto control and dominance.'"  *Id.* (quoting *United States v. Margiotta,* 688 F.2d 108, 125 (2d Cir.1982)).  Fiduciary relationships can exist in many contexts other than an employer-employee relationship, such as where "other persons . . . assume a legal duty of loyalty comparable to that owned by an officer or employee to a private entity."  *Rybicki*, 354 F.3d at 142 n.17 (citations omitted); *see also Smith*, 985 F. Supp. 2d at 595 ("As to the types of fiduciary duty the violation of which is sufficient to support an honest-services-wire-fraud prosecution, it is clear from the Second Circuit's holding and canvassing of the case law in *Rybicki* that the duty of loyalty is unquestionably one such type.").

In light of the broad set of fiduciary duties recognized under the case law, multiple courts have recognized that the doctor-patient relationship is a fiduciary duty recognized under the honest services fraud statute.  *See Nayak*, 769 F.3d at 984 ("[T]he intangible harm from a fraud can often be quite substantial, especially in the context of the doctor-patient relationship, where patients depend on their doctor – more or less completely – to provide them with honest medical services in their best interest."); *United States v. Greenspan*, No. 16 Cr. 114 (WHW), 2016 WL 4402822, at *15-16 (D.N.J. Aug. 16, 2016) (rejecting defendant's argument that "medical doctors have no clearly defined duty of honest services to their patients within the meaning of the federal honest services fraud statute"); *United States v. Scanlon*, 753 F. Supp. 2d 23, 25–26 (D.D.C. 2010) (noting that while pre-*McNally* cases typically involved public official-public, employee-employer, and union official-union member relationships, that "this does not mean that these examples represent an exhaustive list of the fiduciary relationships that can support an

29

honest-services fraud prosecution, to the exclusion of other fiduciary relationships such as . . .
doctor-patient. . . .") (citing *Rybicki*, 354 F.3d 142 n. 17); *aff'd*, 666 F.3d 796 (D.C. Cir. 2012);
*United States v. Neufeld*, 908 F. Supp. 491, 500 (S.D. Ohio 1995) (rejecting defendant
physician's argument that honest services fraud counts "must be dismissed because there was no
fiduciary relationship between [the doctor] and any of the ostensible victims" since "there
certainly are elements of a fiduciary relationship between [the doctor] and his patients." (citing
*United States v. Willis*, 737 F.Supp. 269, 271 (S.D.N.Y.1990) ("It is difficult to imagine a
relationship that requires a higher degree of trust and confidence than the traditional relationship
of physician and patient."))); *cf. World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp.
2d 486, 503 (S.D.N.Y. 2007) ("Attorney/client or doctor/patient relationships are sufficiently
rooted in trust and confidence to trigger super-contractual fiduciary duties.") (quotations and
citations omitted).[16]

The defendants further contend that, even if the doctor-patient relationship is a
recognized fiduciary duty under the honest services fraud statute, Count Three must still be
dismissed because the Indictment never alleges that the defendants "prescribed Subsys to
patients who did not need it," (Schlifstein Br. at 13), or that the defendants prescribing of Subsys
otherwise was "without regard to patient need and contrary to a physician's duty to exercise
reasonable medical judgment."  (Freedman Br. at 13; *see also* Voudouris MTD Br. at 16).

These arguments, which echo the defendants' assertion that Count Three fails unless the
defendants intended tangible harm, should likewise be rejected.  When a physician accepts bribes
in return for prescribing, the patient's intangible right to his doctor's honest services is breached,
irrespective of whether the patient was tangibly harmed or whether the doctor's treatment of the

---

[16] Although the fiduciary duty that was breached in this case is abundantly clear, whether such a duty in
fact exists is, in any event, a question of fact for the jury.  *See Halloran*, 821 F.3d 321, 340 (2d Cir.
2016).

patient deviated from the "a physician's duty to exercise reasonable medical judgment." (Freedman Br. at 13). As aptly stated by the district court in *Neufeld*, an honest services fraud case in which a doctor solicited bribes in return for referring his patients to another provider, such conduct breached the defendant-doctor's fiduciary duty to his patients because "the health of his patients was certainly not [the defendant's] only concern" and because "[h]is patients deserved medical opinions and referrals unsullied by mixed motives." *Neufeld*, 908 F. Supp. at 500. Accordingly, this conduct constituted a "breach of the fiduciary relationship between [the doctor] and his patients [and] support[ed] a theory of fraudulent deprivation of the 'intangible right to honest services.'" *Id.*; *see also Nayak*, 769 F.3d at 978 (rejecting defendant's argument that indictment was insufficient for failure to allege that defendant's conduct "caused or was intended to cause tangible harm to any of the referring physicians' patients" and affirming conviction despite the fact that indictment did not allege that the defendant "caused or intended to cause any sort of tangible harm to the patients in the form of higher costs or inferior care").

The same is true in this case. The Indictment alleges that the defendant doctors each accepted large Speaker Program fees—for Speaker Programs that were actually shams—in return for prescribing Subsys. Contrary to the defendants' arguments otherwise, the Government need not allege, nor prove at trial, that the doctors' prescriptions of Subsys were unwarranted or that the patients received improper medical care in order to show a breach of fiduciary duty. A doctor who accepts bribes in return for prescribing breaches a fiduciary duty to his patient.

       *c.*     *The Indictment Need Not Allege Material Misrepresentations or Omissions*

Finally, in support of dismissal of Count Three the defendants also argue that the Indictment fails to allege a material misrepresentation or material omission to the defendants' patients concerning the Speaker Program payments. (*See* Voudouris MTD Br. at 15; Schlifstein

Br. at 11-12; Freedman Br. at 13).[17]  It is clear from the Indictment that the honest services fraud

charge centers on bribes the defendants accepted in return for prescribing Subsys (*see* Indictment

¶ 158) (alleging that the defendants "having devised and intending to devise a scheme or artifice

to defraud, and to deprive patients of their intangible rights to their doctors' honest services . . .

participated in a scheme to prescribe [Subsys] to patients in return for bribes and kickbacks . . .

thereby depriving patients of their intangible rights to their doctors' honest services"), and it is

reasonably implied that the defendants did not disclose that they were accepting bribes in return

for prescribing to their patients.[18]  *See United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir.

2002) ("An indictment must be read to include facts which are necessarily implied by the

specific allegations made." (quotations omitted)).  Accordingly, the Indictment's allegations are

more than sufficient.

---

[17] While the Court need not decide this issue at this juncture, a material misrepresentation or omission is not an element of an honest services fraud offense.  In *United States v. Skelos*, 15 Cr. 317 (KMW), this Court instructed the jury that the elements of honest services fraud were (1) a scheme or artifice to defraud "the State of New York and its citizens of their intangible right to the defendant Dean Skelos's honest services through bribery"; (2) that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and (3) the use or interstate wires in furtherance of the scheme to defraud.  In describing the first element, a scheme or artifice to defraud, the Court did discuss "false and fraudulent statements, representations, or omissions," and noted that "the deceit may consist of the concealment of the things of value that the public official has solicited, or the public official's implicit, false representation to his government employer and the public that the public official has not solicited bribes."  Thus, the Indictment's allegation that an object of the conspiracy was to "devise[] and intend[] to devise a scheme and artifice to defraud," (Indictment ¶ 158) is more than sufficient to state the elements, and the precise meaning of that statutory language need not be defined or alleged in the Indictment.  *See United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime.").

[18] During much of the period of the charged offense, the Centers for Medicare and Medicaid Services maintained a publicly available database of payments from pharmaceutical companies to doctors, including the Speaker Program fees to these defendants.  That database is not relevant, however, because (1) the fact the information was publicly available does not mean the patients were made aware of it and (2) the database mischaracterized the payments as "[c]ompensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program."  As alleged in the Indictment, the payments were not for providing a bona fide educational service (because the Speaker Programs were largely shams), but rather were bribes and kickbacks for prescribing Subsys.

In any event, the defendants' argument further fails because the defendants are charged with a conspiracy to commit honest services fraud wire fraud, not the substantive offense.  Thus, the Indictment need not allege each and every element of the object of the conspiracy.  As the Second Circuit has stated, "in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *LaSpina,* 299 F.3d at 177 (quoting *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir. 1995) (quotations omitted)).  Accordingly, even assuming for the sake of argument that the Government was required to prove a material misrepresentation or omission in order to meet the elements of the substantive offense of honest services wire fraud, the defendants' argument that Count Three should be dismissed still fails because the Government is not required to allege with precision each and every element of the object of the conspiracy.

### 4.    *The Motion to Dismiss Count Four Should Be Denied*

Defendants Goldstein and Voudouris also seek to dismiss Count Four, which charges each of them with committing aggravated identity theft in violation of 18 U.S.C. § 1028A, on three separate grounds.  (*See* Goldstein Br. at 13-14, Voudouris MTD Br. at 17-23.) First, they contend that Count Four should be dismissed due to defects in Count Three's allegation that they committed honest services wire fraud, the enumerated felony violation "during and in relation to" which they allegedly committed aggravated identity theft (Indictment ¶ 160).  (*See* Goldstein Br. at 13-14, Voudouris MTD Br. at 17.)  Second, they claim that Count Four fails to allege that they possessed the requisite knowledge to commit aggravated identity theft.  (*See* Goldstein Br. at 14, Voudouris MTD Br. at 17-19.)  Third, they assert that the Indictment fails to show that the alleged identity theft occurred "during and in relation to" the honest services wire fraud

conspiracy charged in Count Three.  (*See* Goldstein Br. at 14, Voudouris MTD Br. at 19-23.)  All three arguments lack merit.

As an initial matter, the defendants' argument that Count Four must be dismissed along with Count Three fails for the simple reason that, as discussed above, the motions to dismiss Count Three must be denied.  Alternatively, if the Court does dismiss Count Three, the Government will not proceed with the prosecution of Goldstein and Voudouris on Count Four of the Indictment.

Like many of the defendants' arguments in support of their motions to dismiss, Goldstein's and Voudouris's second and third arguments challenging Count Four misapprehend the standard an indictment must meet to survive a dismissal motion.  The Indictment includes the very elements that the defendants claim are missing from Count Four: It alleges that "JEFFREY GOLDSTEIN and DIALECTI VOUDOURIS, the defendants, *knowingly* transferred, possessed, and used, without lawful authority, a means of identification of another person, *during and in relation to* a felony violation enumerated in . . . Section 1028A(c), to wit, without authorization, GOLDSTEIN and VOUDOURIS transferred, possessed, and used, and aided and abetted the transfer, possession, and use of, the names, signatures, National Provider Identifier numbers, and state license numbers of health care professionals on sign-in sheets for Speaker Programs *during and in relation to* the offense charged in Count Three of this Indictment."  (Indictment ¶ 160 (emphases added); *see also* Voudouris MTD Br. at 17 (acknowledging that "the Indictment at ¶ 160 recites the language of the aggravated identity theft statute that includes knowledge").)  The Indictment therefore alleges that Goldstein and Voudouris committed identity theft "knowingly" and "during and in relation to" the fraud alleged in Count Three, and the motions to dismiss Count Four must be denied on this ground.

The defendants' claims that the Indictment omits elements of aggravated identity theft rely on a hyper-technical analysis that is inappropriate at the motion to dismiss stage.  Contrary to Voudouris's arguments, the Indictment does not need a "factual allegation specifically stating Voudouris' knowledge of the elements of the crime" (Voudouris MTD Br. at 18),[19] an explanation for why Voudouris committed or aided and abetted the offense set forth in Count Four even though she "had no responsibility for Insys' sign-in sheets" (*id.* at 18-19), or a catalog of "facts showing that the forged or falsified names on sign-in sheets were used directly to commit the alleged conspiracy to defraud Dr. Voudouris' patients of her honest services" (*id.* at 21).  By returning the Indictment, the grand jury indicated that it found probable cause to support Count Four.  That alone "is enough to call for trial of the charges on the merits."  *Costello*, 350 U.S. at 363.  If the Government's evidence at trial is insufficient to prove the elements of aggravated identity theft, the defendants may of course move for a judgment of acquittal.  *See* Fed. R. Crim. P. 29.  But the defendants' arguments that the factual allegations in the Indictment do not support an inference that they could have satisfied all the elements of aggravated identity theft are "premature" because "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Moreover, although there is no legal requirement to do so, the Indictment includes factual allegations that support the very inferences the defendants contend are inappropriately omitted.  For example, contrary to the defendants' arguments (*see* Goldstein Br. at 14, Voudouris MTD

_____

[19] Voudouris approvingly cites *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), for the proposition that "'knowingly' applies to every element of the crime of aggravated identity theft."  (Voudouris MTD at Br. at 17.)  As the Supreme Court noted in *Flores-Figueroa*, under principles of "ordinary English grammar, it seems natural to read the [1028A] statute's word 'knowingly' as applying to all the subsequently listed elements of the crime."  556 U.S. at 650.  Accordingly, and contrary to Voudouris's argument, the Indictment's inclusion of "knowingly" in Paragraph 160 *does* allege "Voudouris' knowledge of the elements of the crime" (Voudouris MTD Br. at 18).

Br. at 19-20), the Indictment plainly explains how the forgery and falsification of sign-in sheets occurred "during and in relation to" the honest services wire fraud conspiracy. The Indictment alleges that the honest services fraud conspiracy charged in Count Three included payment of "bribes and kickbacks, including Speaker Program fees" (Indictment ¶ 158); that "at least two or more health care professionals" needed to be "in attendance at all Speaker Programs" (*id.* ¶ 22); that "sign-in-sheet[s]" documented the names and professional affiliations of the health care professionals who attended the programs (*id.* ¶ 24); that the Speakers—including the defendants—were aware of these requirements because they were required to participate in training sessions that covered Speaker Program policies (*id.* ¶ 25); that the defendants prescribed Subsys in exchange for bribes and kickbacks disguised as compensation for conducting educational Speaker Programs (*id.* ¶¶ 63, 77, 107, 122); that the defendants' Speaker Programs often involved no educational component (*id.* ¶¶ 34-35, 37-38); and that Goldstein and Voudouris helped forge and falsify sign-in sheets for Speaker Programs by adding names and other information of health care professionals who had not been in attendance (*id.* ¶¶ 36(b), (d)). These and other allegations in the Indictment plainly support an inference that Goldstein and Voudouris committed the identity theft "during and in relation to" the fraud—an inference, for example, that Goldstein and Voudouris forged and falsified sign-in sheets to make the Speaker Programs appear legitimate because those Speaker Programs enabled them to collect bribes and kickbacks in return for prescribing Subsys. The Indictment was not required to establish the relationship between Counts Three and Four with nearly that level of specificity. Because the allegations in Count Four easily satisfy the minimal requirements needed to proceed to trial, the motions to dismiss should be denied.

5.      *The Motion to Dismiss Count Eight Should Be Denied*

Schlifstein contends that the HIPAA offense charged in Count Eight should be dismissed because the Indictment does not address whether Schlifstein disclosed individually identifiable healthcare information to Insys employees who were "authorized to receive it pursuant to statute or regulation," and because the Indictment does not identify "any particular patient names or appointment times that Dr. Schlifstein revealed."  (Schlifstein Br. at 13-14.)  This motion should be denied.[20]

The Indictment alleges that Goldstein and Schlifstein disclosed without authorization—or aided and abetted the unauthorized disclosure of—"patient records" containing individually identifiable health information "to [Insys] employees," in violation of the HIPAA statute.  (Indictment ¶ 168.)  It further alleges that Goldstein and Schlifstein permitted an Insys sales representative to access their medical office's electronic medical files, including files of patients who "had never signed a waiver permitting disclosure of their medical information to Insys and its employees."  (*Id.* ¶ 74.)

Schlifstein correctly notes that the HIPAA statute, 42 U.S.C. § 1320d-6, "allows for various exceptions."  (Schlifstein Br. at 13-14.)  But no legal authority requires the charging document to allege facts sufficient to rebut every potential defense to a HIPAA violation.  The Indictment gives Goldstein and Schlifstein ample notice of the offense charged in Count Eight, and the Government intends to prove at trial that the disclosures of patient information relevant to Count Eight were not made to Insys employees for the defendants' practice's "own treatment, payment, or health care operation," 45 C.F.R. § 164.506(c)(1), "for the payment activities of the entity that receive[d] the information," *id.* at (c)(3), or for any other permissible purpose.

---

[20] To the extent Goldstein joins in the motion to dismiss Count Eight, these arguments apply with equal force to him.  While it does not appear that Voudouris is moving to dismiss Count Seven, which also charges her with the same HIPAA offense, these arguments apply with equal force as to that count.

Finally, the notion that Count Eight is defective because the Indictment fails to identify "any particular patient names" is as incorrect as it is misguided.  The HIPAA statute is designed to protect patients' sensitive medical information; requiring public charging documents to identify the "names" of "particular patient[s]" whose information was improperly disclosed would compound the harm and victimize those patients anew.  Schlifstein cites no authority for this nonsensical prosposition.  The Indictment "contain[s] all of the elements of the offense," and its allegations that the offense occurred "[i]n or about 2013 and 2014" and involved "the unauthorized disclosure of[] patient records to [Insys] employees" (Indictment ¶ 168) "enable the defendant[s] to plead double jeopardy in defense of future prosecutions for the same offense." *United States v. Santeramo*, 45 F.3d 622, 624 (2d Cir. 1995).  Nothing more is required, and the motion to dismiss Count Eight should be denied.

## II.      THE MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED

The defendants claim that they are entitled to an array of particulars regarding the Government's case.  The defendants' motion should be denied.  Through the lengthy, detailed Indictment, as well as the voluminous and organized discovery, the defendants have more than sufficient information to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).

### A.      Background

As is described above, the defendants are charged in a lengthy Indictment spanning 74 pages and 171 paragraphs.  With respect to the Speaker Programs, the Government's Indictment alleges that many of these Speaker Programs were "merely social gatherings at high-end restaurants with no educational presentation whatsoever," and that the Speaker Programs often

"lacked an appropriate audience of peer-level doctors with a professional reason to be educated about [Subsys]." (Indictment ¶ 4). The Indictment goes on to describe in detail the manner in which the Speaker Programs were essentially shams, as described above.

The Indictment also contains detailed allegations regarding Goldstein's, Schlifstein's, and Voudouris's wrongful disclosure of individually identifiable information in violation of HIPAA. (*See* Indictment ¶¶ 74, 124-129, 168).

The defendants were provided with voluminous Rule 16 discovery which included, among other things, the sign-in sheets from their Speaker Programs, detailed information pertaining to each doctor's prescribing of Subsys, including patient files and insurance records. The discovery was provided in organized form and included detailed indices.

As is detailed in the defendants' submissions, on June 26, 2018, the defendants jointly requested a bill of particulars. (*See* Hoffinger Declaration ("Hoffinger Decl."), Ex. A). In their joint request, the defendants principally sought additional specifics regarding (1) which of their Speaker Programs the Government specifically alleged were sham programs; (2) which of their patients the Government specifically alleged were defrauded, deprived of honest services, prescribed Subsys where not medically appropriate or not necessary; (3) as to Drs. Goldstein and Voudouris only, which health care professionals' information or signatures did the Government specifically allege the defendants used to forge sign-in sheets without that individual's authorization; and (4) additional details regarding Voudouris's, Goldstein's, and Schlifstein's wrongful disclosure of individually identifiable health information. (Hoffinger Decl. Ex. A).

On September 10, 2018, the Government responded to the defendants' requests, noting that in light of the detailed Indictment and the voluminous discovery, "all in electronic form and accompanied by a detailed index," that the defendants were "not entitled to further particulars."

(Hoffinger Decl. Ex. B, at 1).  Nevertheless, "in an effort to aid in [the defendants'] review of the discovery," and to "assist [the defendants] in preparing for trial," in its letter the Government endeavored to provide the defendants with additional guidance regarding the information they sought, including by providing references to particular portions of the discovery, with specific bates ranges, responsive to their requests.  (Hoffinger Decl., Ex. B, at 3-5).

Not satisfied with the Government's response, the defendants filed the instant motion.

### B.    Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to move for a bill of particulars "before or within 14 days after arraignment or at a later time if the court permits."  Fed. R. Crim. P. 7(f).  Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *see also United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007).  Thus, "'[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'"  *United States v. Berganza*, No. 03 Cr. 987 (DAB), 2005 WL 372045, at *5 (S.D.N.Y. Feb. 16, 2005) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)).  If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery, no bill of particulars is required.  *Bortnovsky*, 820 F.2d at 574; *see also United States v. Spy Factory*, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997).

A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial."  *United*

*States v. Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, at *24-*26 (S.D.N.Y. May 18, 2012).  "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985); *see also United States v. Silberstein*, No. 02 Cr. 800 (SWK), 2003 WL 21488024, at *6 (S.D.N.Y. June 27, 2003) (quoting *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)).  A bill of particulars should not be employed in an attempt to "lock the government into its proof." *United States v. Rigas,* 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003); *see also United States v. Mahabub*, No. 13 Cr. 908, 2014 WL 4243657, *2 (S.D.N.Y. Aug. 26, 2014) ("The government's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise"); *United States v. Samsonov*, 07 Cr. 1198, 2009 WL 176721, at *2-*4 (S.D.N.Y. Jan. 23, 2009) (bill of particulars should not be "misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches").  Nor is the function of a bill of particulars "to allow defendants to preview the evidence or theory of the Government's case." *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989) (citations omitted).  "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *United States v. Triana-Mateus*, No. 98 CR. 958(SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002); *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 484-85 (S.D.N.Y. 2013) ("It is improper to use a bill of particulars to compel the Government to disclose the manner in which it will prove the charges or preview its evidence or legal theory." (internal citation and alteration omitted)).

41

The ultimate test is whether the information sought is *necessary*, not whether it is helpful. *See United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *Payden*, 613 F. Supp. at 816 ("It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case.").   Under the relevant legal standard, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996).

Where, as here, the information sought by a defendant is provided in the charging instrument or through some other means, such as in discovery, a bill of particulars is not necessary.  *See Kazarian,* 2012 WL 1810214, at *25 (noting the "enormous amount of discovery material," which "provide[s the defendant] with much of the information sought in the request for a bill of particulars"); *see also, e.g.*, *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *Samsonov*, 2009 WL 176721, at *4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).

Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."  *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987); *see also Mahabub*, 2014 WL 4243657, at *2.  Moreover,

the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)). These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Henry*, 861 F. Supp. at 1197.

Whether to order the Government to file a bill of particulars lies "within the sound discretion of the district court." *Zemlyansky*, 945 F. Supp. 2d at 485 (quoting *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)). "When exercising this discretion, a court must consider the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—to determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *7 (S.D.N.Y. Dec. 3, 2013) (internal quotation marks omitted).

Applying these principles, courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for additional details about either the manner in which the offense was committed or how the Government intends to prove its case at trial. *See, e.g.*, *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (noting that Government may not be compelled to provide bill of particulars disclosing manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977)

(rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case").

### C.   **Discussion**

There is no basis for a bill of particulars in this case.  The charges against the defendants are set forth in far more detail in the Indictment than is required.  In addition, Rule 16 discovery has provided the defendants with an even more detailed understanding of the Government's evidence than the charging instrument.  The defendants cannot plausibly claim—as they must, in order to be entitled to a bill of particulars—that that the Indictment lacks sufficient detail to allow them to plead double jeopardy against subsequent prosecution for the same acts, or to understand the criminal conduct of which they stand accused.

Instead, what the defendants seek through their motion is detailed evidentiary information well beyond what they are entitled to, in an effort to improperly obtain a preview of the Government's trial proof.  The defendants' request for a bill of particulars is thus in direct contravention to the clearly settled law that a defendant is not entitled to a bill of particulars as a general investigative tool, a discovery device, or a means to compel early disclosure of evidence to be offered at trial.  The defendants' requests are precisely the types of requests for particularization that courts in this District routinely deny.  *See, e.g., Rigas,* 258 F. Supp. 2d at 304  (bill of particulars should not be employed in an attempt to "lock the government into its proof."); *see also Mahabub*, 2014 WL 4243657, at *2; *Samsonov*, 2009 WL 176721, at *2-*4 (bill of particulars should not be "misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches").  This Court should do the same.

####### 1.     *Defense Request 1 Should Be Denied*

Turning to the defendants' specific requests, all defendants seek in Defense Request No.
1[21] additional particulars regarding the sham nature of the Speaker Programs. The defendants
specifically seek (1) an itemized list of dates, locations, and participants for each Speaker
Program event that the Government maintains was a sham and "as to each . . . the deficiencies
that rendered each such event a 'sham'"; (2) each instance when sign-in sheets for a Speaker
Program were forged and falsified and for each such sign-in sheet the date and location of the
program, the identity and identifying information of the person whose name was forged, the
person who personally entered the forged and false information and "which defendant allegedly
'participated in the forgery and falsification of the sign-in sheets' or 'helped forge and falsify
sign-in sheets' and precisely how the defendant did so"; (3) each instance when a Speaker did
not stay for his own Speaker Program; (4) each instance when a Speaker did not conduct a
presentation using the preapproved slide deck; (5) each instance in which a Speaker Program
"involved excessive alcohol and/or drug use and was a 'purely social affair[],'" as alleged in ¶ 39,
including "whether on each occasion alcohol or a drug was consumed and if the latter, specify
the drug"; and (6) "the dates, locations and participants in each Speaker Program the government
maintains 'were merely social gatherings at high-end restaurants with no educational
presentation whatsoever.' as alleged in ¶ 4." (Defense Request No. 1(a)-(f)).

All of the aforementioned requests are exactly the sort of "minutiae" of the Government's
case, including the "when, where, and with whom," that the defendants are *not* entitled to
through a bill of particulars. *See United States v. Jimenez*, 824 F.Supp. 351, 363 (S.D.N.Y.1993)

---

[21] "Defense Request No." refers to the requests contained in the defendants' June 26, 2018 joint letter
request for particulars. (*See* Hoffinger Decl., Ex. A). In their moving papers, various defendants seek
subsets of the particulars set forth in the June 26, 2018 joint letter request and also join in each other's
arguments for a bill of particulars. (*See* Voudouris BOP Br. at 5-10; Goldstein Br. at 17-18; Schlifstein
Br. at 14-16; Freedman Br. at 3 n.1).

(motions in conspiracy cases for the "whens," "wheres," and "with whoms" are routinely denied because the Government should not be compelled to provide a preview of its evidence and give away its case before trial); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense."); *Torres*, 901 F.2d at 234 ("Acquisition of evidentiary details is not the function of the bill of particulars."); *Leonelli*, 428 F. Supp. at 882 (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case"); *United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) (a defendant may not "use a bill of particulars to preview the government's evidence or trial strategy, or to require the government to specify the minutiae of how it will prove the charges." (citations omitted)).

While the defendants might find all of the detailed information they are requesting regarding the sham Speaker Programs helpful in preparing for trial, that is decidedly not a basis for granting a bill of particulars. *See Payden*, 613 F. Supp. at 816 ("It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case.").

The defendants' motion is particularly meritless in light of the detailed allegations specifying how the Speaker Programs were "shams" that did not involve education. Those detailed allegations are far more than the defendants are entitled to, and certainly put the defendants on sufficient notice of the acts of which they stand accused. Thus, Defense Request No. 1 must be denied. *Berganza*, 2005 WL 372045, at *5 ) ("'[a] bill of particulars should be

required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" (quoting *Torres*, 901 F.2d at 234)).

Furthermore, the defendants' request is also particularly baseless in light of the discovery that the defendants have received, which the Government directed the defendants to in its response letter of September 10, 2018. (Hoffinger Decl. Ex. B, at 3). The sign-in sheets for the Speaker Programs provide detail about the supposed attendees at each of the Speaker Programs. The defendants can analyze these sign-in sheets to identify, among other things, repeat attendees at their Speaker Programs, programs where there were no new attendees that would require legitimate education about Subsys, and programs where the only attendees were office staff and Insys employees not requiring education. The defendants thus have plenty of information to work with, and certainly more than they are entitled to under the law. *See, e.g., Samsonov*, 2009 WL 176721, at *4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial). The function of a bill of particulars is decidedly not for the Government to do defense counsel's job for them.

Nor can a bill of particulars be used as a mechanism to seek to lock the Government in on its proof, and in particular to seek to limit which Speaker Programs the Government may seek to show at trial were shams. The defendants' motion seeking itemized list of each and every Program that the Government will seek to prove is a sham at trial and, as to each, "the deficiencies that rendered each such event a 'sham,'" is nothing more than a transparent attempt to do just that and should be denied for this reason as well. *See Rigas*, 258 F. Supp. 2d at 304 (A bill of particulars should not be employed in an attempt to "lock the government into its proof."); *Samsonov*, 2009 WL 176721, at *2-*4 (S.D.N.Y. Jan. 23, 2009) (bill of particulars should not be "misused to compel disclosure of how much the Government can prove, nor to foreclose the

Government from using proof it may develop as the trial approaches"). And certainly given the detailed allegations in the Indictment about the exact manner in which the defendants' Speaker Programs were not legitimate educational events, the notion that the defendants would suffer "unfair surprise" with respect to what the Government will contend was the sham nature of their Speaker Programs is farcical. *See Mahabub*, 2014 WL 4243657, at *2 ("The government's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise.").

Finally, Defense Request No. 1 is baseless because the Government is not required even to prove at trial that particular Speaker Programs were shams. As an initial matter, this is not an element of any charged offense. Furthermore, as the Government indicated in its September 10, 2018 letter in response to the defendants' requests, many witnesses may have attended multiple Speaker Programs and recall that the vast majority of the Speaker Programs they attended were non-educational and social in nature, but may not recall with specificity which Speaker Programs on which dates were shams and which actually involved education. Moreover, testimony from a witness who recalls a Speaker using narcotics at a Speaker Program would be relevant and admissible regardless of whether the witness is able to recall the precise dates and locations of the relevant Speaker Programs. Thus, Defense Request No. 1 must be denied on the additional ground that the Government is under no requirement to prove at trial that particular Speaker Programs on particular dates were shams.

     2.    *Defense Request 2 Should Be Denied*

In Defense Request No. 2, the defendants seek with respect to Counts Two (violation of the Anti-Kicback Statute) and Three (honest services fraud conspiracy) that the Government

identify (1) "each instance when a defendant allegedly prescribed Subsys where not medically appropriate" including dates and patient names; (2) "each patient who was allegedly deprived of his/her intangible right to his/her physician's honest services"; (3) "when and how such patient was allegedly defrauded of his/her intangible right to honest services"; (4) with respect to Voudouris, which patients "for whom Dialecti Voudouris allegedly knowingly prescribed 'unnecessary' [Subsys] refills," as alleged in Indictment ¶ 122; and (5) with respect to Voudouris, which patients "whose prescriptions were allegedly 'stockpiled,' at Medical Office-3," as alleged in Indictment ¶ 123. (*See* Defense Request No. 2(a)-(e)).

As an initial matter, Defense Request No. 2 fails because it is based on the false premise that the Government is required to prove with respect to either the substantive Anti-Kickback charge or the honest services wire fraud conspiracy charge that the defendants' prescriptions of Subsys were not medically appropriate. As discussed at length in connection with the motion to dismiss, that is not the law. *See supra* at Part I.B.3.

In addition, to the extent the defendants seek a detailed list of each and every time they defrauded specific patients and how they did so, they are simply not entitled to this information through a bill of particulars. In cases involving allegations of numerous instances of fraudulent conduct with respect to many victims or many transactions, courts have routinely denied requests for particulars of this nature. *See, e.g., United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013) (in case involving large Ponzi scheme, denying request for bill of particulars identifying, among other things, all "allegedly false records upon which the Government intends to rely to prove its case," "the specific entries [in specific books and records] that the Government alleges [the defendants] knew were false," "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are

fraudulent," the "dates and stock names for all alleged backdated transactions," and "all unnamed clients and allegedly fake trades referred to in" a particular count); *United States v. Levy*, 11 Cr. 62(PAC), 2013 WL 664712, at *4, 13 (S.D.N.Y. 2013) (in case charging stock manipulation through false representations by corrupt brokers, request for bill of particulars recounting "each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted); *United States v. Numisgroup Int'l Corp.*, 128 F. Supp. 2d 136, 150 (E.D.N.Y. 2000) (denying bill of particulars request for specification of coins allegedly subject to false statements where subject coins were identifiable through discovery and through defendants' own records).   This is particularly true given that the defendants have been provided with the patient files and medical insurance records of the relevant patients in Rule 16 discovery.

Finally, to the extent the Government decides to call an expert witness at trial to opine on the medical appropriateness of the defendants' prescriptions of Subsys, the Government will be required to provide additional information about that expert witness's expected testimony pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure.  The defendants cannot use a bill of particulars filed approximately eight months in advance of trial as an end run around Rule 16(a)(1)(G) and appropriate expert disclosure deadlines.

### 3.     *Defense Request 3 Should Be Denied*

In Defense Request No. 3, the defendants seek with respect to Count Four, which charges Goldstein and Voudouris with aggravated identity theft, the date, the Speaker, the identity of the health care professional whose identity was used without their permission, the specific means of identification that was allegedly transferred, possessed and used, "who physically entered the

means of identification on the sign-in sheet," "precisely how" Goldstein and Voudouris "allegedly transferred, possessed or used without permission the identity of a health care professional," and "each person whom . . . Goldstein and . . . Voudouris allegedly 'aided and abetted the transfer, possession, and use of, the names, signatures, National Provider Identifier numbers, and state license numbers of health care professionals on sign-in sheets for Speaker Programs,' as alleged in ¶ 160." (Defense Request No. 3(a)-(g)).

The defendants' request for these particulars relating to the aggravated identity theft charge should be denied for multiple reasons.  First, the Indictment itself already provides Goldstein and Voudouris with detailed information about the conduct of which they stand accused.  The Indictment specifically alleges that Goldstein and Voudouris "at times helped forge and falsify sign-in sheets . . . including by providing identifying information of health care professionals who had not been present at [their respective] Speaker Programs to be entered on sign-in sheets, without those individuals' authorization." (Indictment ¶ 36(b). (d)).  The defendants are not entitled to any additional detail through a bill of particulars.  *See, e.g.,* *Berganza*, 2005 WL 372045, at *5 ) ("'[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" (quoting *Torres*, 901 F.2d at 234)).

In addition, Defense Request No. 3 should be rejected because the Government is not required to prove at trial, nor to provide in a bill of particulars, the specific identities of the individuals' whose identifying information was used on the sign-in sheets without their authorization.  All the Government must prove in order to meet the elements of aggravated identity theft is that the defendant knew that the identities used without authorization on the sign-in sheets belonged to a real person, not which specific person's identity was used.  *See Flores-*

*Figueroa v. United States*, 556 U.S. 646, 647 (2009) (government must show that the "defendant *knew* that the 'means of identification he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person.'"). No case cited in the defendants' briefs state that defendants charged with aggravated identity theft are entitled to learn, through a bill of particulars, the names of the individuals' whose identifying information was used without authorization.

### 4. *Defense Requests 6 and 7 Should Be Denied*

In Defense Request No. 6 and 7, which relate to Counts Seven and Eight (charging wrongful disclosure of individually identifiable health information), the defendants seek "the name of the person whose information was disclosed," the "date of disclosure," "to whom the information was disclosed, and "whether it is alleged that Goldstein or Schlifstein or another provided the information." (Defense Request No. 7(a)-(d); Goldstein Br. at 18).[22]

As is true for the defendants' other requests, this request should also be denied because the Indictment already provides the defendants with more than sufficient detail about the conduct underlying these counts. The Indictment alleges that Goldstein and Schlifstein disclosed patient records to Insys employees in violation of HIPAA (Indictment ¶ 168), and that Goldstein and Schlifstein permitted an Insys sales representative to access their medical offices' electronic medical files, including for patients who "had never signed a waiver permitting disclosure of their medical information to Insys and its employees." (Indictment ¶ 74). As to Voudouris, the

---

[22] In the June 26, 2018 letter, Goldstein and Schlifstein also seek to know "whether Goldsetin or Schlifstein was acting as a principal, accomplice or both" but they appear to no longer be seeking this information in their motion. (Goldstein Br. at 18). Voudouris does not advance any specific arguments as to Defense Request No. 6, which relates to Count Seven charging her with violation of HIPAA, but does join in her co-defendants' motions. Thus, the Government does not address any of the more specific requests contained in Defense Request No. 6 as Voudouris does not appear to be seeking those additional particulars through her motion and instead to only be joining in her co-defendants' motion as to the HIPAA count.

Indictment alleges that she gave Insys employees "access to patient names and other patient information that [the Insys employees] used to complete opt-in forms" for Subsys and that "[m]any of the patients listed on the forms had not authorized Voudouris to share their medical information with [Insys]. . . ." (Indictment ¶ 126). The Indictment further alleges that Voudouris took these steps in order to assist her Insys sales representative win a contest at Insys that would reward the Insys sales representative with the most new patient "opt-ins" during a period in April 2015 (Indictment ¶ 124-129). These allegations provide the defendants with more than sufficient information to understand the nature of the charges against them and what conduct they stand accused of.

The defendants cite no authority for the proposition that when wrongful disclosure of individually identifiable health information is charged they are entitled to know the specific names of the individuals' whose information was disclosed. The defendants' request that the Government provide particulars about "to whom the information was disclosed" and whether it is alleged that Goldstein, Schlifstein or another provided the information is, at bottom, a request for additional details about exactly how they committed the crime. They are not entitled to such information through a bill of particulars under well-settled law. *See, e.g., United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008, at *9 (S.D.N.Y. July 3, 2003) (Government not required to provide the "'wheres, whens, and with whoms' regarding the charges in the indictment"); *Triana-Mateus*, 2002 WL 562649, at *5 ("The Government not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed."); *Zemlyansky*, 945 F. Supp. 2d at 484-85 (S.D.N.Y. 2013) ("It is improper to use a bill of particulars to compel the Government to disclose the

manner in which it will prove the charges or preview its evidence or legal theory." (internal citation and alteration omitted)).

*          *          *

In sum, the defendants' various requests should be denied because the defendants have made no showing whatsoever that the information they seek is in fact necessary to allow them to plead double jeopardy against a subsequent prosecution for the same acts, or to understand the criminal conduct of which they stand accused.

### III.    THE TRIALS SHOULD NOT BE SEVERED

All the defendants argue, or join others who argue, that their trials should be severed from those of their codefendants. (*See* Burducea Br. at 11-19, Goldstein Br. at 14-15, Schlifstein Br. at 17-18, Freedman Br. at 3 n.1 (joining severance motions); Voudouris BOP Br. at 22 (joining codefendants' motions "to the extent not inconsistent with her motions")).[23]   But the defendants were properly joined under Rule 8(b) of the Federal Rules of Criminal Procedure, and discretionary severance is not warranted under Rule 14.

The federal criminal justice system has a strong policy in favor of joint trials of defendants who are indicted together.   *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 537 (1993).   Joint trials generally ensure fairness and serve the interests of justice "by avoiding the scandal and inequity of inconsistent verdicts" and by "enabling more accurate assessments of relative culpability." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).   Joint trials also eliminate the random unfairness of the last-tried defendants having "the advantage of knowing the prosecution's case beforehand." *Id.*   In addition, joint trials promote efficiency by obviating the need for the Government to "present[] the same evidence again and again," or to call "victims

---

[23] It is not clear to the Government from Voudouris's brief whether she is, in fact, joining in the motion to sever.

and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." *Id.* These factors explain why joint trials "play a vital role in the criminal justice system." *Zafiro*, 506 U.S. at 537 (quotation marks omitted).

A defendant in a multi-count, multi-defendant case who seeks severance from the indictment must show either that (1) he was misjoined in violation of Fed. R. Crim. P. 8(b), or (2) notwithstanding proper joinder of defendants or charges, a discretionary severance pursuant to Rule 14 is warranted because the defendant would be severely prejudiced by a joint trial.

The defendants fail to make either showing here. Their severance motions should therefore be denied.

## A.  Misjoinder (Rule 8(b))

In their motions for severance pursuant to Rule 8(b), the defendants contend that they have been misjoined because the Indictment alleges multiple conspiracies. Using the familiar metaphor courts have applied to this context, the defendants argue that the Government's allegations amount to a "wheel" conspiracy with Insys at the hub, the doctor defendants as individual spokes, and no rim connecting everyone into a single criminal scheme. (*See* Burducea Br. at 11-15, Goldstein Br. at 14-15, Schlifstein Br. at 17-18.) The motions are premature and, in any event, wrong on the merits. They should be denied.

### 1.  *Applicable Law*

Rule 8(b) of the Federal Rule of Criminal Procedure provides:

Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The Second Circuit has interpreted Rule 8(b) to mean that "'joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common scheme or plan.'"  *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990)).

Whether evidence proves "a single or multiple other independent conspiracies is a question of fact for a properly instructed jury."  *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994).  A defendant's "contention that the proof at trial may show multiple separate conspiracies rather than a single conspiracy alleged in the indictment is an argument properly made at the conclusion of the Government's case-in-chief, not in a pretrial motion."  *United States v. Jones*, 652 F. Supp. 1561, 1565 (S.D.N.Y. 1986).

"There is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member."  *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (internal citations omitted).  Proof of a single conspiracy requires nothing more than evidence from which "'it reasonably could be inferred that [multiple defendants] participated in the alleged enterprise with a *consciousness of its general nature and extent*.'"  *Id.* (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)) (brackets and emphasis added).

Co-conspirators need not have agreed on the details of the conspiracy, so long as they have agreed on "the essential nature of the plan," nor must the goals of all the participants be congruent, so long as their goals are not at cross purposes.  *See Maldonado Rivera*, 922 F.2d at 963; *see also United States v. Heinemann*, 801 F.2d 86, 92 n.1 (2d Cir. 1986).  Nor is it required that the members of a conspiracy "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member."

*United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (internal quotation marks omitted); *see also United States v. Sureff*, 15 F.3d at 230 (a single conspiracy "may encompass members who neither know one another's identities . . . , nor specifically know of one another's involvement").

In the context of a "wheel conspiracy," a single conspiracy requires some showing "that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014). "[W]hether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy." *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971); *see also United States v. Taggert*, No. 09 Cr. 984 (BSJ), 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010). Severance is unwarranted where codefendants "were likely aware—or should have been aware—that they were involved in a broad project" for a common illegal goal. *Taggert*, 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (internal quotation marks omitted); *see id.* (denying severance motions where charging documents suggested that defendants "may have been unaware of each other's *identity*" but "could not have been unaware that the other existed," because "[t]hat is all that a wheel conspiracy requires." (emphasis in original)).

2. *Discussion*

The defendants were properly joined into the conspiracy offenses charged in Counts One and Three of the Indictment. Their motions seeking severance fail for at least two independent reasons.

First, the motions are premature because whether defendants were members of the same conspiracy is a factual question to be decided by a jury at trial. *See Sureff*, 15 F.3d at 229 (whether evidence proves "a single or multiple other independent conspiracies is a question of fact for a properly instructed jury"); *United States v. Lloyd*, 947 F. Supp. 2d 259, 265 (E.D.N.Y. 2013) (same). The Indictment alleges that the defendants were members of the same conspiracy, and the Government is entitled to prove those allegations at trial. If the defendants believe the proof at trial establishes the existence of multiple distinct conspiracies, rather than the one conspiracy charged in the Indictment, they will have an opportunity to argue as much following the Government's case-in-chief. *See Jones*, 652 F. Supp. at 1565. On this basis alone, the defendants' motions should be denied.

Second, the Indictment's "speaking" allegations alone—not to mention additional facts the Government intends to prove at trial—establish that the defendants participated in the same conspiracy. The Indictment alleges, for example, that Goldstein and Schlifstein were partners in the same medical office (Indictment ¶ 9); that the same Insys sales representative worked with Freedman, Goldstein, and Schlifstein during the conspiracy (*id.* ¶ 12); that a different Insys sales representative worked with Freedman, Goldstein, Schlifstein, and Voudouris during the conspiracy (*id.* ¶ 13); that Schlifstein boasted of having recruited Burducea, among others, to prescribe Subsys and become a Speaker (*id.* ¶¶ 100-101); and that Voudouris's efforts to help her sales representative win an "opt-in" contest fell short because the sales representative for a coconspirator, Burducea, won the competition instead, a fact Voudouris learned because she specifically asked her sales representative whether he won (*id.* ¶¶ 126, 128). The Indictment further alleges that Goldstein and Voudouris each went to a Speaker Program led by Freedman (*id.* ¶¶ 64, 108) and that Schlifstein attended multiple Speaker Programs led by Goldstein (*id.*

¶¶ 90, 93).  These factual allegations—which no legal authority cited by the defendants suggests the Indictment was required to include in order to avoid severance—show that every defendant "knew or had reason to know of the existence, but not necessarily the identity, of one or more" of at least one other defendant's participation in the same conspiracy.  *Manarite*, 448 F.2d at 589.  Accordingly, "there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other."  *Ulbricht*, 31 F. Supp. 3d at 554; *see Manarite*, 448 F.2d at 589; *Taggert*, 2010 WL 532530, at *1.

At trial, in addition to proving the allegations in the Indictment, the Government expects to introduce even more evidence of the defendants' participation in a conspiracy with one another.  That evidence will likely include, among many other things, proof that Freedman and Goldstein led separate Speaker Program dinners at the same restaurant on the same night; that sign-in sheets listed Goldstein as having attended approximately four of Freedman's Speaker Programs and approximately one of Schlifstein's Speaker Programs; Schlifstein as having attended approximately 21 of Goldstein's Speaker Programs and approximately one of Freedman's Speaker Programs; Freedman as having attended approximately two of Goldstein's Speaker Programs; and Voudouris as having attended approximately seven of Freedman's Speaker Programs.  This and other evidence will therefore prove that the defendants knew of one another and were members of the same conspiracy.

### B.    Discretionary Severance (Rule 14)

Every defendant except Goldstein also moves for severance to provide relief from prejudicial joinder, pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure.  (*See* Burducea Br. at 15-19, Schlifstein Br. at 18, Freedman Br. at 3 n.1 (joining severance motions), Voudouris BOP Br. at 22 (joining codefendants' motions "to the extent not inconsistent with her

motions")).  The motions fail to identify the type of serious risk of undue prejudice that would justify the extraordinary relief of discretionary severance.

1.     *Applicable Law*

Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14.

"There is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro*, 506 U.S. at 537.   "Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy."  *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

A defendant seeking severance under Rule 14 bears the "extremely difficult burden," *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), of showing that prejudice from the joinder would be so extreme as to deny him or her a constitutionally fair trial.  *See United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).  Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.  *Zafiro*, 506 U.S. at 540. Indeed, it is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."  *United States v. Carson*, 702 F.2d 351, 366 (2d Cir. 1983); *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990); *see also United States v. Zackson*, 6 F.3d 911, 922 (2d Cir. 1993).  The Supreme Court has instructed that district courts should grant severance under Rule 14 only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  506 U.S. at 539.

60

Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *Id.*

"The decision to grant or deny severance is 'committed to the sound discretion of the trial judge.'" *United States v. Spinelli*, 352 F.3d at 54 (quoting *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002)). The trial court's exercise of that discretion is "virtually unreviewable" on appeal. *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993). Finally, courts have repeatedly recognized that any potential prejudice caused by a joint trial can be effectively mitigated by instructions to the jury that they must consider separately each individual defendant and each charge, and consider only the evidence that has been admitted against each defendant. *See Zafiro*, 506 U.S. at 540-41; *Rittweger*, 524 F.3d at 179; *United States v. O'Connor*, 650 F.3d 839, 859 (2d Cir. 2011).

### 2.   Discussion

The defendants do not come close to meeting their "extremely difficult burden," *Casamento*, 887 F.2d at 1149, of establishing a basis to grant discretionary severance.

The preference for joint trials for defendants indicted together is particularly acute in this case. The defendants played similar roles in the same conspiracy during roughly the same time period. Their criminal contact brought them into contact with many of the same coconspirators and fact witnesses the Government expects to testify against them. Trying the defendants separately would require the Government to call multiple witnesses to testify about the same subject multiple times. Given the extensive background information needed to understand the criminal scheme (*see, e.g.*, Indictment ¶¶ 2, 6, 14-17, 19-28, 30-33), each trial would be long. Severance would thus impose substantial burdens on witnesses and consume considerable Court and U.S. Attorney's Office resources.

There is no risk of prejudice here that would justify such an extraordinary result.  As noted above, the defendants occupied similar roles in the criminal scheme and committed the same core criminal conduct: They are all doctors who prescribed Subsys to their patients in exchange for bribes and kickbacks paid in the form of fees for sham Speaker Programs.  To be sure, the incriminating particulars of each defendant's criminal conduct differed in some ways. For example, as the Indictment alleges, Goldstein used cocaine with Insys employees in restaurant bathrooms at his Speaker Programs (Indictment ¶ 39(a)), Freedman prescribed more Subsys and received more money from Insys than any other defendant (*id.* ¶ 40), Schlifstein boasted that he helped recruit another defendant, Burducea, into the conspiracy (*id.* ¶¶ 100-101, 134), and Voudouris let an Insys sales representative take, on her behalf, the FDA-mandated exam she was required to pass before prescribing Subsys (*id.* ¶ 110). But no single defendant's conduct was more egregious than any another defendant's conduct to such a degree that would jeopardize anyone's right to a fair trial. Furthermore, an appropriate limiting instruction could cure any potential harm from spillover prejudice.  Accordingly, the motions to sever should be denied.

## IV.   THE DEFENDANTS' REQUESTS FOR DISCOVERY ORDERS SHOULD BE DENIED

The defendants seek various orders relating to discovery and disclosure deadlines.  Those motions should be denied.

### A.   *Brady* and Related Disclosures

The defendants move to compel the Government to produce various materials they contend must be disclosed pursuant to *Brady*, *Giglio*, and related cases.  (*See* Freedman Br. at 14-23, Voudouris BOP Br. at 18-22, Goldstein Br. at 15-16, Schlifstein Br. at 16-17).  Besides moving generally to require the production of *Brady* and related materials, the defendants

specifically seek an Order directing the Government to disclose evidence gathered in other investigations and prosecutions involving Insys (*see* Freedman Br. at 21, Voudouris BOP Br. at 19-22, Goldstein Br. at 15-16) and to disclose complete transcripts and reports from all interviews in which witnesses made statements that constitute *Brady* as to one or more of the defendants (*see* Freedman Br. at 22-23, Voudouris BOP Br. at 18-19 and 22, Schlifstein Br. at 16-17).   The Government has complied and will continue to comply with its disclosure obligations, and there is no basis to issue the orders the defense seeks.   The motions should therefore be denied.

### 1.     Applicable Law

The Government has a "constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001).   "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that an outcome of a trial in which the evidence had been disclosed would have been different." *Id.* at 142.   "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982).   The scope of the government's *Brady* obligation does not extend to "investigative files merely because they contain information which could assist the defendant." *United States v. Reddy*, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002).   The government is not required to disclose exculpatory, material evidence if the defendant knows or should have known of "the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* (citing *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)).

The Second Circuit has often "reiterate[d] the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa*, 267 F.3d at 144; *United States v. Conyers*, No. 15 Cr. 537 (VEC), 2016 WL 7189850, at *8 (S.D.N.Y. Dec. 9, 2016) ("The Government satisfies its burden under *Brady* and *Giglio* so long as it turns over information in time for its 'effective use at trial.'" (quoting *Coppa*, 267 F.3d at 146)); *see also United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Velasquez*, No. 96 Cr. 126 (JFK), 1997 WL 414132, at *6 (S.D.N.Y. July 23, 1997) ("'[I]mpeachment' information is properly disclosed when the witness is called to testify at trial.").

2.  *Discussion*

The Government recognizes its obligations under *Brady*, has acknowledged its obligations in correspondence with defense counsel, and has produced and will continue to produce information that warrants disclosure.  As a result, the defendants' requests for orders compelling the production of *Brady* material should be denied.  *See, e.g.*, *United States* v. *Reyes*, 417 F. Supp. 2d 257, 260-61 (S.D.N.Y. 2005) (denying defendant's motion to compel production of *Brady* material where Government made good-faith representation that it understood its discovery obligations and will timely disclose any such material); *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at *3 (S.D.N.Y. Jan. 26, 2017) (denying motion to compel where "the Government represents that it recognizes its obligations under *Brady*, and that while the Government is not aware of any *Brady* material, should the Government become aware of any, it will produce it promptly" (internal quotation marks and alterations omitted)).

64

To the extent the defendants seek disclosure of *Giglio* material through their motion, this too should be denied because it is well-established practice in this District to produce such material, as well as 3500 material, shortly in advance of trial.   *See, e.g.*, *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *6 (S.D.N.Y. Jan. 6, 2010) (declining to order immediate disclosure of *Giglio* material, because the Government stated it would provide both *Giglio* and Jencks Act material "shortly before trial"); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. March 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis in the law."); *see generally Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").

As to evidence gathered in other investigations and prosecutions involving Insys, the Government has produced far more than its discovery and disclosure obligations require.  The Government has been producing—and intends to continue producing—nearly all discovery materials provided to the defendants in *United States v. Babich et al.*, the District of Massachusetts case against multiple Insys executives.[24]   The District of Massachusetts productions, in turn, include the complete discovery productions other U.S. Attorney's Offices made in their own prosecutions involving Insys, as set forth in the Massachusetts discovery order Voudouris included with her motion papers. (*See* Declaration of Susan Hoffinger, Jan. 22, 2019, Exhibit G, at 13 ("[T]he other USAOs have provided D. Mass with all discovery produced to the defendants in those cases and the government has, in turn, provided that discovery to the

---

[24] The only items withheld from the defendants in this case, but produced to the defendants in the District of Massachusetts and other districts, are specific materials that the Government has determined are not discoverable at this time.  For example, the Government has withheld prior statements of witnesses expected to testify in this case because those statements constitute 3500 material, which the Government intends to produce at a later date.  As it has done with witness statements gathered in the Southern District of New York investigation, however, the Government intends to continue reviewing prior witness statements for potential *Brady* material that needs to be disclosed earlier.

Defendants in this case.")).   Moreover, those other United States Attorney's Offices, including the District of Massachusetts, all produced in discovery *all* reports from witness interviews, regardless of whether those items were subject to Rule 16, *Brady*, *Giglio*, the Jencks Act, or any other disclosure requirement. (*See United States v. Babich et al.*, No. 16 Cr. 10343 (ADB) (D. Mass.), Transcript of Conference Held July 17, 2018, Dkt. 369, at 22).   The defendants here therefore have access to the discovery materials—including full witness reports—given to defendants in the *Babich* case and in the other districts with cases involving Insys.

Finally, to the extent the defendants seek "the full witness statements relating to the highlighted or summarized portions identified in the Government's *Brady* letter," (Voudouris BOP Br., at 21), this request should also be denied because the letters provided by the Government disclosing relevant portions of these witnesses' statements that may constitute *Brady* material is more than sufficient for the Government to meet its obligations.   The Government does not need to produce *entire* witness statements merely because it has already disclosed *portions* of those statements pursuant to *Brady* and in an abundance of caution.   The Government's prior disclosures of arguably exculpatory material does not entitle the defendants to see additional investigative files that they speculate, without any discernible basis, constitute *Brady* materials.   *See LeRoy*, 687 F.2d at 619; *Reddy*, 190 F. Supp. 2d at 575; *United States v. Wedd*, 15 Cr. 616 (KBF), 2016 WL 1055737, at *5 (S.D.N.Y. Mar. 10, 2016) (denying disclosure of all relevant notes and memoranda where Government had already disclosed sufficient information to meet its *Brady* obligations); *United States v. Gatto*, 316 F. Supp. 3d 654, 657 (S.D.N.Y. 2018) ("*Brady* does not, however, compel the routine or wholesale disclosure of witness statements.").

The motions concerning *Brady* and related disclosures should therefore be denied in their

entirely.

**B.** **Production Deadlines**

The defendants also move for an order setting various deadlines for pretrial disclosures, including disclosures of 404(b) evidence, expert testimony, 3500 material, and witness and exhibit lists. (*See* Burducea Br. at 24-25, Goldstein Br. at 16, Schlifstein Br. at 17-18.) The motions should be denied.

*1.     Expert and Rule 404(b) Notice*

The defendants request an order directing the Government to provide notice of any expert testimony and any evidence it intends to admit under Rule 404(b) of the Federal Rules of Evidence 90 days before trial. (*See* Burducea Br. at 25; Schlifstein Br. at 17.) Those requests should be denied.

While the Federal Rules of Criminal Procedure do not provide for specific timing of expert witness disclosures, "it is expected that the parties will make their requests and disclosures in a timely fashion." Advisory Committee Notes to 1993 Amendment to Fed. R. Crim. P. 16. In this case, the Government understands all defendants to be requesting expert notice. *See* Fed. R. Crim. P. 16 (a)(1)(G). If the Government provides such notice, the defendants will have reciprocal expert-notice obligations. *See* Fed. R. Crim. P. 16 (b)(1)(C)(i). If the Government intends to present expert testimony, it will provide the requisite notice in a timely fashion, and no later than four weeks before trial. *Cf. United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, at *21 (S.D.N.Y. Jan. 2, 2001) (requiring Government, in 26-count case against 23 defendants charged with RICO offenses involving securities manipulation and illegal kickbacks, among other conduct, to provide expert disclosure to defendants 30 days before trial). The Government is also willing to negotiate with defense counsel a different

schedule that would govern all parties' expert notices and, pursuant to an agreed upon schedule, is willing to provide expert notice earlier than four weeks before trial, but not 90 days before trial as the defendants request.

Rule 404(b) requires the Government to provide "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown," of its intent to use evidence of other crimes, wrongs, or bad acts.  Fed. R. Evid. 404(b).  "Rule 404(b), however, sets no minimum time for action by the government in this request, nor would any time limit be appropriate, since the evidence the government wishes to offer may well change as the proof and possible defenses crystallize."  *United States v. Matos-Peralta*, 691 F. Supp. 780, 790 (S.D.N.Y. 1988); *see also United States v. Al Marri*, 230 F. Supp. 2d 535, 541 42 (S.D.N.Y. 2002) (noting that "[o]bviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial," and denying request for production more than two weeks before trial); *United States v. Allums*, No. 97 Cr. 267 (HS), 1997 WL 599562, at *1 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that the defense may have an opportunity to challenge their admission; this is all that is required with respect to Rule 404(b) evidence.").

The Government expects to provide notice of Rule 404(b) evidence at a reasonable time before trial and, consistent with the typical practice in this District, intends to move *in limine* to admit such evidence.  Pursuant to an agreed upon schedule with defense counsel, the Government will likely be willing to provide Rule 404(b) notice 45 days prior to trial.  Requiring earlier disclosure is unnecessary and, given that "the evidence the government wishes to offer may well change as the proof and possible defenses crystallize," *Matos-Peralta*, 691 F. Supp. at 790, would be counterproductive; *see also Heredia*, 2003 WL 21524008, at *10 (courts "deem

notice afforded more than ten working days before trial as 'reasonable' within the meaning of Rule 404(b)").

> 2.    *3500 Material*

Defendants also seek an order requiring the Government to produce Jencks Act materials, *see* 18 U.S.C. § 3500, 75 days before trial.  That proposal should be denied.

The District Court lacks the power to mandate early production of Jencks Act material. *See, e.g.*, *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ("We have previously held that Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements."); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987); *United States ex rel. Lucas* v. *Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974).  Moreover, "[a] defendant is not automatically entitled as a matter of right under the Federal Rules of Criminal Procedure to a list of the names and addresses of the Government's witnesses prior to trial."  *United States v. Washington*, 947 F. Supp. 87, 88 (S.D.N.Y. 1996); *see also Weatherford v. Busey*, 429 U.S. 545, 559 (1977); *United States* v. *Alessi*, 638 F.2d 466, 481 (2d Cir. 1980).

Nevertheless, the Government intends to begin producing Jencks Act material three weeks before trial.  This schedule affords the defendants and their attorneys ample time to review these materials.   In the event that the Court sets a date for Jencks Act disclosures, the Government respectfully requests that the Court order the defendants, who have reciprocal disclosure obligations pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, to disclose prior statements of non-defendant witnesses on the same schedule.

> 3.    *Trial Exhibits and Witness List*

Finally, the defendants move to require the Government to produce "[p]reliminary, non-binding" witness and exhibit lists, with copies of marked exhibits, 90 days before trial, and to

produce final versions of those materials 30 days before trial. Those requests are unnecessary and should be denied.

The Government intends to disclose witness and exhibit lists, including copies of marked exhibits, sufficiently early to ensure a fair and efficient trial. As with 3500 materials, the Government expects to begin producing those materials three weeks before trial. *See United States v. Reddy*, 190 F. Supp. 2d 558, 571 (S.D.N.Y. 2002) ("The Government has indicated that it intends to make its exhibits available for inspection consistent with its production pursuant to 18 U.S.C. § 3500. The Court finds that such disclosure is sufficient under the circumstances to promote an orderly trial."). To the extent the defendants want earlier disclosures, the Government is willing to negotiate a reasonable schedule, provided the defendants will agree to be bound by the same obligations placed on the Government. *See, e.g.*, *United States v. Chalmers*, 474 F. Supp. 2d 555, 573 (S.D.N.Y. 2007) (ordering defendants and Government to disclose exhibits on the same schedule). The proposal that the Government provide a witness list and exhibit list 90 days before trial, however, is extraordinary and not warranted in this case, despite the voluminous discovery. In other recent complex cases in this District involving voluminous discovery, such as *United States v. Gatto*, 17 Cr. 686 (LAK), and *United States v. Blaszczak*, 17 Cr. 357 (LAK), the Government provided its exhibit list and witness list approximately 30 days before trial.[25]

---

[25] The defendants also seek to require the Government to submit its requests to charge 90 days before trial, which is far earlier than such requests are typically filed. In the absence of an Order from the Court setting a schedule, the Government intends to confer with defense counsel in an effort to agree on a reasonable schedule for the parties to file proposed voir dire, jury instructions, and verdict forms.

## **CONCLUSION**

For the reasons set forth above, the defendants' motions should be denied in their entirety.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By: _____/s/_____
Noah Solowiejczyk
David Abramowicz
Assistant United States Attorneys
(212) 637-2473/6525