# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## 18-cr-217 (KMW)

---

## UNITED STATES OF AMERICA

### -against-

## JEFFREY GOLDSTEIN,

### Defendant.

---

## SENTENCING MEMORANDUM ON
## BEHALF OF JEFFREY GOLDSTEIN

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Jeffrey Goldstein*
767 Third Avenue, 26th Floor
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

**Marc A. Agnifilo, Esq.**
**Jacob Kaplan, Esq.**
         *Of Counsel*

# **Table of Contents**

I.    Preliminary Statement ................................................................................... 1

II.   Introduction ..................................................................................................... 1

III.  Individualized Assessment of Jeffrey Goldstein ...................................... 8

      A.    History and Characteristics of Jeffrey Goldstein........................ 8

            1.    Family Background ................................................................. 8

            2.    Goldstein Is a Dedicated Father to His Four Children ............... 12

            3.    Goldstein Has Been Instrumental in Caring for His 6-
                  Year-Old Son's Hemophilia ............................................. 17

            4.    Goldstein Was a Dedicated Doctor and Friend to His
                  Patients ................................................................................. 21

      B.    Nature and Circumstances of the Offense Conduct ................................ 31

            1.    History of Fentanyl and Subsys ...................................... 31

            2.    Goldstein's Fentanyl Prescriptions Before Joining the
                  Insys Speaker Program .................................................... 32

            3.    The Insys Speaker Program.............................................. 33

            4.    Goldstein's Fentanyl Prescriptions After Joining the
                  Insys Speaker Program .................................................... 34

III.  Analysis.......................................................................................................... 38

      A.    A 15-Month Sentence Is a Significant Punishment That
            Would Adequately Punish Goldstein While Not Having a
            Long-Term Effect on the Goldstein Family.............................. 38

i

       1.      Guidelines Range ................................................................... 38

       2.      A Sentence Longer Than 15 Months Is Not Required
to Reflect the Seriousness of the Offense, to Promote
Respect for the Law, or to Provide Just Punishment for
the Offense ............................................................................ 39

       3.      Sentencing Parity and General Deterrence Support a
15-Month Sentence ............................................................... 43

IV.   Conclusion ........................................................................................... 50

ii

## I.      **PRELIMINARY STATEMENT**

Defendant Jeffrey Goldstein, through his counsel, submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following his guilty plea to Conspiracy to Violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371. For the reasons discussed below, we respectfully submit that a 15-month prison sentence, followed by 3 years of supervised release, is a fair, reasonable and appropriate sentence considering Goldstein's role in the offense conduct and his individual circumstances (including significant family challenges) that, we submit, warrant a substantial downward variance from the Guidelines.

## II.      **INTRODUCTION**

Jeffrey Goldstein, a 50-year-old former doctor and father of four—including a 6-year-old Hemophiliac son—stands before this Court for sentencing for his role in a criminal scheme, devised by a Boston-based pharmaceutical company (Insys) to use its speaker program to pay doctors to prescribe its groundbreaking sublingual Fentanyl spray (Subsys). Goldstein unreservedly admits and expresses complete remorse for his criminal conduct in participating in the Insys speaker program after realizing it was nothing but a sham and a means to influence doctors to prescribe Subsys (in part, based on monies he was paid through the speaker program). Because of his misdeeds, Goldstein's life is a pale reflection of what it once was. As a consequence of his guilty

plea, he will no longer be a doctor, he will go to prison and, for the rest of his days, he will be a convicted felon.

It is especially tragic that Subsys, a highly effective drug when used appropriately, was the centerpiece of such wide-spread illegal activity as it likely would have been a well-known and highly regarded pain medicine even without an illicit marketing strategy. For people in constant, severe pain, relief cannot come fast enough. As a sublingual Fentanyl spray, Subsys had a delivery method that gave pain patients relief within a few minutes, far faster than other pain medications. For many pain patients, this rapid onset drug changed their lives for the better. Relieved of constant, debilitating pain, these patients were able to lead more productive lives. Moreover, because Subsys eased pain quicker than other opioids, these patients could reduce their overall opioid intake because they no longer need to depend on multiple doses of other opioids to obtain pain relief.

In the beginning, Goldstein, who specialized in emergency medicine and orthopedics and worked in a pain management medical practice, joined Insys' speaker program because he believed in Subsys; he was already familiar with Fentanyl and became impressed with the revolutionary fast and effective sublingual delivery method that brought pain relief in a few minutes. Seeing its positive effects, Goldstein prescribed the drug to more and more of his pain patients. As he had done with

- 2 -

numerous other pharmaceutical companies—including for other Fentanyl medicines—Goldstein agreed to speak for Insys to promote Subsys.

There is no dispute that, in the normal course, doctor speaker programs are appropriate educational means to raise the awareness of certain drugs or medical procedures.  Despite starting with good intentions, believing initially that Insys was employing a legitimate, good-faith speaker program, Goldstein realized at some point that Insys was paying him speaking fees to incentivize him to prescribe Subsys.  It should be noted that after the Insys investigation conducted by the U.S. Attorney in Massachusetts became public, counsel and the Court became aware of the aggressive internal marketing strategies employed by Insys and its employees.[1]  However, these

---

[1] For example, Alec Burlakoff (Insys' Vice President of Sales and a designer of Insys' criminal scheme) messaged a sales representative that she should "not [] worry about the communication skills of practitioners speaking about the Fentanyl Spray: '[t]hey do not need to be good speakers, they need to write a lot of ... [prescriptions for the Fentanyl Spray].'" (See ¶ 53 of the Superseding Indictment in District of Mass. Case 16-cr-10343.)  On another occasion, Burlakoff spoke to the company's combined sales force with the following remarks:

> [t]hese [doctors] will tell you all the time, well, I've only got like eight patients with cancer. Or, I only have, like, twelve patients that are on a rapid-onset opioids [sic]. Doc, I'm not talking about any of those patients. I don't want any of those patients. That's, that's small potatoes. That's nothing. That's not what I'm here doing. I'm here selling [unintelligible] for the breakthrough pain. If I can successfully sell you the [unintelligible] for the breakthrough pain, do you have a thousand people in your practice, a thousand patients, twelve

Insys internal emails and strategies were deliberately kept from the doctors, including Goldstein, who participated in the speaker programs. Therefore, while Goldstein certainly came to see that the Insys speaker program was not a legitimate, educational undertaking, this realization came gradually. Regrettably, even after realizing the illegitimate nature of the program, Goldstein continued to allow these speaking fees to play a role in prescribing Subsys to his patients. As noted, Goldstein admits his guilt and is extremely remorseful for engaging in conduct that has changed his life and the lives of his wife and children forever. He is also deeply ashamed and saddened to have participated in a sham speaker program relating to something as direly serious as opioids, which have created a health crisis of the sort he was sworn to prevent as a once proud and dedicated doctor.[2] His conduct has already cost him the medical license he

_____

of them are currently on a rapid-onset opioids [sic]. That leaves me with at least five hundred patients that can go on this drug.

(Id. at ¶ 80.)

[2] As is well-known to the Court and the public by this point, the opioid crisis was fostered by some of the best-loved companies in the United States. Johnson & Johnson, for instance, agreed to pay the State of Oklahoma alone $572 million in the Fall of 2019 for its pronounced role in these matters. Also, prior to being exposed as a bad actor in the opioid crisis, Purdue Pharma, was viewed as a sound pharmaceutical company. These, and many other, large pharmaceutical companies who profited to the tune of billions of dollars were permitted to pay fines to spare their executives any jail time. So, to the extent that Goldstein is certainly a participant in the larger opioid crisis

worked all his life to achieve, including 4 years of medical school and 7 years of residency. This conduct also cost him the means to provide for his family. Without his income as a doctor, Goldstein is struggling to pay child support for his two older children (13-year-old daughter and 9-year-old son) and cannot provide for his two younger children (6-year-old son and 2-year-old son) with his wife Christine. Goldstein now drives for Uber and Lyft to try, albeit unsuccessfully, to provide for his family.

Goldstein's new financial reality was recognized by the Probation Department, which notes in the PSR that "It is not lost on us that the defendant has already received some penalization for his conduct, in that he can no longer practice medicine and his livelihood has significantly diminished." (PSR Addendum at p. 38.)

In addition to financial woes, Goldstein and Christine also face another troubling reality: Christine will have to raise their two children alone while Goldstein is in prison. This situation is particularly severe because their oldest son, 6-year-old E.G., was born with Hemophilia, a dangerous blood disorder, which will be described further below. For the past several years, Goldstein administered the plasma protein infusions that E.G. needed every time he was injured, which was a common occurrence given the young boy's active nature. Moreover, the decision whether to infuse plasma protein is

---

facing America, it is worth noting how different participants were indeed treated differently.

a serious consideration because the infusions can have significant long-term effects. As
Christine Goldstein notes in her letter to this Court:

> Having my husband around not only to treat but to make
> decisions to treat was incredibly reassuring because the
> treatment itself can cause long term problems. We often said
> to each other that it is better that we had a child with this
> disease than someone who had less of a capacity to deal with
> it.

(Ex. 1: Letter of Christine Cloutier Goldstein at 2.) Now, without Goldstein at home,
Christine will be forced to address this serious medical condition on her own while also
raising their rambunctious 2-year-old son, L.G.

It is for these financial and health-related concerns, as well as other reasons stated
below, that we ask this Court to sentence Goldstein to 15 months imprisonment—a
sentence that we respectfully submit is sufficient, but not greater than necessary, to
comply with the purposes of federal sentencing while also limiting the drastic effect this
sentence will have on the Goldstein family.  In making this sentencing request based
primarily on the pronounced financial, emotional and medical impact on Goldstein's
family and his Hemophiliac son, we in no way seek to diminish the role Goldstein
played in this offense or the gravity of the offense overall.

Furthermore, in making this sentencing request, counsel is aware that the
government believes Goldstein is more culpable than Dr. Todd Schlifstein (Goldstein's
medical partner and co-defendant), who this Court previously sentenced to 24 months

- 6 -

imprisonment. As argued below, however, Schlifstein, unlike Goldstein, persuaded other doctors to prescribe Subsys and used that fact to petition the company for more speaking engagements. Additionally, Schlifstein, who was board certified in pain management, was ostensibly more valuable to the company's criminal conduct as he was paid more per speech than Goldstein.

Even if Goldstein was equally or more culpable than Schlifstein, there are other sentencing considerations that urge a lower sentence for Goldstein, namely the health and wellbeing of his children and the dire financial situation the family is currently in (and which will only be worse once Goldstein leaves his family to serve his prison sentence). It is presumably for these reasons that the Probation Department—the independent arm of the Court that considers a defendant's culpability and family circumstances—recommends a lower sentence for Goldstein (30-month recommendation on a Guidelines range of 57-60 months) than it did for Schlifstein (36-month recommendation on a Guidelines range of 46-57 months). We therefore submit that sentencing Goldstein to a shorter sentence than Schlifstein would not trigger sentencing parity concerns and, in fact, is consistent with the recommendations of the Probation Department.

### III.   INDIVIDUALIZED ASSESSMENT OF JEFFREY GOLDSTEIN

In determining the appropriate sentence for a defendant, a sentencing court "must make an <u>individualized</u> assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" <u>Gall v. United States</u>, 552 U.S. 38, 50 & n.6 (2007) (quoting 18 U.S.C. § 3553(a)(1)) (emphasis added). Here, Goldstein's history, characteristics, the circumstances of his offense and the unusually great impact a lengthy prison sentence will have on his family financially and in terms of the care required for his Hemophiliac son urge this Court to impose a 15-month prison sentence, followed by 3 years of supervised release.

### A.   History and Characteristics of Jeffrey Goldstein

#### 1.   Family Background

Goldstein was born in December, 1969, the youngest of three boys to Leonard and Adrienne Goldstein. (PSR at ¶ 114.) As Goldstein grew up in Old Bethpage, N.Y., his father worked as an accountant while his mother was home with the children (before working as a teacher once her children were older). (PSR ¶ at 116.) Despite some tough times growing up, Goldstein recalls having a happy childhood. (PSR ¶ at 116; Ex. 2: Letter of Jeffrey Goldstein at 1 ("While I know some years were not as good as others either due to my father being unemployed or my mother being very ill due to a brain

- 8 -

aneurysm when I was 10 years old, I never felt that I was lacking from their love or attention.""))

As the youngest of three boys, Goldstein "always tried to keep up with his older brothers, both academically and athletically." (Ex. 3: Letter of Harold Goldstein at 1; see also Ex. 4: Letter of Jonathan Goldstein at 1 ("With only 4 years separating the three of us, we grew up doing everything together. We were often our own team playing sports and other games with all the other kids in the neighborhood and if ever there was a disagreement, we knew that someone always had our back.")) As a result, Goldstein remains extremely close to his brothers to this day. (Ex. 3: Letter of Harold Goldstein at 1 ("The three brothers have a very close relationship with each other and our respective families. We see each other on a regular basis and, along with extended family who live close by, celebrate birthdays, holidays or just get together.""))

The Goldstein family was always close knit, as Goldstein "enjoyed family dinners, playing outdoors with his brothers and friends and vacationing with his family." (PSR at ¶ 116.) Because of this, Goldstein spent considerable time with his grandparents, aunts, uncles and cousins, and remains close with his extended family to this day. (Ex. 5: Letter of Holly Goldstein at 1 ("Though at this time [Jeffrey and I] don't live as close as we'd like, we get together frequently and our families continue to share a solid bond."); Ex. 6: Letter of Andrew Schwartz at 1 ("Growing up, Jeff and I

- 9 -

spent every holiday and many weekends together, and we have remained rather close even though I moved from New York to [Colorado] a decade ago.")) [3]

As a close-knit family, Goldstein's parents had a profound impact on his life; as he explains:

> My Father was my hero, over any athlete or mentor and my mother was my greatest fan and motivator but as a teacher for children with special needs, she was also quick to discipline and instruct me on my mistakes and/or failures. I am proud to say that I am a product of my upbringing.

(Ex. 2: Letter of Jeffrey Goldstein at 1.) Goldstein's deep devotion to his parents was displayed this past year as he helped his parents deal with his father's pancreatic cancer diagnosis. Goldstein's brother, Harold, details how Goldstein made their father's health a priority:

---

[3] (See also Ex. 7: Letter of Danielle Craighead at 1 ("[Jeffrey] loves our extended family like we are his own kids."); Ex. 8: Letter of Darin Goldstein at 1 ("Some of my fondest memories are my family's summer trips to visit our NY cousins—especially Jeff. . . . Jeff was the one who would always take time to play with us whether it was rough housing or burying us in the sand at the beach. We always knew we would have the best time in New York visiting with our family. As I grew older and my interests changed, Jeff was still the cousin who would take the time to maintain a strong relationship with me. Anytime I am in New York, Jeff always makes the time and effort to make sure we get together for a dinner to catch up or time out at the Hamptons. Whether I'm in town for a vacation or in town for business, Jeff always makes the time."); Ex. 3: Harold Goldstein's Letter at 1 ("[Jeffrey] would do anything to help one of his family members or friends."); Ex. 9: Letter of Carol Kleinberg at 1 (stating that Jeffrey "engages his family, friends and community from the inside out—never saying 'no' when help is asked for"); Ex. 10: Letter of Ilissa Erney at 1 ("[Jeffrey] puts his family before anything and makes time for everyone.")))

- 10 -

> Jeffrey made it his priority to be at [oncologist] appointments with my parents to help them digest the medical terminology and to assist in deciding on the best courses of treatment. He was in contact with all my father's doctors, ensuring he was getting the best possible care and that nothing was overlooked. Jeffrey kept the rest of the family informed and up-to-date on treatment and prognosis on an almost daily basis.

(Ex. 3: Letter of Harold Goldstein at 1; see also Ex. 4: Letter of Jonathan Goldstein at 2 ("[Jeffrey] was an instrumental part of my dad's care, interpreting everything for us so as a family we could help with his care decisions."); Ex. 11: Letter of Nicole Tauriello-Goldstein at 1 ("[Jeffrey ] was at his father[']s bedside everyday while he was ill or on the phone with doctors helping to assist with his care  . . . ."); Ex. 12: Letter of Gail Cohen at 1 ("I saw the devotion and love he exhibited to his dad during his illness."); Ex. 13: Letter of Irwin Cooper at 1 ("It would be easy for me to write about all of the ways that Jeffrey has made an impact on me. Most recently it was the way that Jeffrey conducted himself when his father became gravely ill. Putting his own issues aside, he found the strength to take care of Lenny and support Adrienne."); Ex. 14: Letter of Marc Goldstein at 1 ("As a son, Jeff may have caused some graying to his parents' heads, but as an adult, he has always been there for them when needed."))

Sadly, after 56 years of marriage, Goldstein's father passed away in September at age 80. Since his passing, Goldstein has been his mother's caretaker as she suffers from congestive heart failure (including a heart attack in November 2019) and hypertension

and has previously had a stroke due to a brain aneurysm. (PSR at ¶ 114; Ex. 4: Letter of Jonathan Goldstein at 2 ("That is also the case for my mother, who while not critical, has had more than her share of illness, most recently a heart attack just a few weeks ago, and we rely on Jeffrey to help us keep up with all that is going on with her care."); Ex. 11: Letter of Nicole Tauriello-Goldstein at 1 (Goldstein "makes sure that his mother is taken care of, brings her to his home for long weekends to spend with his family."); Ex. 15: Letter of Adrienne Goldstein at 1 ("He has been my health care giver as well as my husband's before he died in September."); Ex. 14: Letter of Marc Goldstein at 1 ("[A]s an adult, [Jeffrey] has always been there for [his parents] when needed."); Ex. 16: Letter of Leslie Schwartz at 1 ("Jeffrey is [his mother's] source of strength now, more than ever."))

## 2.      Goldstein Is a Dedicated Father to His Four Children

Goldstein married Stacey Sayetta in 2003, and they had two children together: A.G. (13-year-old girl), who suffers from attention deficit disorder, and C.G. (9-year-old boy), who suffers from oppositional defiant disorder. (PSR at ¶ 122). Goldstein and Sayetta were divorced in 2013; as part of the divorce decree, A.G. and C.G. live with their mother and Goldstein has a court-ordered obligation to pay $6,000 a month in child support and contribute half the costs of all medical, educational, afterschool or

recreational expenses. (PSR at ¶ 122.) Goldstein continues to co-parent with Sayetta and cares for the children on alternating days and holidays. (PSR ¶ at 122.)

In 2014, Jeffrey married Christine Cloutier and they have two children together: E.G. (6-year-old boy) and L.G. (2-year-old boy). (PSR ¶ at 123.) Despite his divorce, Goldstein maintains a close relationship with A.G. and C.G. and makes every effort to involve them with his younger children. Harold Goldstein gives one example: "Jeff regularly drives into New York City after work to pick up the two older children so they can have dinner and spend the night together with their siblings in New Rochelle.  He then gets up early the next morning to drive them back into the city for school." (Ex. 3: Letter of Harold Goldstein at 2; see also Ex. 16: Letter of Leslie Schwartz at 1 ("[Jeffrey and Christine] have successfully managed to make it work out. It has taken all the driving back and forth to the city from Westchester, all the chaperoning to sports and dance lessons, all the help with homework etc. that they have been more than willing to do for their kids. Two families successfully meshed into one."); Ex. 17: Letter of Mitch Alden at 1 ("I saw a man who, by his ex-wife, was forced through a hard divorce, yet kept his positivity on the forefront so his children would be sheltered from anything negative. . . . [He] never second guess[ed] the inclusion of his children from his first marriage."); (Ex. 18: Letter of Maria Del Carmen Goldstein at 1 ("[Jeffrey] makes sure his children are shielded from [his divorce] as much as possible."))

- 13 -

Goldstein has always made time for his children despite his busy work schedule.

As his sister-in-law, Sonna Goldstein, notes:

> He is an outstanding father who goes above and beyond for his children and works to instill the value of "family first." It is truly remarkable to watch Jeffrey balance the scheduling logistics of his four children (two of whom live and go to school in New York City). Jeffrey's true love for and dedication to his children, coupled with his desire to not miss a single dance recital, soccer/basketball game, or school event is what helps him manage to "make it all happen."

(Ex. 19: Letter of Sonna Goldstein at 1; see also Ex. 20: Letter of Marc Lion at 1 ("The devotion he has to his wife and children give meaning to the phrase family first. His ability to juggle his work-related responsibilities and still make the necessary time to spend with his children is the epitome of a well-rounded work/life balance."); Ex. 21: Letter of Kevin Cloutier at 2 ("I have to tip my cap to Jeff as he is constantly pulled in a thousand directions and how well his children and family consistently still come first without sacrifice to commitments to patients, friends and still provide some semblance of a normal family life at home."); Ex. 10: Letter of Ilissa Erney at 1 ("He puts his family before anything . . . ."))

In a similar vein, other letter writers note how excited Goldstein is to spend time with his children. As his cousin, Marc Goldstein, notes:

> The Jeff of his youth comes out when he is with his kids. He is a kid at heart! He loves to get down & dirty with the kids. He's an active, involved dad who can go from changing

- 14 -

> diapers to playing I Spy to having a catch to talking with
> them about serious issues. Jeff is there for his children . . . .

(Ex. 14: Letter of Marc Goldstein at 1; see also Ex. 18: Letter of Maria Del Carmen

Goldstein at 1 ("He has an amazing way with kids and I see that it continues to grow -

he is the most incredible father. His children are his life and each one has a unique and

special relationship with him. It truly warms my heart to see him with his family. . . .

He gives them 120% of his time, love and attention."); Ex. 11: Letter of Nicole

Tauriello-Goldstein at 1 ("How do I even begin to explain how extraordinary he is as a

husband to his wife Christine and father to his 4 kids . . . that he adores and that adore

him. He always has enough attention, love and time for each of them. He is constantly

running to take them to dance, soccer and basketball games and then is on the sideline

cheering them on."); Ex. 22: Letter of Heather Rosenthal at 1 ("Jeff is a wonderful and

patient father. I have seen him with his children many times. He is so attentive to them

and tries, as much as possible, to spend time with them. It is his pure joy to have all of

his children together in the same place. He is the ultimate dotting dad. It is so clear how

high their affection is for him and their desire to be with him as often as possible.")).

    As noted in the attached letters, Goldstein's close relationship with his children

has made an impression on those around them. (See, e.g., Ex. 17: Letter of Mitch Alden

at 1 ("I was fortunate enough to attend Jeff's first wedding, see him establish himself as

an entrepreneur, and watch him become one of the most caring fathers I have ever

witnessed."); Ex. 23: Letter of Mark Augenstein at 1 (describing Goldstein "as a remarkable and involved husband and hands-on father"); Ex. 24: Letter of Laura Bisbee at 1 ("I know how important his family is to him and I know how much his children adore him."); Ex. 25: Letter of Dan Chumsky at 1 ("He is the consummate family-man, always putting others, especially his family, friends, and patients before himself . . . ."); Ex. 26: Letter of Sue Everest at 1 ("His dedication to his children and wife is limitless."); Ex. 27: Letter of Christina Flores at 1 ("One of my favorite qualities about Dr. G is that he is truly an amazing father to his 4 children."); Ex. 28: Letter of Greg Goldstein at 1 ("Nothing is more important to Jeffrey than his children and taking care of his family."); Ex. 3: Letter of Harold Goldstein at 2 ("I have never seen a father as devoted to his children as Jeff is."))[4]

---

[4] (See also Ex. 8: Letter of Darin Goldstein at 1 ("[Jeff's] kids adore him and he always makes time for activities with them. . . . Jeff always seems to find a way [to be available for his children at all times]."); Ex. 29: Letter of Joseph Granato at 1 ("I have witnessed Jeff being very involved in his children's lives, participating in school functions, sports and spending quality time with his family."); Ex. 30: Letter of Edward Martin at 1 ("He is a loving father and husband, and his kids adore him."); Ex. 31: Letter of Peter Rosenblum at 1 ("[W]hen I saw Jeff, his eyes would light up when talking about his kids."); Ex. 32: Letter of Dr. Kenneth Schwartz at 2 ("[Jeffrey] is an incredibly concerned father with tremendous love for all four of his children . . . .He takes wonderful care of all of them . . . ."); Ex. 33: Letter of Benjamin Stein at 2 ("you can easily see how natural and comfortable he is with the physical, mental, and emotional aspects of parenting and how dedicated he is in his role as father."); Ex. 34: Letter of Deborah Tobia at 1 ("His dedication to his now, personal family including his wife Christine and his four young children . . . is one to be admired as a dedicated, supportive, and hands on husband and father."); Ex. 35: Letter of Lewis and Carole Yevoli at 2

### 3. Goldstein Has Been Instrumental in Caring for his 6-Year-Old Son's Hemophilia

While Goldstein's is close with all his children, his bond with E.G. is critical because E.G. was born with Hemophilia Type A, a rare genetic blood disorder caused by a missing or defective clotting protein in the blood. (PSR at ¶ 123.) As a result, E.G's blood does not clot or coagulate properly.  In the event of an external or internal injury causing damage, however slight, to a blood vessel, the blood will exit the vessel into the surrounding tissue to an inordinate degree.  This could lead to a dangerous condition due to extensive bleeding, especially with internal injuries, or to damage to surrounding tissue, especially cartilage, due to the exposure to pooled blood.

There are two primary types of Hemophilia: Type A, which involves a lack of a blood-clotting protein called Factor 8, so named because it is encoded by the F8 gene; and Type B, which involves a lack of a serine protease called Factor 9.  E.G. suffers from the Type A variety, also known as classic hemophilia.

Type A hemophilia is further divided into three levels: severe, moderate and mild, each level corresponding to the amount of Factor 8 in the blood.  Normal blood has a

---

("On the many occasions when our families got together we were always impressed by Jeffreys outstanding relationship with his children. He is the enviable kind of dad who unquestionably put their needs ahead of his own. He frequently stressed the importance of good manners and of being respectful. What stands out in our minds the most though is the overwhelming love and adoration he gives to his children unconditionally."))

Factor 8 activity level of above 50%.  The severe variety of the condition is defined as having less than 1%; the moderate variety is having between 1% and 5%; and the mild variety is between 6% and 50%.  E.G. suffers from the moderate version of the condition, with a Factor 8 level of about 3%.

On a practical level, moderate Type A Hemophilia presents a series of medical challenges, which are especially acute with young, active children.  Any injury, be it a fall, being struck by a ball, banging one's knee, can, and likely will, cause some internal bleeding.  E.G.'s grandfather, Kevin Cloutier (Christine's father) also suffers from Hemophilia Type A and notes how he managed to play sports as a child but also "spent a good majority of my time laid up as a result." (Ex. 21: Letter of Kevin Cloutier at 1.) He further notes how everyday injuries would have a more drastic effect on him: "A minor injury that would take a normal person a day or two to heal would sideline me for weeks. The simple bumps and bruises from everyday life were sometimes enough to trigger serious concerns." (Id.)[5]

---

[5] Cloutier's wife, Angie, describes how her husband's hemophilia continues to affect him as an adult: "When my husband gets hurt, he is down for months at a time because he needs to remain still so that once a clot does form, he doesn't move wrong and make it start bleeding again. He is a grown man and it is a struggle to handle that." (Ex. 36: Letter of Angie Cloutier at 1.) Seeing how her husband struggles with his Hemophilia, she wonders how her young grandson E.G. is able to handle his condition: "I can't imagine what a child goes through. Keeping a child still for months is near impossible." (Id.; see also Ex. 21: Letter of Kevin Cloutier at 2 ("[E.G] is a very active, devil may care child full of energy as any boy will be. Jeff and Christine had to explain to Elon his

In the normal course, a healthy person will develop a bruise, signifying the passage of blood from the vessels to some other part of the body.  However, for the moderate Type A Hemophiliac, the question arises of whether the blood's severely impaired clotting abilities will stop the bleeding at a reasonable point such that there is not either too much blood loss or that the blood amount in the surrounding tissue will not itself cause damage or further injury.

This is a judgment call that Goldstein makes for his son on sometimes a daily basis.  As an active, athletic 6-year-old, his son experiences the normal bumps and bruises of being a healthy, happy child.  However, with each bump and bruise, Goldstein must make a decision whether to let the injury heal naturally, which is preferable, or instead to administer a Factor 8 infusion, which is intrusive, painful and detrimental to the body's ability to develop the protein needed to heal itself.

Goldstein has become proficient in making this judgment primarily because he has seen his son's condition over the course of his life and has a wealth of experience. It also helps of course that he has extensive medical training.  Unfortunately, these injuries are fairly common, as E.G. has already been infused 5 times in January-February 2020. Counsel has viewed a recent video of Goldstein administering a plasma

---

limitations and requirement for infusions when he does hurt himself. And at his age, it is often."))

- 19 -

protein infusion to E.G.; this video (which is heart wrenching and admittedly hard to watch) depicts E.G. crying uncontrollably as Goldstein prepares to give the shot and demonstrates how it sometimes takes the entire family (including Goldstein's 2 older children distracting E.G.) to calm E.G. down so that Goldstein can administer the plasma protein infusion.   Counsel will provide this video to the Court and the government upon request.

Without Goldstein being available to observe his son's injury and make the decision on whether to administer the infusion, Christine would have to take the son to either his blood doctor in Manhattan, assuming such injury happened during office hours, or, more likely, would have to take the child to a hospital proficient in treating this particular blood disease, one of which is located in the Bronx, New York.

Therefore, it seems to be beyond debate that Goldstein's medical and family situation is not the norm.   It is normal, of course, for a family to suffer when a loved and loving member of that family is in jail.   However, where, as here, there is a particular, serious, rare medical condition facing a young child that, through specialized training and a life-time of experience, a father is able to assess and treat better and differently than all others, this is truly a situation where a downward variance under the § 3553 factors is appropriate.

### 4. Goldstein Was a Dedicated Doctor and Friend to His Patients

As a college student, Goldstein "found a love of the sciences, specifically biology," but medical school was "not at the top of [his] list." (Ex. 2: Letter of Jeffrey Goldstein at 1.) That changed in 1990 when his uncle was diagnosed with Leukemia. As Goldstein explains:

> My father's older brother was larger than life to me. He was a big, strong former professional football player and my father's best friend, he was adored. In 1991, at the age of 55, he died. I knew at that moment that I wanted to do some good in this world and help people! I wanted to become a doctor.

(Id.) Given Goldstein's desire to help others, it was no surprise that he choose to enter the medical field. (See, e.g., Ex. 5: Letter of Holly Goldstein at 1 ("It never surprised me that Jeff chose medicine as a career. It was evident at an early age he possessed not only the intelligence, curiosity and passion required of a doctor but also the most sincere interest in people and the world around him."; Ex. 25: Letter of Daniel Chumsky at 1 ("While my ambitions tended to lean towards getting a high paying job on wall street and living the good life, Jeffrey's goal was a lot more simple, he wanted to do something where he could interact and help people and if he could make a decent living doing it all the better.")). With his parents' support and the counseling of his vascular-surgeon uncle, Goldstein decided to apply to medical school.

- 21 -

In 1991, Goldstein graduated from SUNY Albany with a bachelor's degree in biology and a minor in chemistry. (PSR at ¶ 138.) From 1992 − 1996, Goldstein attended the New York College of Osteopathic Medicine, earning a medical degree in Osteopathy. (Id.) Goldstein started his medical career working as an emergency room resident in St. Barnabas and other hospitals. (Ex. 2: Letter of Jeffrey Goldstein at 2 ("As a young Physician I was determined and inspired to be the finest doctor I could be. I started out in Emergency Medicine, working in some of the busiest Emergency Departments in New York.")

At St. Barnabas, Goldstein instantly made an impression on the staff as a hard-working doctor who genuinely cared for his patients. Goldstein's oldest brother, Harold, also worked at the hospital as a doctor at that time and comments how hospital colleagues would stop him to compliment his brother:

> A portion of Jeffrey's education was a residency in emergency medicine at St. Barnabas Hospital, where I was also on staff. On many occasions, colleagues in the hospital would stop me and relay their experience with Jeffrey, stating he was hard working and genuinely cared for the patients. He was well respected by the attending physicians, co-residents and hospital staff as he worked and learned under what was often extreme circumstances seeing the sickest patients that the Bronx has to offer.

(Ex. 3: Letter of Harold Goldstein at 1.) Harold Goldstein also recounts how he met some of his brother's patients over the years and how they spoke highly of Goldstein:

- 22 -

"I have had the privilege of meeting some of the patients that Jeff has taken care of over the years and they always speak his praises, telling me how he helped them out of difficult medical situations and how he listened and showed compassion." (Id.)

Working in emergency rooms taught Goldstein some important realizations, namely that addressing a patient's pain was a priority:

> The number one reason a patient would come to an emergency room was pain and if a patient's pain was not treated successfully, despite all else being wonderful, they would rate their experience on surveys as subpar. So as a physician during this time period, it was ingrained our heads that we must treat the pain. So much so that they actually called it the fifth vital sign (along with blood pressure, heart rate, breathing rate and oxygen saturation).

(Ex. 2: Letter of Jeffrey Goldstein at 2.)

Goldstein took this lesson with him when he started in private practice by partnering with Todd Schlifstein, who was board certified in pain management:

> When I entered private practice, I chose to work with not only a board certified pain management physician with over 10 years' experience but a prominent doctor who was on staff and an adjunct professor at NYU, A board member of the New York Pain Society and someone who has testified before congress as an expert. This was intentional, as I always wanted to be able to have a person I can turn to for support and I used my partner every day in discussion.

(Id.)

- 23 -

Together, Goldstein and Schlifstein started a pain management practice and a medical spa. Goldstein focused his private practice on "help[ing] his patients live a more meaningful and fulfilling life." (Ex. 4: Letter of Jonathan Goldstein at 2.) To do this, Goldstein took the time to "listen to what his patients told him and what they didn't, always going beyond what may have been his responsibility to really understand the problem and then using his knowledge and thoughtfulness to arrive at the proper diagnosis and treatment." (Id.)

Goldstein also focused on trying to wean his patients off their reliance on pain medications. One of these patients was C.C., describes how Goldstein was "a very big part of [his] transition off of these addictive [pain] medications":

> I came from doctors who were treating me for pain management, as Jeff was. Jeff however would actually listen to me when [I] spoke. He wasn't one of these doctors who just gives you 5 minutes and sends you off with a script. Jeff would check me every time [I] came in to be sure we were managing the symptoms correctly. Jeff was very compassionate and always told me that in some time you have to find a way to manage the pain without medication. Jeff would help me try different medications that were less toxic and less addictive as well as helping me ween off the unnecessary amount if medications [I] had received from previous doctors. Jeff was a very big part of my transition off of these addictive medications. . . . If it weren't for Jeff I fear I would have fallen into a bad category of mishandled clients who wind up on too much medicine

- 24 -

(Ex. 37: Letter of C.C. at 1.) Because of Goldstein, C.C. has been able to get the surgical

treatment he needed to get his life back:

> I am grateful for Jeff being the very last pain management
> doctor I had to see. He helped me a great deal. I am glad to
> say with his help was able to get off of the medications and
> get myself surgical treatment for the issue in my back that
> was the source of the pain and discomfort and have been
> medication free for a few years now and [I] feel absolutely
> great!! Back in the gym and looking fantastic!

(Id.) He also notes how Goldstein went out of his way to help him in other ways:

> He would call and check up on me because at that time [I]
> had my 2 daughters with no spouse and no help. He even
> offered to help find me babysitting!! Jeff cared more than
> people know and [I] think its important that you understand
> that not all doctors are created equal. Some actually have
> passion for their job and commitment to caring for their
> patients as Jeff did.

(Id.)

C.C.'s story demonstrates a common theme amongst Goldstein's patients. One

patient, A.S., sustained serious injuries from a severe car accident in 1987, including a

shattered jaw and compound fractures of his arms and legs. For three decades, taking

pain medications became "a way of life" for A.S.:

> I had confided in Jeff that I had a severe accident in 1987
> with a near death experience. I had been involved in an
> accident where I had numerous compound fractures of my
> arms and legs, shattered my jaw and many other serious

- 25 -

> injuries, landing me in the hospital for almost a year. Since then I had been prescribed almost every type of pain medication and it just became a way of life for the past 30 years. Many of the injuries never healed correctly and I had always had pain in my legs, back and other areas as well as many medical issues as a result of being over medicated.

(Ex. 38: Letter of A.S. at 2.)

This all changed when he met Goldstein, who took the time to work though A.S.'s issues and wean him off his pain medications.

> Jeff really spent the time with me to understand my issues and acted as a guide in my journey of a complete recovery which I never even dreamed of being possible. With Jeff's help I was able to put my life in order, research a team of doctors who would perform all the surgeries necessary to fix my leg and get me to walk upright and not limp for the first time in 30 years. This process changed my life. Jeff personally reviewed my progress and helped rid me of my dependence of pain meds. He was able to ascertain that the side effects of these pain meds were causing me to take other medications that were also not necessary. During the recovery process Jeff created a health and wellness program for me that has changed my life.

(Id.) A.S. notes that, "[b]ecause of Jeff, at 48 years old I am physically and mentally in the best shape of my life and no longer taking any pain medication. I can also do things like run and skip rope." (Id.)

Another patient, T.T., describes how Goldstein encouraged him to focus on therapy instead of pain medication:

- 26 -

> I initially went to Dr. Jeff as a matter of convenience as I worked in New York City and it was impossible to take a day off every month to see my doctor in Ct. and get physical therapy. Dr. Jeff prescribed the pain medication I already used to get me through the persistent pain I had on a daily basis. He never over prescribed me and constantly tried to lower my already low dose prescription. One week when Dr. Jeff was on vacation, a fill in doctor looked at my charts and MRI and immediately doubled my prescription according to what she saw in my charts. Dr. Jeff caught that change the next month and brought it back down lower than it was before. In all the years I knew and was a patient of Dr. Jeff, He constantly suggested that I do more therapy and not rely on pain medications.

(Ex. 39: Letter of T.T. at 1-2.) Because of Goldstein, T.T. was able to wean himself off pain medications: "By early 2017 Dr. Jeff helped me successfully stop using all opioid and pain medications. It has now been well over 2 years since I took any kind of prescribed pain medication . . . ." (Id.) T.T. notes how he "can honestly say I am forever indebted to Dr. Jeff Goldstein for helping me find alternative therapies and exercise to manage my back pain." (Id.)

Because of his caring nature, Goldstein became a friend—not just a doctor—to many of his patients. One patient, A.M.S., notes how his "relationship with Dr. Goldstein developed into a personal friendship encompassing both of our immediate families," and how, "[a]long with my wife and teenage son, I socialize with Jeff, his wife and young children." (Ex. 40: Letter of A.M.S. at 2; see also Ex. 41: Letter of G.S. at 1

- 27 -

("Over a period of years, I developed a personal relationship and friendship with Jeff. I had the opportunity to enjoy many enjoyable activities with Jeff and on occasion with his wife Christine."); Ex. 42: Letter of C.P. at 1 ("We had grown from a client/patient relationship into a friendship in the months he had treated me."); Ex. 28: Letter of Greg Goldstein at 1 ("I have . . . witnessed Jeffrey in his office and met many of his patients. I was always jealous that I did not have the type of relationship with my doctors that Jeffrey had with his patients. . . . He displays empathy, compassion and intelligence with patients, family and friends."))

Many of Goldstein's patients have been recipients of his acts of kindness that went beyond the normal doctor relationship:

- Offering to help a single father of two children find a babysitter. (Ex. 37: Letter of C.C. at 1.)

- Advocating for a patient in a disability case and helped her search for employment, including by "present[ing] leads and discuss[ing] possible options of jobs that would allow [her] to work while not affecting [her] injuries so much." (Ex. 43: Letter of J.L. at 1.)

- Walking through a snowstorm to see patients even though the office was closed because of the weather. (Ex. 44: Letter of Jennifer Cherubin at 1.)

- Being there for a former patient as he woke up from colon cancer surgery. (Ex. 42: Letter of C.P. at 1 ("Fast forward to Jan 2015 I was admitted into Memorial Sloan Kettering

- 28 -

> [cancer] hospital, half my colon removed and 6 months of chemo to follow, I awoke after the surgery to see [Goldstein] standing there. I didn't know what to think but all I could think was this man was not only my [doctor] outside this whole ordeal but a true friend.")

Being a dedicated doctor sometimes requires protecting patients from non-medical threats. Dr. Marc Schechter recounts one incident where Goldstein physically protected a suspected domestic abuse victim from her partner:

> Jeff was working as an attending physician at a Bronx emergency room. He was caring for a woman he suspected of domestic abuse. The patient's significant other had demanded access to her room. Jeff immediately came to her defense blocking his way. This person began to, walk away then turned around rushing Jeffrey knocking him to the ground. The man even bit Jeff on his flank during the ensuing scuffle. Jeff remained steadfast to protect his patient. It is this protective nature that is an integral part of who he is.

(Ex. 45: Letter of Dr. Marc Schechter at 1.)

In addition to going the extra mile for his patients, Goldstein has also volunteered his time to organization and charities to help others in need. Patient J.M. notes how Goldstein volunteered for the FDNY, American Legions Post and Veterans Administration, giving free medical advice to war veterans.

> I have sought his help & advice on medical issues, social issues & psychological issues for myself and members of my American Legion Post. He has helped members with stress

- 29 -

and PTSD issues always giving valuable advice and positive information and never ever asking [for] a fee. The Veterans Admin[istration] needs help in this area and he would be an invaluable asset.

(Ex. 46: Letter of J.M. at 1.) Similarly, Monica and Steven Wald note how Goldstein "has sponsored and volunteered his practice" to raise money for charity events for "Chron's and Colitis, Brain Tumor Awareness, Breast Cancer and Lupus." (Ex. 47: Letter of Monica & Steven Wald at 1.) In addition to these charities, Goldstein also dedicates his time to other organizations as well:

> I am active doing charity work with two Hemophilia chapters and the lymphoma and leukemia society. I take part in many charity events, most recently the Long Island Fight for Charity. I was one of the organizers for a lupus charity event and a children's brain cancer event. My wife and I involve our children in these events as much as their schedule allows. I have spent many hours speaking with and counseling members of the FDNY whom have suffered from 9/11 or have had other significant issues.

(Ex. 2: Letter of Jeffrey Goldstein at 2.)

It is because of all of the foregoing that Dr. Hillel Trope writes this Court to note that the medical "profession is better because of Jeff." (Ex. 48: Letter of Dr. Hillel Trope at 1 ("Jeff is one of those unique practitioners that despite the overwhelming regulations and stressors as Physicians we face, he never ever lost the sympathy, empathy and compassion that transitions a Doctor to a true Physician. The profession

- 30 -

is better because of Jeff and I have seen that firsthand. . . . He is truly truly an asset to the medical arena.”))

## B.     NATURE AND CIRCUMSTANCES OF THE OFFENSE

### 1.      History of Fentanyl and Subsys

While Subsys is a relatively new drug, Fentanyl itself has a long history of treating pain. First synthesized in 1960, the opioid was originally used primarily as a general anesthetic. In the early 1990s, however, fentanyl patches were developed to provide pain relief by releasing steady doses of the opioid drug over a 2-3 day period because “researchers believed that transdermal fentanyl could be useful for acute pain after surgery and for patients with chronic pain who needed steady, sustained blood levels of a strong opioid.” The Fentanyl Story, The Journal of Pain, Vol. 15, No. 12 at p. 1219 (December 2014), available at https://www.jpain.org/article/S1526-5900(14)00905-5/pdf. Although the fentanyl patch “was successful in the management of chronic pain because it produced a steady-state blood level of fentanyl that lasted for 2 to 3 days with a single patch” the drug was less effective on acute pain because it took 14 to 18 hours to get to a steady-state concentration.” Id. at 1220.

A few years later, drug companies started developing oral transmucosal fentanyl (e.g., lollipops) “to provide sedation, analgesia, and anxiolysis prior to surgery and later for breakthrough pain (BTP) episodes in patients who were opioid tolerant.” Id. at

1219. This delivery method provided quicker relief, as patients felt relief within 5-15 minutes of taking the drug.

Over the next decade, drug companies continue to improve on the delivery method (from lozenges, tablets and films that dissolved orally to nasal sprays) to provide quicker relief to pain patients. The Subsys delivery method—sublingual spray—proved to be the quickest delivery system.  In January 2012, the FDA approved Subsys for the management of breakthrough pain for cancer patients who were already receiving and tolerant to opioids. In the months and years that followed, Subsys was commonly used "off label" to treat other forms of pain.

### 2.    Goldstein's Fentanyl Prescriptions Before Joining the Insys Speaker Program

Dr. Goldstein first learned about Fentanyl in medical school, but it was during his time as a medical resident that he saw the drug's potential for treating pain:

> My first experience with fentanyl was as a resident in Orthopedics in 1998 when a child with a broken bone needed the bone put back in place. He was given the fentanyl in lollipop form and the procedure went so smooth and the child felt no pain.

(Ex. 2: Letter of Jeffrey Goldstein at 3.) In the years that followed, Goldstein used Fentanyl intravenously and in other forms "with great success" to treat pain disorders in the emergency room setting. (Id.)

- 32 -

In January 2013 (before he met any Insys sales representatives or employees),
Dr. Goldstein prescribed Subsys to one of his patients. Prior to meeting Dr. Goldstein,
this patient was taking nearly 30 pills a day (including short-term and long-term opioids)
for pain associated with back pain and his prior brain cancer. Through Subsys,
Goldstein was able to significantly reduce this patient's daily pill intake. After two
months, however, Goldstein stopped prescribing Subsys because the patient felt the
medication was too strong.

### 3. The Insys Speaker Program

In August 2012, Insys created a speaker program that compensated doctor and
other health care professionals to provide educational presentations about Subsys. In
the beginning, the Insys speaker program seemed no different than the numerous other
drug companies that Goldstein had spoken for over the years. Unbeknownst to
Goldstein and some of other doctors in the speaker program, however, Insys was using
its speaker program to induce doctors to prescribe large quantities of Subsys.

As borne out at last year's trial of Insys executives and employees in Boston,
Insys was an inherently corrupt company. Presumably seeing a good thing in Subsys,
Insys incentivized its sales force to push the drug onto as many doctors and patients as
possible. As noted in the indictment in this case, Insys "calculated the ratio of return
on investment . . .   for each Speaker by dividing the sales generated from the

practitioner's prescriptions by the Speaker Program fees that practitioner was paid." (Indictment at ¶ 31.) Internal emails and other evidence demonstrated the abhorrent lengths Insys would go to in order to sell and distribute Subsys as widely as possible. The unfortunate reality is that Subsys was a highly effective drug and would have become popular and profitable on its own merit. However, unhappy with that enviable reality, Insys wanted more.

Although Goldstein did not join the speaker program to break the law, it became clear over time that Insys was using its speaker program to induce doctors to prescribe the drug. Sadly, Goldstein continued to participate in the speaker program even after he realized its purpose. In total, from June 13, 2013 to December 2015, Goldstein received approximately $196,000 in speaker fees. (PSR at ¶ 61.)

### 4.    Goldstein's Fentanyl Prescriptions After Joining the Insys Speaker Program

Goldstein's first interaction with the speaker program and Insys' sales representatives was in March 2013 when Goldstein attended a program led by Dr. Gordon Freedman. (PSR at ¶ 62.) After this program, an Insys sales representative named Jonathan Roper[6] started visiting Goldstein's office to convince Goldstein to

---

[6] Roper played a significant role in Insys' criminal scheme and is now a cooperating witness for the government. Roper is scheduled to be sentenced by Judge William Pauley on May 8, 2020.

- 34 -

speak on behalf of Subsys. (PSR ¶ at 62.) In the week after he attended the program, Goldstein prescribed Subsys to 5 patients. (PSR ¶ at 62.)[7] While the government may believe this is evidence that Goldstein joined Insys' conspiracy at this point, these prescriptions are more consistent with a doctor learning more about a new delivery system for a drug with which he had seen great results in the past and using it to help patients address their pain needs. This is particularly true as these 5 patients were being treated for a spinal fusion and post-surgical pain (patient #1), spinal fusion, post-surgical pain, migraines and knee pain (patient #2), cervical decompression, spinal fusion, back pain and liver disease (patient #3), spinal stenosis and fusion with nerve pain (patient #4) and herniated discs, lower back pain and nerve issues (patient #5.) Before being prescribed Subsys, all of these patients were taking an exorbitant number of opioids to address their debilitating pain. Goldstein was able to reduce their pill intake and address their pain episodes through Subsys.

To be clear, we are not justifying or minimizing Goldstein's criminal conduct; he readily admits that he violated the law and is remorseful for his conduct. Nevertheless, in terms of relative culpability and for sentencing purposes, it is important for counsel to note that Goldstein did not enter into the speaker program intending to violate the

---

[7] The government and the PSR allege that Goldstein prescribed Subsys to "approximately six new patients" in that time frame. (Indictment at ¶ 65; PSR at ¶ 62.) We have only been able to identify 5 new patients.

law or further Insys' criminal scheme.  As noted earlier, while internal Insys emails demonstrate a straightforward and brazen scheme within Insys to bribe doctors, the company did not make its criminal objectives as clear to the doctors.  However, as noted, there is no doubt that, at some point, Goldstein knew what he was doing was illegal. Whether it was the company paying for strip club and casino outings, paying for Goldstein's and Schlifstein's holiday party or the nature of many of his speaking engagements (including drug use on rare occasions), Goldstein became aware that the company was paying him to prescribe Subsys.

The government also relies on the increase of micrograms prescribed (and presumably prescriptions) between the 4th Quarter of 2013 and the 1st Quarter of 2014. (Indictment at ¶ 79; PSR ¶ at 74.) While the government believes that the increase in micrograms is directly related to an increase in speaker programs for Goldstein, there were several other factors in play in Goldstein's medical office at the time that explain the increase in the 1st Quarter of 2014. Notably, Goldstein and co-defendant Dr. Todd Schlifstein were partners in a medical practice and a medical spa. (Indictment at ¶¶ 8, 9, 90; PSR at ¶ 140.) During the 1st Quarter of 2014, Schlifstein took time away from the office after his brother's death. Moreover, even after returning to work, Schlifstein began to focus more of his time on the medical spa in the 1st Quarter of 2014. As a result, Goldstein saw many of Schlifstein's patients in his absence and continued

Schlifstein's course of treatment by also prescribing Subsys. Accordingly, this increase was based, at least in part, by these additional patients.

Furthermore, the government is ostensibly arguing that Goldstein increased his prescriptions during this time frame to ensure that he received more speaking fees. The speaking schedule for the entire 2014 year, however, was already set in place well before the end of the 1st Quarter of 2014. Specifically, in a January 31, 2014, email, Insys employee Rachel Ortense provided Goldstein with his speaking schedule for February – December 2014 that included 45 speaking engagements. (Ex. 49: Ortense 1/31/14 Email.) In other words, Goldstein's near-weekly speaking engagements in 2014 were based on his 2013 (not 2014) prescriptions. Consequently, the increase of prescriptions in the 1st Quarter of 2014 was not merely a means to get more speaking fees and was likely the result of many factors (including those listed above).[8] Again, we are not arguing that the speaking fees did not play a role in prescribing Subsys; they did, and that is why Goldstein violated the law. Rather, we are respectfully asking this Court to

---

[8] This email also belies another allegation in the indictment that Insys provided Goldstein with 29 speaking programs between April and September 2014 "in an effort maintain to [Goldstein's] high volume of [Subsys] prescriptions" following an April 3, 2014 argument between Goldstein and the company's vice president of sales because Goldstein was prescribing a competitive fentanyl product. (Indictment at ¶¶ 81-82.) As this email demonstrates, 27 of these speaking programs were already scheduled for Goldstein in January 2014, nearly 3 months before his argument with the Insys executive.

recognize, for sentencing purposes, that not every increase in prescriptions were based on greed.

## VI.   ANALYSIS

### A.   A 15-MONTH SENTENCE IS A SIGNIFICANT PUNISHMENT THAT WOULD ADEQUATELY PUNISH GOLDSTEIN WHILE NOT HAVING A LONG-TERM EFFECT ON THE GOLDSTEIN FAMILY

Goldstein appreciates that this case is undoubtedly serious and is deserving of a prison sentence. The only remaining question is how long must Goldstein be away from his family in prison to reflect the statutory sentencing considerations given his particular circumstances.

### 1.   Guidelines Range

Probation's Pre-Sentence Report contains the following Guidelines analysis:

| Category | Points |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a), 2B4.1(a)) | 8 |
| Specific Offense Characteristic – Benefit (U.S.S.G. §§ 2B1.1(b)(1)(J), 2B4.1(b)(1)(B)) | +18 |
| Specific Offense Characteristic – Abuse of Position of Trust (U.S.S.G. § 3B1.3) | +2 |
| Acceptance of Responsibility Adjustment (U.S.S.G. §§ 3E1.1(a), 3E1.1(b)) | -3 |

- 38 -

| Category | Points |
|---|---|
| Total Adjusted Offense Level | 25 |

(PSR ¶¶ 95-105.)

The advisory Guidelines range associated with an adjusted offense level of 25 for an individual with a criminal history Category I (Goldstein has no prior criminal record) is 57-71 months imprisonment. Because the crime that Goldstein pleaded to has a 5-year maximum sentence, the Guidelines in this case are 57-60 months imprisonment.

**2.    A Sentence Longer Than 15 Months Is Not Required to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment for the Offense**

In fashioning an appropriate sentence, one consideration for this Court is whether the imposed sentence is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). There are several reasons why these concerns are met in this case with a 15-month sentence. First, Goldstein has already lost the medical license that he worked so long and hard to achieve. Although he recognizes that he has no one to blame but himself, losing what he loved to do—taking care of his patients and bettering their lives—is a significant punishment that will continue for the rest of his life, well after he finishes the prison sentence imposed in this case.

- 39 -

Second, now, at age 50, Goldstein must find a new profession to provide for his 4 children. The longer Goldstein is warehoused in prison, the older he gets and the harder it will ultimately be for him to find meaningful employment.

Third, a long-term prison sentence will have a drastic effect on the Goldstein family. In addition to being the only breadwinner at home, Christine Goldstein will now be the only caretaker for their two young children.  As noted in her father's letter: "Christine could potentially be left with trying to raise two very young children alone while working fulltime and trying to maintain a stable home." Ex. 21: Letter of Kevin Cloutier at 3. Moreover, Christine will be alone in dealing with E.G.'s Hemophilia. Administering the necessary plasma infusion following an injury is a painful process. Christine will now need to be spend countless hours in doctor's offices or hospitals to make sure E.G. receives these plasma infusions. This will only cause additional stress on Christine as she continues to provide financially and emotionally for her family. The sooner Goldstein returns home, the easier it will be for Christine and their family.

Fourth, a 15-month sentence will reflect the good deeds that Goldstein has done throughout his life. As Judge Jed S. Rakoff of this District eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral

- 40 -

> philosophies, and systems of justice, was plainly part of what Congress
> had in mind when it directed courts to consider, as a necessary sentencing
> factor, "the history and characteristics of the defendant."

United States v. Adelson, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); accord Gall v.

United States, 552 U.S. 38, 52 (2007) ("'It has been uniform and constant in the federal

judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting Koon

v. United States, 518 U.S. 81, 113 (1996))).

The letters submitted on Goldstein's behalf demonstrate his good deeds and

charitable works. Post-Booker, a defendant's history of charitable activities can be

considered as one of the factors appropriate in imposing a sentence under the advisory

guidelines. Notably, several courts have granted a defendant a variance or downward

departure based on the defendant's "exceptional" good works. See, e.g., United States

v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000) (upholding the district court's downward

departure where many of the letters supporting Serafini "contain[ed] substantive

descriptions of Serafini's generosity with his time as well as his money"). As Serafini

and other cases make clear, whether it is categorized as a downward departure or the

basis for a non-guidelines variance owing to the 18 U.S.C. § 3553(a) factors, a life of

- 41 -

extraordinary good works towards others remains a vital factor for a sentencing court to consider.[9]

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. See, e.g., Tomko, 562 F.3d at 572 (describing how the defendant's "charitable acts [ ] involved not only money, but also his personal time"); Cooper, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); Serafini, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self" (internal quotation marks omitted)).

As described in the many letters discussed above, Goldstein's good deeds have involved his time and effort and not only his money. Furthermore, as these personal vignettes demonstrate, Goldstein's good deeds have been exceptional and extensive in scope, manifested by nearly 70 letters submitted in support of Goldstein detailing his

---

[9] See, e.g., United States v. Tomko, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); United States v. Cooper, 394 F.3d 172, 177-78 (3d Cir. 2005) (noting that "[d]ownward departures for good works . . . are permissible when the works are exceptional," and upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others").

extremely impressive acts of kindness. These letters make clear that Goldstein's good deeds have impacted countless people.

> As best summed up by Goldstein's friend, Dr. Jill Sisselman:
>
> Jeffrey is a person who is in a constant state of helping others. Whether it be his children, his parents, his friends, or just a person luck enough to be in the seat next to him, his conversation and incredible demeanor just make the world a better place to be.

(Ex. 50: Letter of Dr. Jill Sisselman at 2; <u>see</u> Ex. 51 for 20 additional letters supporting Goldstein.)  To the extent a defendant's good deeds are a relevant factor in fashioning a proper sentence, the countless lives that Goldstein has unquestionably impacted support a 15-month prison sentence.

### 3.    Sentencing Parity and General Deterrence Support a 15-Month Sentence

One of the 18 U.S.C. § 3553(a) considerations is sentencing parity with similarly situated defendants. Here, Goldstein was indicted with 4 other doctors. One of the doctors, Dr. Gordon Freedman, was convicted at trial and has subsequently pleaded guilty to intentionally and knowingly distributing and possessing with intent to distribute a controlled substance (in satisfaction of a separate 16-count indictment). His sentencing is scheduled for April 23, 2020. Another co-defendant, Doctor Dialecti Voudouris, is scheduled to be sentenced by this Court on March 2, 2020.

- 43 -

Doctor Alexandru Burducea was previously sentenced by this Court to 57 months imprisonment. This sentence was based on several aggravating factors not present in Goldstein's case. Specifically, this Court noted Dr. Burducea's conduct included lying to Mount Sinia Hospital and the FBI, falsifying patient notes and insurance paperwork to obtain coverage for Subsys prescriptions and engaging in a conflict of interest by having his girlfriend receive commissions for his Subsys prescriptions. This Court also noted the need to protect the public from Dr. Burducea because he had perpetuated a post-indictment fraud to harm two other doctors with falsely posting negative online reviews. This conduct makes Dr. Burducea distinguishable from Goldstein.

Doctor Todd Schlifstein was previously sentenced by this Court to 24 months imprisonment. While Schlifstein and Goldstein worked together, there are significant differences in their conduct that support a lower sentence for Goldstein. First, Schlifstein's conduct demonstrated that, from the beginning, he was joining Insys' criminal scheme to prescribe Subsys in exchange for speaking fees. As noted in the government's sentencing letter regarding Schlifstein:

> Schlifstein informed Insys that he would prescribe Subsys to a number of new patients, and Insys told Schlifstein it would make him a speaker. Around early November 2013 [before he was nominated as a speaker], Schlifstein and his Insys sales representative met in Schlifstein's office, where Schlifstein looked through his calendar of upcoming appointments

and identified specific patients to whom he would begin prescribing Subsys.

(Dkt. 169: Gov't 10/21/19 Sentencing Letter at 3.) According the indictment, this sales representative, Fernando Serrano, "wrote down the patients' names and the dates of the scheduled appointments." (Indictment at ¶ 94.) From this conduct it is clear that Schlifstein entered the speakers program knowing the full scope of the scheme. In contrast, while Goldstein ultimately recognized that Insys was in essence paying him to prescribe Subsys, there is no evidence to support the allegation that Goldstein started in the speakers program with the intent on violating the law.

Moreover, unlike Goldstein, Schlifstein tried to get other doctors to join the criminal conspiracy. As noted in the indictment, Schlifstein "repeatedly lobbied [Insys] employees and executives . . . to assign him more speaker programs" and "often emphasized that he deserved credit for persuading other doctors to prescribe [Subsys]." (Id. at ¶ 99.) To get more speaker fees, Schlifstein bragged to Insys that he had "'talked to' three other doctors -- including [co-defendant] Alexandru Burducea …-- 'who are all writing now.'" (Id. at ¶ 100.) There is no evidence that Goldstein encouraged other doctors to join Insys' criminal scheme.

Despite these distinctions, the government has stated that it believes Goldstein is more culpable than Schlifstein. (See Schlifstein Sentencing Tr. at 36.)  This is undoubtedly based on the argument that Goldstein received more money from Insys

($196,000 v. $127,000) and prescribed more Subsys than Schlifstein. We respectfully note that these figures are merely a reflection of the fact that Goldstein joined the speaker program nearly a year before Schlifstein did (April 2013 v. March 2014).

Moreover, although the government believes Goldstein is more culpable, Insys itself ostensibly viewed Schlifstein as more valuable to the company. Notably, Schlifstein was more valuable to Insys as a speaker, as reflected by the fact that his speaking fees started at $2,400/speech in March 2014 and were increased to $3,000/speech in April 2014. (Indictment at ¶ 95.) Being less valuable to Insys, Goldstein was initially paid $1,000/speech in May 2013, before being raised to $1,600/speech in October 2013 and finally $2,200/speech in March 2014 (Indictment at ¶¶ 66, 69, 78.)

Furthermore, as demonstrated above, Schlifstein entered the speaker program knowing that his speaking fees were exclusively tied to his Subsys prescriptions. Consequently, nearly all (if not all) of his speaker fees were tied to the criminal scheme. Goldstein, on the other hand, did not join the speaker program to break the law. Accordingly, not all of his speaker fees are tied exclusively to the criminal scheme. For these reasons, we submit that Goldstein is deserving of a lesser sentence than Schlifstein.

We also note the Probation Department supports giving Goldstein a lower sentence than Schlifstein. Specifically, the Probation Department recommends a 30-month sentence for Goldstein (on a Guidelines range of 57-60 month) despite recommending a 36-month sentence for Schlifstein (on a Guidelines range of 46-57 months). Whether the Probation Department believes that Goldstein is less culpable than Schlifstein or that Goldstein's family circumstances are more severe, the discrepancy in sentencing recommendations resolves any sentencing disparity issues.[10]

We further note that a 15-month sentence would be consistent with sentences issued in the District of Massachusetts against the Insys executives and employees who were the main orchestrators of the criminal scheme. We ask the Court to consider the following sentences:

---

[10] To the extent the government argues that Goldstein is more culpable than Schlifstein because Goldstein was also charged with Aggravated Identity Theft (Count 4 in the indictment), this is a distinction without a difference. Count 4 is tied to the allegation that Goldstein "at times helped forge and falsify sign-in sheets" for his speaker programs. (Indictment at ¶ 36(b).) Although not charged in Count 4, Schlifstein's conduct was very similar to Goldstein's in that Schlifstein is alleged to have known that "sign-in sheets for his Speaker Programs were being forged and falsified," and that Schlifstein, at times, "instructed his assigned sales representative to have employees from [his medical office] sign sign-in sheets for Speaker Programs they had not attended." (Id. at ¶ 36(d).)

| Defendant | Role at Insys | Guidelines | Recommendation | Sentence |
|---|---|---|---|---|
| John Kapoor | Founder/Exec. Chairman | 262-327 mos. | 180 mos. | 66 mos. |
| Michael Gurry | VP of Managed Markets | 262-327 mos. | 132 mos. | 33 mos. |
| Joseph Rowan | Regional Sales Director | 324-405 mos. | 120 mos. | 27 mos. |
| Richard Simon | National Director of Sales | 262-327 mos. | 132 mos. | 33 mos. |
| Sunrise Lee | Regional Sales Director | 262-327 mos. | 72 mos. | 366 days |
| Michael Babich | Chief Executive Officer | 188-235 mos. | 66 mos. | 30 mos. |
| Alec Burlakoff | VP of Sales | 188-235 mos. | 60 mos. | 26 mos. |

These sentences are significant when compared to the Guidelines sentence that the government will recommend in this case against Goldstein. Counsel appreciates that Goldstein is a doctor and should have known better; however, there is no justifiable reason to sentence Goldstein to a 60-month sentence (which is only 6 months less than John Kapoor's sentence, who was Insys' founder and gained the most from the scheme) or even to a sentence in the 26-33 month range of these defendants who orchestrated and profited the most from Insys' criminal scheme.

Additionally, Goldstein's sentencing fits into the context of this case as well as the efforts of the Department of Justice nationwide to curtail and appropriately prosecute the abuse and misuse of opioids. In this regard, it is fair to comment that the sentences administered by the District of Massachusetts for the Insys executives and

employees who deviously masterminded the overarching criminal scheme in this case, and who enjoyed the lion's share of the profits, were roughly between one-third and one-quarter of the sentences called for by the Guidelines. This is true even for those executives who did not cooperate in the government's investigation.

Lastly, a 15-month sentence would meet the need for general deterrence[11] in this case. First, Goldstein is going to prison. This sends the message to other similarly situated doctors that this is a serious crime that carries serious penalties. Second, many other doctors—including Goldstein's co-defendants—have been sentenced to prison. These prison sentences further emphasize the seriousness consequences in store for a doctor or other healthcare professional who commits a similar crime.

To the extent the government believes that 15 months in prison is not enough of a general deterrent, counsel has two responses: (1) those viewing this sentence will appreciate that it is unique to Goldstein and based on an individualized assessment of his character and his personal family circumstances; and (2) a 15-month sentence is 15 more months in prison than any Johnson & Johnson or Purdue Pharma executive spent in prison for their roles in fueling the opioid epidemic.

---

[11] Considering Goldstein's character (as detailed in this Sentencing Memorandum and accompanying letters) and the fact that he is no longer a doctor, the government would be hard pressed to argue that there is a need for specific deterrence in this case.

## IV.   CONCLUSION

For the reasons set forth above, a sentence of 15 months is a fair and reasonable sentence given the specific Section 3553(a) factors of this case.

Dated: February 27, 2020

Marc Agnifilo
Jacob Kaplan
Brafman & Associates P.C.