

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One St. Andrews Plaza*
*New York, New York 10007*

March 11, 2020

**By ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re:  <u>United States</u> v. <u>Jeffrey Goldstein</u>, 18 Cr. 217 (KMW)

Dear Judge Wood:

The Government respectfully submits this letter in connection with the sentencing of defendant Jeffrey Goldstein ("the defendant" or "Goldstein"), which is scheduled for 11:00 a.m. on Wednesday, March 18, 2020. As stipulated in the defendant's plea agreement and calculated by the Probation Department, the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") sentencing range applicable to the defendant is 57 to 60 months' imprisonment. For the reasons discussed below, the Government respectfully submits that a sentence within the Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Goldstein is easily the most culpable of the four defendants in this case who pled guilty before trial for agreeing to accept bribes from Insys Therapeutics ("Insys") in exchange for prescribing Insys's fentanyl-based drug, Subsys. Of the four, Goldstein—by far—collected the most from Insys in bribes and prescribed the most Subsys, reflecting his longer and more active participation in the scheme. But Goldstein would rank first on the culpability list even if all four defendants prescribed and were paid the same amounts. As detailed below, Goldstein, even more than the others who entered guilty pleas, schemed to leverage his power to prescribe expensive and dangerous medications for personal gain. A substantial sentence within the Guidelines range of 57 to 60 months' imprisonment is therefore warranted.

I.     <u>Offense Conduct</u>

As detailed in the Presentence Investigation Report dated January 8, 2020 ("PSR"), Goldstein, a doctor of osteopathic medicine, accepted bribes and kickbacks from Insys Therapeutics ("Insys") in exchange for prescribing Insys's fentanyl-based drug, Subsys. Specifically, Goldstein collected $196,000 in purported speaker fees from Insys from June 2013

to December 2015. (PSR ¶ 61). In return, he prescribed enough Subsys to account for more than $6.8 million in net sales for Insys.

    A.    <u>Subsys and the Insys Speakers Bureau</u>

Fentanyl is a synthetic opioid approximately 50 to 100 times more potent than morphine. It is classified as a Schedule II controlled substance under the Controlled Substances Act, meaning that it has a high potential for abuse. (PSR ¶ 36).

In January 2012, the U.S. Food and Drug Administration (the "FDA") approved Subsys, a fentanyl spray administered sublingually (i.e., under the tongue), for the management of breakthrough pain in cancer patients who were already receiving and tolerant to opioid therapy for their underlying persistent cancer pain. The Subsys label expressly warned against prescribing the drug to patients who were not already opioid tolerant, "[d]ue to the risk of fatal respiratory depression." In March 2012, Subsys entered the commercial market. (PSR ¶ 35).

Unlike some fentanyl-based medications, such as transdermal patches, Subsys is in a category of drugs known as Transmucosal Immediate Release Fentanyl ("TIRF") products, which are rapid-onset opioids designed to treat breakthrough pain in opioid-tolerant adults with cancer. Because of the risk of misuse, abuse, and addiction associated with TIRF products, including Subsys, practitioners must enroll in a mandated FDA program known as the Transmucosal Immediate Release Fentanyl Risk Evaluation and Mitigation Strategy program (the "TIRF REMS Program") and complete required training and testing in order to prescribe Subsys and other TIRF products for outpatient use. Patients, too, must enroll in the TIRF REMS Program in order to be prescribed TIRF products, including Subsys. (PSR ¶ 37).

In August 2012, Insys established the Insys Speakers Bureau, a roster of doctors and other health care providers paid purportedly to provide educational presentations, known as speaker programs, about Subsys. Rather than recruit potential speakers based on their qualifications as educators, Insys targeted speakers who would be willing to prescribe Subsys in large volumes. Insys executives instructed sales representatives to focus their time and resources on a few select doctors and provide them with lucrative speaker fees, among other benefits, in exchange for prescribing high quantities of Subsys. After the Speakers Bureau launched, Insys executives tracked and circulated statistics regarding speakers' prescribing habits. For a time, Insys calculated each speaker's "ROI"—return on investment—by dividing the sales generated from the practitioner's Subsys prescriptions by the amount Insys had paid that practitioner in speaker fees. (PSR ¶¶ 24, 52).

    B.    <u>Goldstein's Participation in the Conspiracy</u>

Goldstein, a doctor of osteopathic medicine, was certified in emergency medicine. Together with codefendant Todd Schlifstein, he owned and operated a medical practice on the Upper East Side beginning in 2009. In addition to seeing pain management patients, the business included a "medical spa" devoted primarily to cosmetic procedures. (PSR ¶¶ 29-30, 140).

Hon. Kimba M. Wood
March 11, 2020
Page **3** of 11

    *1.    Goldstein joins the conspiracy in 2013*

On March 27, 2013, Goldstein attended an Insys speaker dinner led by codefendant Gordon Freedman and attended by Jonathan Roper, who had recently been hired as an Insys sales representative covering Manhattan, and Jeffrey Pearlman, an Insys sales representative who had recently been promoted to a management role. (PSR ¶ 62). During the trial of Gordon Freedman, Pearlman testified that Freedman "did not describe Subsys" or give an educational presentation during the dinner; instead, he spoke with Goldstein about the Insys Speakers Bureau "and the benefits of being part of the speaker program." (Trial Transcript from *U.S. v. Freedman*, 18 Cr. 217 (KMW) ("Trial Tr.") at 161-62, 226-27). After that dinner, Roper visited Goldstein's office and raised the possibility of nominating Goldstein to the Speakers Bureau. (PSR ¶ 62).

Goldstein was already familiar with Subsys and its potential benefits because Pearlman had been giving him marketing materials and details about various studies for months. (Trial Tr. 227). That educational information about Subsys had little impact on Goldstein's treatment decisions: Before March 28, 2013, Goldstein prescribed Subsys to only one patient. In contrast, the prospect of becoming a paid speaker for Insys had an immediate effect on Goldstein's prescribing habits: From March 28, 2013, through April 2, 2013, Goldstein prescribed Subsys to six new patients. (PSR ¶ 62).

Pleased with Goldstein's sudden eagerness to prescribe Subsys, Roper nominated Goldstein to the Insys Speakers Bureau on April 12, 2013. (PSR ¶ 63; Trial Tr. 358-59). In May 2013, Goldstein signed an agreement with Insys promising him a fee of $1,000 per speaker program. (PSR ¶ 63). Meanwhile, Goldstein's Subsys prescriptions continued to rise. Goldstein, who had written just eight Subsys prescriptions before April 2013, prescribed Subsys 97 times from April 2013 through September 2013. During the same period, he was the designated speaker at 12 programs, for which he collected total fees of $12,000. (PSR ¶ 64).

In October 2013, Goldstein attended an Insys training program for speakers in Arizona, where he partied with Insys executives and entered into a new agreement that increased his per-program speaking fee to $1,600. (PSR ¶ 65). Based on their interactions with Goldstein in Arizona, Insys executives expected his Subsys prescribing to increase. Sunrise Lee, an Insys sales executive, wrote to Alec Burlakoff, the company's Vice President of Sales, that "[a]fter meeting with Dr. Goldstein this past week," she was "confident that we will gain additional business from him." (Indictment ¶ 70). Lee's optimism was well-founded: Goldstein prescribed Subsys to three new patients in his first week back from Arizona, and he continued to accelerate his Subsys prescribing in the months that followed. Whereas Goldstein wrote 54 Subsys prescriptions during the third quarter of 2013, he prescribed Subsys 85 times in the fourth quarter, a period when he also received $11,000 in fees for being the designated speaker at eight programs. (PSR ¶¶ 66-67).

In addition to paying Goldstein lucrative speaker fees, Insys showered Goldstein benefits to reward him for prescribing Subsys in volumes and induce him to prescribe even more. In 2013, for example, Insys paid $595.74 for Roper, Goldstein, and their wives to eat dinner at a Connecticut casino in May; $592.75 for Roper and Goldstein to eat at an Atlantic City casino in June; approximately $2,000 for a nightclub outing for Goldstein in July; more than $4,000 at a strip club for a private room, alcoholic drinks, and lap dances for Goldstein and Schlifstein in October 2013;

Hon. Kimba M. Wood
March 11, 2020
Page **4** of **11**

and more than $2,000 for Goldstein's office Christmas party in November or December. (PSR ¶ 68). None of those events related whatsoever to educating others about Subsys, and none of the valuable benefits Insys provided to Goldstein were reported to Centers for Medicare and Medicaid Services ("CMS") as required by the Physician Payments Sunshine Act, which went into effect in August 2013.

Cognizant of his status as one of the nation's top Subsys prescribers—he even requested copies of internal Insys reports tracking physicians' prescribing habits—Goldstein sought to extract other advantages from Insys. In late 2013, Goldstein informed Roper and Burlakoff that he was interested in the restaurant business, prompting Burlakoff to take steps to introduce Goldstein to Insys's founder and majority shareholder, John Kapoor, who also owned a restaurant chain ("Restaurant Chain-1").[1] Goldstein subsequently emailed Kapoor and a senior manager of Restaurant Chain-1 and expressed his interest in opening a Restaurant Chain-1 location in Manhattan. Goldstein thereafter forwarded his correspondence with Kapoor to Burlakoff, who forwarded the messages to Insys's CEO, Michael Babich. Burlakoff write that he hoped Kapoor was "serious" and was not going to "waste Dr. Goldstein's time and effort" because "Dr. Jeff Goldstein is a valuable gem!" Babich responded that Kapoor "just left for overseas," but "I can ensure he calls Jeff when he gets back"—a message Burlakoff forwarded to Goldstein, stating "FYI." Goldstein was thus fully aware that Insys's highest-ranking executives were taking steps to ensure that the company's founder worked with Goldstein on a restaurant venture unrelated to Insys's pharmaceutical business.

>    *2.    Goldstein extracts more money from Insys in 2014*

In 2013, Goldstein was a paid speaker not only for Insys, but also for the manufacturer of a competitor TIRF product ("TIRF Product-1"). He also wrote prescriptions for TIRF Product-1, albeit not to the same extent as he prescribed Subsys. In early 2014, Goldstein used his relationship with the competitor as leverage to extract higher fees and other benefits from Insys.

Insys's management, particularly Alec Burlakoff, began complaining to Roper in early 2014 that Goldstein was prescribing TIRF Product-1 to too many patients. Roper relayed the complaints to Goldstein, and in late January 2014, Roper asked Goldstein to switch patients to whom he had prescribed TIRF Product-1 to Subsys. Goldstein agreed to do so. Roper relayed the news to his superiors at Insys: "Goldy went to collect a check . . . , assured me all [TIRF Product-1] pts will be switched back to subsys." (Indictment ¶ 75).

Goldstein kept his promise to Insys: From January 30, 2014, through February 12, 2014, for example, he prescribed Subsys to four patients to whom he had previously prescribed TIRF Product-1. Accordingly, Goldstein's prescriptions for TIRF Product-1 plummeted. He prescribed TIRF Product-1 11 times in December 2013, but only five times each in January 2014, five times in February 2014, and twice in March 2014. Goldstein's Subsys prescriptions, meanwhile, continued to climb. Goldstein prescribed 8,027,000 micrograms of Subsys during the first quarter of 2014, a 31 percent increase from the prior quarter. (PSR ¶¶ 71-74).

---

[1] Kapoor was convicted at trial in the District of Massachusetts for his role in the Insys bribery scheme. He was sentenced principally to 66 months' imprisonment.

Hon. Kimba M. Wood
March 11, 2020
Page **5** of **11**

Insys rewarded Goldstein's loyalty. On March 21, 2014, the company gave Goldstein a new contract that increased his speaking fee to $2,200 per program. (PSR ¶ 74).

The experience only emboldened Goldstein to use the threat of helping an Insys competitor to his personal advantage. On March 28, 2014, Goldstein emailed Roper a copy of a consulting agreement he had entered into with TIRF Product-1's manufacturer ("TIRF Manufacturer-1"). Roper forwarded the email to Burlakoff. Goldstein's relationship with TIRF Manufacturer-1 enraged Burlakoff and triggered a bitter argument. On April 3, 2014, Burlakoff sent Goldstein a series of text messages informing him, among other things, that Burlakoff had learned about Goldstein's agreement with TIRF Manufacturer-1, that Insys was in "full litigation/bulldozer mode with these thieves," and that Burlakoff would "take down every single physician associated with [TIRF Manufacturer-1]." Goldstein responded that "my belief has always been that Subsys is the best," but he added, "take the dinners, I can[']t be bought but you lost an asset for your company because your an ass." Burlakoff replied, "[W]e work on loyalty here pal ... we don't buy business or doctors, it's sad that you even think that way. If our measly couple hundred grand can buy you...." Goldstein then responded that he would no longer be prescribe or be a paid speaker for any TIRF product, including TIRF Product-1 and Subsys, and that if "patients want to stay on I will try to direct them to a doctor who's prescribing if they want to stay on the medication." (PSR ¶ 75).

Rather than walk away, Goldstein doubled down, accepting more money from Insys and continuing to prescribe large volumes of Subsys in exchange for bribes. Despite claiming that he would no longer prescribe or be a paid speaker for any TIRF product, Goldstein quickly contacted the Insys executive who coordinated the Insys Speakers Bureau to say he had been "fired" by Burlakoff. In response, Insys offered Goldstein additional speaker programs, which Goldstein readily accepted. In addition, following the argument with Burlakoff, Goldstein sent Roper a purported $9,800 invoice—which Goldstein knew was fraudulent—for a security system that Goldstein claimed he installed in his home because he was scared of Burlakoff. Insys thus sent Goldstein a check for $9,800 for a non-existent security system. (PSR ¶ 76).

The $9,800 payment and the additional paid speaker programs appeased Goldstein. He collected $63,800 for 29 speaker programs from April through September 2014, and he continued to prescribe Subsys in high volumes. (PSR ¶ 76). In the fourth quarter of 2014, Goldstein's prescriptions rose even further. He prescribed approximately 11,662,000 micrograms of Subsys from October through December 2014, an increase from the prior quarter of almost 2,500,000 micrograms. He was the sixth-highest prescribe of Subsys nationally in that quarter, accounting for more than $800,000 in net sales to Insys during those three months. He was also Insys's fifth-highest-paid speaker in 2014, collecting fees totaling $110,600. (PSR ¶ 77).

Practically none of Goldstein's patients, however, had cancer. From a medical perspective, it made little sense that a doctor with his experience, credentials, practice focus, and patient population would rank among the top prescribers of one of the most powerful commercially available fentanyl products.

Hon. Kimba M. Wood
March 11, 2020
Page **6** of 11

         3.     *The sham nature of Goldstein's speaker programs*

The vast majority of Goldstein's so-called speaker programs were not educational and did not entail any "speaking." He was intoxicated from alcohol or drug use at multiple dinners where he was the designated speaker. Goldstein and Insys employees used marijuana in his office before some events, and he used cocaine in the restaurant bathroom during others. (PSR ¶ 60). At times, Goldstein did not even stay for his own speaker dinners. Instead, he would order takeout at the restaurant and leave. That practice was so routine that before a dinner on September 1, 2014, Goldstein sent his sales representative a text message asking, "Is dinner take out or we expecting peeps?" (PSR ¶ 58). Many of the speaker dinners Goldstein did attend were predominantly social affairs unrelated to Subsys. At times, Goldstein invited individuals who were not in the medical field and had no reason to attend a purportedly educational lecture about Subsys. For example, Goldstein invited his accountant to one speaker dinner, much of which he and the accountant spent discussing Goldstein's finances. (PSR ¶ 55). And a friend of Goldstein's who worked as a podiatrist, and therefore had no medical basis to prescribe Subsys or any other TIRF products, repeatedly attended Goldstein's speaker dinners. (PSR ¶ 56).

Sign-in sheets for Goldstein's speaker programs were often forged and falsified with names and purported signatures of people who had not, in fact, attended. The forgeries created the illusion that Goldstein had given educational presentations to an appropriate audience of health care professionals, and that everyone was obeying a $125 cap on food and drinks per attendee. Goldstein knew that sign-in sheets for his speaker programs were being forged and falsified, and he sometimes gave Insys sales representatives identifying information of healthcare professionals who had not attended his speaker dinners so that information could be entered in sign-in sheets without the healthcare professionals' authorization. (PSR ¶ 57).[2]

In the first half of 2015, amid reports that Insys was being investigated regarding, among other things, its Speakers Bureau, Goldstein grew concerned that the sham nature of his speaker dinners might be exposed. He did not, however, begin conducting legitimate educational events. Instead, he instructed his sales representative at the time to place an iPad on the table during his dinners in order to create the false appearance that he was using the iPad to present educational slides. (PSR ¶ 79).

         4.     *Goldstein's prescriptions decline when he stops getting paid in 2015*

Beginning in the third quarter of 2015, Insys significantly decreased the number of speaker programs it hosted nationally, including the programs allocated to Goldstein. Whereas Insys had paid Goldstein $24,200 to conduct 11 speaker programs in the second quarter of 2015, it allocated Goldstein only one program, for which it paid him $3,700, in the third quarter of 2015. During the same period, Goldstein's Subsys prescriptions declined, as well. Whereas Goldstein prescribed Subsys 91 times during the second quarter of 2015, he prescribed it only 64 times during the third quarter. After December 2015, Goldstein was not allocated any speaker programs, and his Subsys prescriptions continued to decrease. He wrote approximately 37 Subsys prescriptions during the

---

[2] As Fernando Serrano testified during Gordon Freedman's trial, Goldstein sometimes signed sign-in sheets for speaker dinners he had not attended. (*See, e.g.,* Trial Tr. at 604-05).

Hon. Kimba M. Wood
March 11, 2020
Page **7** of 11

first quarter of 2016, and just seven Subsys prescriptions during the last quarter of 2016. (PSR ¶ 80).

## II.     <u>Procedural History and Sentencing Guidelines Calculation</u>

Goldstein was arrested on March 16, 2018, for offenses alleged in Indictment 18 Cr. 217 (KMW) (the "Indictment"). (PSR ¶ 85). On August 16, 2019, he pled guilty to Count One of the Indictment, charging him with conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371. (PSR ¶ 12).

Goldstein pled guilty pursuant to a plea agreement in which the parties stipulated that his offense level is 25 and that his Criminal History Category is I, for a recommended Guidelines range of imprisonment of 57 to 60 months and a recommended fine range of $20,000 to $200,000. (PSR ¶ 13). The Guidelines offense level of 25 results from a base offense level of 8, *see* U.S.S.G. § 2B4.1(a); an 18-level increase because the value of the improper benefit Goldstein conferred on Insys—i.e., the net value to Insys of the Subsys prescriptions Goldstein wrote in exchange for speaker fees—exceeded $3.5 million but did not exceed $9.5 million,[3] *see* U.S.S.G. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(J); a 2-level increase because Goldstein, a doctor, abused a position of public or private trust in a manner that significantly facilitated the commission of the offense, *see* U.S.S.G. § 3B1.3; and a 3-level reduction for Goldstein's acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a)-(b).

Goldstein also signed a Consent Preliminary Order of Forfeiture in which he agreed to forfeit $196,000, representing the bribe proceeds disguised as speaker fees that Goldstein collected from Insys.[4]

In the PSR, the Probation Department concurs with the parties' Guidelines calculations (PSR ¶¶ 95-105, 153) and recommends that the Court sentence Goldstein principally to 30 months' imprisonment (PSR at 36).

## III.     <u>The Court Should Impose a Prison Sentence Within the Guidelines Range</u>

A prison sentence for a term within the Guidelines range of 57 to 60 months is warranted in this case based on the sentencing factors the Court must consider.

The Guidelines still provide important guidance following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The Guidelines provide

---

[3] Goldstein's prescriptions accounted for net sales of Subsys totaling approximately $6,892,758.

[4] Goldstein is also jointly and severally liable for restitution to the federal healthcare programs that paid for the Subsys he prescribed. Goldstein's restitution obligation totals $3,916,426. The Court previously ordered defendants Schlifstein, Burducea, and Voudouris to submit responses to the Government's proposed restitution orders by March 25, 2020. (Dkt. 278). The Government respectfully proposes that Goldstein be required to respond on that same schedule.

Hon. Kimba M. Wood
March 11, 2020
Page **8** of **11**

the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which include, among other things, the nature and circumstances of the offense and the need to deter criminal conduct and promote respect for the law. *Id.* at 49-50 & n.6.[5]

    A.    <u>Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment</u>

Goldstein's violation of the Anti-Kickback Statute is especially egregious because it involved a highly addictive and dangerous narcotic. Subsys is one of the commercially available TIRF medications, a class of drugs far more potent than other opioids, including oxycodone and fentanyl patches. A single dose, if administered to someone who is not sufficiently opioid tolerant, could be lethal. The Guidelines do not account for the risk Goldstein's conduct caused to his patients and the public: the Guidelines range would be the same if Goldstein had taken kickbacks in exchange for prescribing or recommending more than $6 million worth of a particular brand of wrist brace, or aspirin.

Allowing bribes to influence any doctor's prescribing decision would be troubling. When the prescription decision involves a drug as potent as fentanyl, corrupt payments create an enormous hazard and public health risk. Goldstein accepted bribes in return for directing his patients to take one of the most potent painkillers that is available commercially. The sentence imposed must reflect the seriousness of that conduct.

Goldstein's conduct here is particularly egregious because the bribes did not merely cause Goldstein to favor Subsys over other TIRF drugs he otherwise would have prescribed. Rather, the corrupt payments induced Goldstein to prescribe Subsys to many patients who otherwise would not have received any potent and dangerous TIRF products whatsoever.

The chart in Paragraph 81 of the PSR, a copy of which is attached hereto as **Exhibit A**, is illustrative. It shows that Goldstein hardly ever prescribed TIRF products before 2013, when the prospect of being a paid Insys speaker spurred him to write a flurry of Subsys prescriptions. He subsequently prescribed a competitor TIRF product (for which he was a paid speaker), but not nearly to the degree that he prescribed Subsys. Then, when Goldstein stopped collecting speaker fees from Insys after 2015, his Subsys prescriptions plummeted, without any corresponding increase in other TIRF prescriptions.

---

[5] The factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, namely, the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

There was no material change in Goldstein's patient population that could explain this pattern. Few of his patients, if any, suffered from breakthrough cancer pain, the only condition the FDA approved Subsys to treat. Goldstein's sentencing submission attributes the 2014 increase in Subsys prescriptions in part to seeing additional patients previously treated by codefendant Todd Schlifstein. (*See* Def. Mem. 36-37). But the relationship between Goldstein's prescriptions and his speaker fees, as illustrated in the chart, is unmistakable.

Goldstein's shamelessly corrupt relationship with Insys and its employees makes his conduct particularly egregious. He had explicit conversations with an Insys manager in which he readily agreed to switch patients from a competitor drug to Subsys. He accepted thousands of dollars from Insys in meals, parties, club outings, and other perks unrelated to educating healthcare professionals or being a physician. Even relative to the non-educational speaker programs hosted by his codefendants, Goldstein's speaker dinners were a farce. And when Burlakoff made plain that Insys expected loyalty from Goldstein in exchange for the lucrative speaker fees, Goldstein demonstrated his commitment with more frequent and more powerful Subsys prescriptions.

B.    Need to Deter Criminal Conduct

A substantial sentence is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).

According to the CDC, drug overdoses killed more than 70,000 people in the United States in 2017, and more than two-thirds of those deaths involved opioids. *See* https://www.cdc.gov/media/releases/2018/p1221-complexity-drug-overdose.html (last visited March 11, 2020). This epidemic starts with prescribing physicians, like this defendant, whose decisions to prescribe highly addictive and potentially deadly medications were motivated by the prospect of financial gain or any other consideration besides a patient's best interests. The medical community follows these cases closely. A prison sentence at the high end of the Guidelines range would help send a strong message that accepting bribes in return for prescriptions will result in a substantial term of incarceration, particularly when the prescriptions are for dangerous and addictive products.

The challenges in investigating and deterring similar bribery schemes involving medical providers heighten the need for deterrence. The law does not prohibit financial relationships between pharmaceutical companies and physicians outright. Physicians are permitted, for example, to accept fees from pharmaceutical companies to conduct educational speaker programs. Conducted properly, those programs enable physicians to use their expertise and experience to teach other doctors about potentially beneficial treatments. Against this backdrop, it is difficult for law enforcement to detect whether a payment to a physician is legitimate or corrupt. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

When doctors let personal financial interests influence treatment decisions, patients pay the price in increased medical costs and increased health risks. A substantial sentence is needed to

deter health care providers from crossing the line, as Goldstein did, between collaboration and corruption.

       C.      <u>Goldstein's Sentencing Submission and Letter</u>

In his sentencing submission and his letter to the Court (*see* Def. Mem. Ex. 2 ("Goldstein Ltr.")), Goldstein appropriately highlights aspects of his personal circumstances, including a medical condition affecting his family, that he argues merit leniency. The Government does not doubt Goldstein's devotion to his family or the gravity of his relative's medical condition. Given the egregiousness of the offense conduct, however, those circumstances do not justify a below-Guidelines sentence, let alone the 15-month sentence requested by the defense.

Troublingly, Goldstein's letter also mischaracterizes and minimizes his conduct in ways that undermine his claims that he "fully understand[s]" the seriousness of his conduct and is "learning from the mistakes I have made." (Goldstein Ltr. 1). Four representations from his letter, in particular, warrant a response.

First, Goldstein writes that he did not entirely grasp "that I was part of something that was illegal" until Roper and Serrano were arrested in June 2016. (Goldstein Ltr. 1). As noted above, though, Goldstein learned during the first half of 2015 that Insys was under investigation and was so concerned that he began placing an iPad on the table during his dinners to create the illusion that he was giving educational presentations. (PSR ¶ 79). Goldstein further demonstrated his awareness that he was breaking the law in June 2015. That month, Schlifstein posted a photo from one of his own non-educational speaker dinners on social media. The photograph showed Schlifstein posing with four women who had no professional reason to attend an educational presentation regarding Subsys. Goldstein saw Schlifstein's public post on social media and erupted in anger. He texted his Insys sales representative at the time a message stating that the sales representative—who also worked with Schlifstein—was "putting myself, my practice you and your baby in danger." The "danger," of course, was that Schlifstein would expose the bribery scheme by publicizing the social nature of the purportedly educational speaker programs. Goldstein's response to the posting included a demand that Insys cancel a speaker dinner Goldstein was scheduled to conduct that evening. Insys did so, but Goldstein subsequently changed his mind and asked to reschedule it.

Second, Goldstein writes that he took his role "[a]s a doctor . . . very seriously," and insists that "[m]oney was never my true motivator." (Goldstein Ltr. 2). Goldstein's involvement in the Insys conspiracy demonstrates otherwise, of course—but that is not the only example. Goldstein sought to pit competing pharmaceutical companies against each other, including by entering into the consulting agreement with TIRF Manufacturer-1, then immediately informing Jonathan Roper he had done so and sending Roper a copy of his confidential agreement. In addition, one Insys sales representative recounted how Goldstein boasted that he bought shares in a small pharmaceutical company and planned to "write the shit out of" the company's drug—i.e., prescribe the drug in high quantities—to drive up the stock price. Goldstein thus exhibited a pattern of prioritizing financial gain over his duties as a physician.

Hon. Kimba M. Wood
March 11, 2020
Page **11** of 11

Third, Goldstein writes that he asked Insys "to remove certain questionable people from my service" because he thought doing so "would remove me from fault." (Goldstein Ltr. 3). Goldstein indeed ordered Insys to find him a new sales representative on multiple occasions, but never out of any concern about ethics or professionalism. In late 2015, Goldstein pressured Insys to hire one of his patients ("Patient-1") to replace his current sales representative. Insys complied with the request even though Patient-1 was wholly unqualified for the role. Patient-1's previous job was working as a strip club bathroom attendant, and Patient-1 was addicted to opioids— including Subsys—prescribed by Goldstein. Moreover, Patient-1 had both financial and personal ties to Goldstein. Patient-1 rented his home in upstate New York from Goldstein, supplied Goldstein with marijuana-laced treats, and routinely visited Goldstein's home to complete various chores, such as fixing Goldstein's audio-visual equipment. It was Patient-1 who, at Goldstein's direction, created the fraudulent invoice that Goldstein used to extract $9,800 from Insys as supposed "reimbursement" for a security system that Goldstein falsely claimed he installed to protect himself from Burlakoff. Given these facts, the notion that Goldstein directed Insys to make personnel changes "to remove certain questionable people from my service" is laughable.

Fourth, Goldstein writes that although "some" of the Insys speaker dinners he conducted did not include any educational presentation, he "was fully prepared to give the presentation on the medication each and every time." (Goldstein Ltr. 4). That is untrue. As noted in the PSR— without objection from the defense—Goldstein not only used cocaine and drank excessive alcohol during some of his speaker dinners, but also "used marijuana with [Insys] employees" at his office "before some Speaker Programs he led." (PSR ¶ 60). Plainly, someone high from marijuana cannot be "fully prepared" to educate medical professionals about a power and highly addictive opioid like Subsys. Moreover, the Government's multiyear investigation included interviews with numerous witnesses, including non-Insys employees, who attended Goldstein's speaker dinners. The witnesses' accounts established beyond doubt that the vast majority of Goldstein's speaker programs—not merely "some" of them—were not remotely educational.

## IV.   Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range of 57 to 60 months' imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
David Abramowicz / Noah Solowiejczyk
Assistant United States Attorneys
Southern District of New York
(212) 637-6525 / 2473

cc:   Defense counsel (by ECF)